**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 06-935 L** |
| | ) | **Judge George W. Miller** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR DOCUMENT PRESERVATION ORDER, CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER**

Dated: April 25, 2008

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Tel: (303) 844-1369
Fax: (303) 844-1350
Terry.Petrie@usdoj.gov

Attorney of Record for Defendant

OF COUNSEL:

ANTHONY P. HOANG
JARED PETTINATO
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663

TERESA E. DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227

SHANI N. WALKER
Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

## TABLE OF CONTENTS

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR DOCUMENT PRESERVATION ORDER, CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER . . . . . 1

I. BACKGROUND . . . . . 4

A. PROCEEDINGS IN THIS CASE . . . . . 4

B. PROCEEDINGS IN THE CASE OF KAW NATION V. UNITED STATES . . . . . 4

C. PRESERVATION PROCEDURES ALREADY IN PLACE . . . . . 7

II. ARGUMENT . . . . . 7

A. A DOCUMENT PRESERVATION ORDER IS NOT NEEDED . . . . . 7

1. Plaintiff Has Failed to Carry Its Burden to Establish A Need For A Document Preservation Order . . . . . 8

(A) Background . . . . . 8

(B) Plaintiff has Failed to Meet the Test Established in Laguna . . . . . 9

2. Sufficient Measures Are Already In Place to Provide Adequate Assurance That Documents Will Not Be Destroyed . . . . . 11

(A) Interior has Issued Numerous Directives to Ensure Preservation of Evidence . . . . . 12

(1) The Acting Deputy Solicitor's March 12, 2007 Departmental Memorandum . . . . . 13

(2) Interior Policy Memoranda Regarding the Movement of Inactive Records . . . . . 15

(3) Opening of the AIRR and Development of the Box Inventory Search System "BISS" . . . . . . . . . . . . . . . . . . 16

(4) Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

(5) Additional Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

(B) Department of the Treasury (Treasury) . . . . . . . . . . . . . . . . . . . . 19

(C) National Archives and Records Administration (NARA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

(D) Environmental Protection Agency (EPA) . . . . . . . . . . . . . . . . . . 20

B. PLAINTIFF'S PROPOSED DOCUMENT PRESERVATION ORDER IS FLAWED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. DEFENDANT'S PROPOSED DOCUMENT PRESERVATION ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

Capricorn Power Co., v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) . . . . 9

Chambers v. NASCO, Inc., 501 U.S. 32 (1991) . . . . 8

Kanemoto v. Reno, 41 F.3d 641 (Fed. Cir. 1994) . . . . 8

Pueblo of Laguna v. United States, 60 Fed. Cl. 133 (Fed. Cl. 2004) . . . . 8, 9

Treppel v. Biovail Corp., 233 F.R.D. 363 (S.D.N.Y. 2006) . . . . 9

Williams v. Mass. Mut. Life Ins. Co., 266 F.R.D. 144 (D. Mass. 2005) . . . . 9

## STATUTES

44 U.S.C. §§ 2108(a) & 2110 . . . . 20

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **SEMINOLE NATION OF OKLAHOMA,** **Plaintiff,** v. **THE UNITED STATES,** **Defendant.** | **Case No. 06-935 L** **Judge George W. Miller** |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR DOCUMENT PRESERVATION ORDER, CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER**

Defendant responds to the "Seminole Nation of Oklahoma's Motion for Document Preservation Order, Confidentiality Agreement and Protective Order" (hereinafter, "Motion for Document Preservation Order" or "Motion for DPO"), and respectfully requests the Court to deny it.[1] Plaintiff bears the burden to show that the document preservation order sought here is necessary, and that it would not be unduly burdensome. Plaintiff has not met its burden.

First, Plaintiff has not demonstrated that the order is necessary. Indeed, Plaintiff **cannot** establish that as a fact in light of the rigorous document retention practices, as well as the other extensive actions Defendant has taken to protect potentially relevant documents and to remove or

---

[1] The Court held a telephonic status conference with the parties on March 6, 2008, to discuss Plaintiff's motion. Among other things, the Court discussed the Plaintiff's request for a Confidentiality Agreement and Protective Order ("CAPO"). Defendant agreed that the entry of a CAPO would be appropriate and the parties agreed to undertake negotiations to see if the parties could stipulate to a CAPO that would be offered to the Court. Since then, Defendant has provided a suggested CAPO to Plaintiff. See Ex. 43. Given the parties' cooperative efforts to date, Defendant's Response does not address Plaintiff's proposed CAPO. If, however, the parties are unable to stipulate to a CAPO, Defendant respectfully requests the Court enter the version proposed by Defendant or provide Defendant the opportunity to file a separate response that addresses this component of Plaintiff's motion.

mitigate any significant risks that such documents will be damaged or destroyed.

Plaintiff has also failed to demonstrate that the proposed order is effective and not overbroad. To the contrary, the preservation – or more accurately – the discovery order Plaintiff requests is overly broad and places severe burdens on the agencies involved. For example, to comply with the proposed order would be so time consuming and labor intensive that it would be virtually impossible for the National Archives and Records Administration ("NARA") to do so, and it would severely curtail NARA's ability to work for other members of the public. Similarly, the demands placed on the Department of the Interior ("DOI") by the proposed order would detract from DOI's ongoing work for Plaintiff and its members, as well as for all other tribes which it serves. Moreover, Plaintiff's proposed order – which covers both active and inactive documents – would, if implemented, prevent DOI from moving inactive documents to the American Indian Records Repository ("AIRR") for indexing, archiving an safe and proper storage. Finally, the search for relevant records that would need to be undertaken by Treasury would involve high dollar costs, excessive time requirements, and a great drain on its resources.

Not only does Plaintiff's motion fail to establish a basis for the Court to issue a document preservation order, the order proposed by Plaintiff does not even truly address preservation issues. Instead the proposed order would dictate the actual production of materials, providing Plaintiff immediate authority to proceed with burdensome discovery that exceeds the scope permitted by the Rules of the Court of Federal Claims ("RCFC"). This is not the purpose for preservation orders and this Court should not countenance Plaintiff's attempt to avoid traditional discovery procedures through the guise of a mislabeled order.

At the outset, the Government, in part through its various departments, including the

Departments of the Interior and Treasury (hereinafter "Interior" and "Treasury"), represents that it has in other tribal trust cases demonstrated a commitment to the preservation of tribal trust documents. See, e.g., Exhibit ("Ex.") 1, Memorandum of Lawrence Jensen, Deputy Solicitor, dated March 12, 2007. This commitment and demonstrated performance outweighs any argument Plaintiff could make to show that an additional, separate retention and preservation order is necessary, independent of the preservation commitment already required by the RCFC. Further, the vast majority of the provisions in Plaintiff's proposed document preservation order ("PDPO") do not address preservation at all. Rather, the PDPO is overly burdensome in that it sets forth a schedule requiring that the Government simultaneously make available potentially relevant documents, both active and inactive, in a large number of records sites involving many different federal agencies. Indeed, it essentially holds those documents captive until all of the PDPO's conditions regarding the timing, nature and extent of Plaintiff's document review have been satisfied, in complete disregard of the carefully considered and developed policies and practices of the federal agency responsible for the records, and beyond the scope of traditional rules of discovery.

Plaintiff simply has not demonstrated that any document collections are exposed to real danger of destruction. Nor can it do so, based on any facts of which Defendant is aware. In addition, Plaintiff's PDPO is a cumbersome discovery order, utilizing a sledgehammer to gain access to agency documents when good faith negotiations could potentially resolve issues between the parties.

Defendant is willing to consider negotiation of a discovery stipulation executed by the parties covering relevant document collections or documents which may lead to relevant

evidence. Defendant is equally willing to reiterate its commitment, and the commitment of its agencies, to the preservation of Seminole Nation documents. However, Defendant does not believe that a wholesale substitution of the draconian discovery provisions of the proposed order for the discovery tools provided under the RCFC (particularly in a document identified as a "Document Preservation Order") is either appropriate or equitable. Also inappropriate is any attempt by Plaintiff to substitute its own judgment for the judgment of the agencies involved here, with respect to the proper document management processes.

## I. BACKGROUND

### A. PROCEEDINGS IN THIS CASE

Plaintiff's counsel filed the initial complaint in this case on December 29, 2006. Docket ("Dkt.") #1. An amended complaint was filed on March 23, 2007. See Dkt. ##9, 10. Early on, the parties filed a joint motion to stay temporarily the litigation. Dkt. #5. The Court granted that motion on February 27, 2007. Dkt. #6. A year later, on February 27, 2008, the parties filed a joint status report informing the Court of Plaintiff's desire to resume the active litigation of the case and its intention to file a motion for a protective order. Dkt. #21. On March 3, 2008, Plaintiff's filed the instant motion. Dkt. #22.

### B. PROCEEDINGS IN THE CASE OF KAW NATION V. UNITED STATES

The law firm that represents Plaintiff in this case also represents plaintiffs in several other tribal trust cases before both the Court of Federal Claims and the federal district courts of Oklahoma.[2] Due to Plaintiff counsel's identical approach to preservation/discovery in Kaw

---

[2] Other cases presently before the CFC include Kaw Nation of Oklahoma v. United States, No. 06-934 L (Judge Allegra); Otoe-Missouria Tribe of Oklahoma v. United States, No. 06-937 L (Senior Judge Smith); Miami Tribe of Oklahoma v. Kempthorne, et al., No. 08-04 (Judge

Nation of Oklahoma v. United States, No. 06-934 L (one of counsel's other cases), the proceedings in that case concerning the preservation/discovery order are particularly germane to the motion now before the Court.

In Kaw Nation, before either party had signaled any interest in seeking a preservation order, the Court announced its intention to enter a document preservation order similar to one issued by the Court in Navajo Nation v. United States, No. 06-cv-00945 L. See Case No. 06-934 L, Dkt. # 17 (preliminary scheduling conference order), #18 at 1 (Plaintiff Kaw Nation submission of proposed protective orders per the Court's direction), #19 at 1 (Defendant United States submission regarding proposed orders per the Court's instruction). The Court subsequently entered a document preservation order that closely tracked the order issued in Navajo Nation. Cf., Exs. 2 (Order filed September 10, 2007 in Navajo Nation) and 3 (Document Preservation Order filed October 24, 2007 in Kaw Nation). Very little of either order actually addresses the defendant's obligation to preserve documents. See Sections 1 ("General Obligation to Preserve"), 4 ("Compliance") and 5 ("Definitions") of Exs. 2 and 3. Rather, the overwhelming majority of the contents of these two orders address the process by which discovery will be undertaken. See Sections 2 ("Document Inspection and Production") and 3 ("Indexation and Inventorying") of both Exs. 2 and 3.

One key difference between the two orders, of extreme importance here as well, concerns

---

Baskir); and Tonkawa Tribe of Indians of Oklahoma v. United States, No. 06-938 (Senior Judge Futey). Cases handled by the law firm presently before the federal district courts of Oklahoma include Seminole Nation of Oklahoma v. Kempthorne et al, No. 06-cv-00556 (E.D. Ok); Kaw Nation of Oklahoma v. Kempthorne, et al., No. 06-cv-01437 (W.D. Ok); Otoe-Missouria Tribe of Oklahoma v. Kempthorne, et al., No. CIV-06-1436 (W.D. Ok); and Tonkawa Tribe of Indians of Oklahoma v. Kempthorne, et al., No. CIV-06-1435 (W.D. Ok).

a provision in the Kaw Nation order that required all documents (other than those located at the AIRR) from all Government offices – no matter where located or how impractical or burdensome – to be provided for inspection in Oklahoma close to where Plaintiff resides. In contrast, the Navajo Nation Order did not require defendant to provide all documents – other than those located at the American Indian Records Repository ("AIRR") in Lenexa, Kansas – for inspection ~~to~~ at a single locale close to plaintiff. See Ex. 2 at Sections 2(a) (addressing procedures for production of documents maintained at Government offices located close to plaintiff) and 2(f)(addressing procedures for making documents available at all other Government offices than those identified in paragraph 2(a)). Cf., Ex. 2 at paragraphs 2(f) and 2(f)(1) with Ex. 3 at paragraphs 2(f) and 2(f)(1). The parties brought their disagreement over this language to the Kaw Nation court's attention, and the court subsequently modified the document preservation order. See Ex. 4, Order filed in Kaw Nation. However, even as the parties now attempt to conduct discovery, it is likely they will need to seek the Court's assistance again in connection with this language.

The history of this issue in Kaw Nation is important here because Plaintiff has proposed an order strikingly similar to the Kaw Nation hybrid preservation/discovery order. Plaintiff, with no factual showing of any need for a **preservation** order, has now introduced into this case the same **discovery** issue presented in Kaw Nation – namely, Plaintiff's quest to have all documents from Government offices no matter where located (with the exception of documents maintained in the AIRR) shipped to the Bureau of Indian Affairs Office in Wewoka, Oklahoma, without regard to the federal agencies' existing retention procedures, the burden that would be imposed if such a move were required, or the need for those documents in any other tribal trust case. See

Plaintiff's Motion for DPO at Exhibit A, paragraph 2(b)(iii).

C. PRESERVATION PROCEDURES ALREADY IN PLACE

Plaintiff's motion for a DPO has not occurred in a vacuum, one in which the landscape is marked by an absence of federal agency efforts to preserve documents. Rather, Plaintiff makes this request in exactly the opposite environment. Both by dint of the general obligation a party in litigation incurs to preserve documents and by virtue of concerted and intense efforts, federal agencies holding materials potentially related to the Indian Tribal Trust cases, including Plaintiff's documents, have instituted procedures to ensure documents are not destroyed and established reporting mechanisms in the event of any inadvertent mishap.

Based upon their understanding of Plaintiff's broad allegations, four federal agencies to date believe they may possibly possess documents potentially relevant to this case and have taken steps to safeguard those documents. As explained below in detail, for three of these agencies (the Department of the Interior, the Department of the Treasury, the National Archives and Records Administration), the actions taken for purposes of this litigation come on the heels of procedures already well in place for Indian Trust litigation generally.[3] The fourth agency, the Environmental Protection Agency, is relatively new to this litigation but it too has taken appropriate steps.

## II. ARGUMENT

A. A DOCUMENT PRESERVATION ORDER IS NOT NEEDED

---

[3] Through the joint status report submitted every 90 days pursuant to the order dated April 13, 2007 (Dkt. #14), the Court has received an idea of the existence and breadth of certain Tribal trust accounting and trust mismanagement cases that have been filed in this Court and in various United States District Courts.

1. Plaintiff Has Failed to Carry Its Burden to Establish A Need For A Document Preservation Order

(A) Background

As in the present case, plaintiffs in Jicarilla Apache Nation v. United States, No. 02-25L, and Pueblo of Laguna v. United States, No. 02-24L, filed motions seeking entry of a document preservation order. Defendant opposed plaintiffs' motions based, in part, on two specific grounds: (1) that the Court lacked jurisdiction to enter the proposed order because it was in large part a disguised injunctive order; and (2) that plaintiff failed to establish it was entitled to the entry of the requested injunctive relief. See e.g., Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order ("Def.'s Opp."), filed November 5, 2003; Pueblo of Laguna v. United States, supra.[4]

On March 19, 2004, the Court granted plaintiffs' motions and found that it had jurisdiction to issue an DPO. In doing so, the Court relied in large part on the inherent powers of the Court to preserve material evidence and to take appropriate action to control and schedule discovery under the RCFC 16. See Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 136-138 (Fed. Cl. 2004). However, the Court also recognized that its inherent authority should be used

[4] In Jicarilla and Laguna, defendant pointed out that the agencies potentially affected by the proposed DPO already had devised and implemented sound procedures for maintaining the integrity and accessibility of records that were moved, whether electronically or physically, and that the proposed DPO would go far beyond those measures by involving the Court and plaintiff even in the most minor and routine agency operations. See Def.'s Opp., at 16-19. Moreover, because the DPO was in essence a disguised request for injunctive relief, the Government, citing Kanemoto v. Reno, 41 F.3d. 641, 644-45 (Fed. Cir. 1994), argued that the Court lacked jurisdiction to grant such relief. See Def.'s Opp., at 16-19. Defendant also argued that plaintiff had failed to meet the traditional four-factor test for entry of an injunction. While Defendant recognizes the Court's decision in Laguna, Defendant respectfully reasserts the foregoing arguments in the current Seminole Nation PDPO proceeding.

only with the utmost restraint because such authority is indeed powerful. See id. at 137 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).

(B) Plaintiff has Failed to Meet the Test Established in Laguna

In Laguna, the Court set out a two prong test which the proponent of an DPO must satisfy. In that case, the Court explained that "one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome." Id. at 138. To satisfy this two prong test, the Court said that a proponent first must show that "absent a court order, there is significant risk that relevant evidence will be lost or destroyed . . . ." Id. (emphasis added). Second, to show that a preservation order is not unduly burdensome, "the proponent must show that the particular steps to be adopted will be effective, but not overbroad . . . ." Id.[5]

The Laguna decision is instructive for other reasons as well. Significantly, the Laguna court recognized that plaintiff, there as here, was asking for more than a preservation order:

> [Plaintiff] . . . would have this Court prohibit generally the destruction of records relevant to this case absent its prior written concurrence. . . . It would also have this Court impose significant restrictions on the inter and intra agency transfer of such records, including the transfer of records from the Department of the Interior to the National Archives and Records Administration, by essentially requiring that plaintiff be offered an opportunity to examine such records prior to their movement.

Laguna, 60 Fed. Cl. at 140.

---

[5] The Laguna two prong test has been followed by other courts with some variations. See, e.g., Treppel v. Biovail Corp., 233 F.R.D. 363, 370 - 71 (S.D.N.Y. 2006); Williams v. Mass. Mut. Life Ins. Co., 226 F.R.D. 144, 147 (D. Mass. 2005). Another case, Capricorn Power Co., v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) presents a three factor analysis for entry of a record retention order. These factors include: (1) level of concern the court has for continuing existence and maintenance of integrity of evidence absent court order; (2) irreparable harm likely to result to the party seeking preservation of evidence; and (3) capability of a party to maintain evidence sought to be preserved, and the physical, spatial and financial burdens created by ordering preservation. See id. at 433-34.

Ultimately, the Court declined to impose the broad transfer restrictions proposed by plaintiff. See id. at 140. In doing so, the Court concluded that such provisions would unduly burden the operations of various agencies in two ways:

(1) By impacting the daily and routine movement of records; and

(2) By injecting plaintiff into agency processes that are designed to avoid the loss or destruction of records by allowing plaintiff to interfere with agency decision making and discretion with respect to retention of records.

See id.

Plaintiff offers nothing in its motion that would satisfy this two-part test. Citing the Kaw Nation and Navajo Nation cases, Plaintiff's sole justification for seeking a preservation order consists of a single statement that "[t]hese protective orders have been entered in other tribal trust fund mismanagement cases in order to preserve discovery documents and facilitate the document exchange between the parties." Motion for DPO at 1. Plaintiff fails to make any attempt to demonstrate that there is a "significant risk" that documents will be damaged or lost. Indeed, it is questionable whether Plaintiff has any real concerns about potential loss of documents, given counsel's acknowledgment before the Court in Kaw Nation that he did not have document integrity concerns but rather expressed his "major concern [as] getting those [records] into a central location that is sufficient to allow us to review those records." Ex. 5, Excerpt of February 20, 2008, oral argument in Kaw Nation at 19:16-18. See also id. at 18:21-19:8 and 19:22-20:1.

Plaintiff likewise fails to demonstrate that the PPDO will be effective but not overbroad, the second element of the Laguna test. Most of Plaintiff's proposed order does not address preservation at all but rather seeks to ensure Plaintiff's access to documents, data, and tangible things on terms and conditions which go far beyond anything contemplated by the discovery

rules of the Court of Federal Claims. The burdensome nature of Plaintiff's order is described and analyzed at Section II.B as well as in the attached declarations of agency representatives who would be required to shoulder the burden of Plaintiff's extraordinary demands. In fact, the Kaw Nation plaintiff has already provided a glimpse of how burdensome those requests can be. After receiving inventories and indices for documents maintained at the Department of the Treasury and NARA, Kaw Nation plaintiff requested "all documents referred to in the provided indices and inventories. . . ." Ex. 6, Letter from counsel for Kaw Nation to counsel for United States in Kaw Nation v. United States, dated April 3, 2008 (emphasis original). This request comports completely with counsel for plaintiff's intention to seek any documents that says "Kaw Nation on it" (Ex. 5 at 29:15-30:14 and 33:23-35:24), even though he acknowledged it was an overbroad request (Ex. 5 at 33:23-34:25), and may well preview what will happen here in this case with a similarly structured DPO.

2. Sufficient Measures Are Already In Place to Provide Adequate Assurance That Documents Will Not Be Destroyed

The key provisions of the March 19, 2004 Jicarilla and Laguna orders essentially mirror each other in that they require the United States and its agencies and employees to take reasonable steps to preserve information that is relevant or may lead to the discovery of information relevant to the litigation. In addition, the parties are directed to meet and confer regarding the indexation of "documents, data, and tangible things" anticipated to be subject to discovery in those cases. Also included in those orders are scheduling provisions for the movement of inactive records of the Department of the Interior. Both orders remain in effect through the present day.

Since the entry of the aforenoted DPO's by this Court, the federal agencies having the vast

preponderance of relevant documents, primarily Interior, have undertaken a number of steps to ensure compliance. The steps taken include: (1) sending preservation directives to agency personnel; (2) training agency personnel; (3) development of records movement protocols; (4) the opening of the AIRR and the creation of the Box Inventory Search System ("BISS"); and (5) a policy emphasis on movement of inactive records to the AIRR to protect trust records.

Most importantly, when this Court entered its orders in Jicarilla and Laguna, Interior was in the process of developing a comprehensive records management program to address the specific weaknesses. Ex. 7, Declaration by Ethel J. Abeita, June 21, 2007, at paragraphs 3-6. In the four years since then, Interior has adopted an institutional records program with three main components: (1) the centralization of all inactive records in an archival - quality records facility, the AIRR, for preservation and indexation (Id., at paragraphs 5-9); (2) the adoption of NARA-approved records retention schedules requiring the indefinite retention of Indian fiduciary trust records (Id., at paragraph 16); and (3) extensive training of Interior and Tribal personnel in records management and safeguarding trust records has been underscored by the issuance of periodic directives to all Interior employees and contractors, as discussed below.

(A) Interior has Issued Numerous Directives to Ensure Preservation of Evidence

Interior officials have also sent a number of preservation directives and periodic reminders to agency management and staff since March of 2004. Specifically, on April 6, 2004, the Deputy Secretary of the Interior issued a memorandum to the heads of various components and subagencies of the Interior Department about the document preservation orders issued in the Jicarilla and Laguna

cases.[6] Exhibit 8. That memorandum reaffirmed the existing duties, responsibilities, and obligations of Interior officials and employees to preserve Indian trust documents as set forth in the Departmental Memorandum dated March 20, 2002. See Ex. 9 and Ex. 8 at 2. The April 2004 memorandum also imposed preservation and retention obligations pertaining to relevant or potentially relevant data and information on the telephone and voice-mail systems of the Interior Department. See id. This memorandum reinforced Interior's policy requiring the indefinite retention of all categories of Indian fiduciary trust records, regardless of the existence of any pending litigation. Ex. 27, Declaration of Richard P. Fielitz, Jr., April 16, 2008. That policy is detailed in the record retention schedules contained in 16 Bureau of Indian Affairs Manual. Id. at ¶ 3.

Since the issuance of those memoranda by the Deputy Secretary, Interior has published periodic reminders containing instructions regarding certain preservation obligations. Some of the publications have occurred on July 9, 2004, July 13, 2004, and October 26, 2006. See Exs. 10, 11, 12.

(1) The Acting Deputy Solicitor's March 12, 2007 Departmental Memorandum

On March 12, 2007, Lawrence J. Jensen, the Deputy Solicitor of the Department of the Interior, issued a Departmental Memorandum to the heads of various components and sub-agencies

---

[6] The recipients of the memorandum were the Secretary; Acting Solicitor; Assistant Secretary - Fish and Wildlife and Parks; Assistant Secretary - Indian Affairs; Assistant Secretary - Land and Minerals Management; Assistant Secretary - Policy; Inspector General; Director, U.S. Geological Survey; Director, Bureau of Land Management; Director, Minerals Management Service; Commissioner, Bureau of Reclamation; Acting Director, Bureau of Indian Affairs; Special Trustee for American Indians; Director, Office of Trust Records; Director, Office of Historical Trust Accounting; Associate Director, Minerals Revenue Management, MMS; Regional Director, Southwest Region, BIA; Superintendent, Jicarilla Agency, BIA; Superintendent, Laguna Agency, BIA; Superintendent, Southern Pueblos Agency, BIA.

of the Interior Department[7] reiterating Interior's policy regarding the preservation and retention of Indian trust-related documents and data. See Ex. 1. Among other things, the memorandum identified, by name, the Tribes (including Plaintiff herein) or groups that had filed trust accounting and trust mismanagement cases against Defendant. See id. Using the broad language set forth by the Court in the document preservation order in Laguna, and Jicarilla, supra, the memorandum mandated the preservation of "all documents, data, and tangible things in the possession, custody or control" of Interior employees, bureaus, and offices that may be relevant to the subject matter of the Tribal Trust cases.[8] Id. at 2. The memorandum applied to all paper documents, electronically stored information, and other materials, such as maps, videos, calendars, and charts, and it also applied to materials stored at off-site storage facilities and Federal Records Centers (FRCs). See id. As noted, that memorandum specified that Seminole Nation trust-related records were among those required to be preserved in compliance with the memorandum. Further, the memorandum instructed Interior employees about the obligations imposed by the recent amendments to the Federal Rules of Civil Procedure to preserve electronically stored information and directed them to comply with those obligations. See id. at 3.

---

[7] The recipients of the memorandum were essentially the same as those identified in footnote 7.

[8] The Office of the Solicitor defined "relevant information" as

> reflecting, referring or relating to (1) any asset, such as funds, land, minerals, forestry, sand and gravel, or other resources, that is, or at any time has been, held in trust by the United States or its agents for the Plaintiff; (2) policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets; (3) proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets; (4) reports, appraisals, reconciliations or evaluations of any trust assets; and (5) information that serves to identify, locate, or link any relevant information, such as file inventories, file folders and indices.

(2) Interior Policy Memoranda Regarding the Movement of Inactive Records

The Department of the Interior recognizes the critical importance of preserving inactive Indian trust records and, in pursuit of this important task, has partnered with NARA to move those documents to the AIRR. See, Ex. 13, Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003. As part of the process of transferring those inactive documents to the AIRR, the documents are carefully indexed and filed in an archive where the entrances and exits of researchers and employees alike are carefully monitored and controlled. Thus, any suggestion by Plaintiff that inactive BIA documents should be retained for Plaintiff's convenience at the BIA office in Wewoka, Oklahoma, is contradictory to Plaintiff's stated objective of document preservation because the documents would in fact be more secure at the AIRR as well as be better protected from potential environmental harms such as natural catastrophe or changes in temperature and humidity. See Part II.A.2.(A)(3), infra, describing the AIRR.

Interior's policy to move inactive records to the AIRR as soon as possible is manifest in several Interior records, three of which are included with this brief: (1) Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005, Ex. 14; (2) Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006, Ex. 15; and (3) Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007, Ex. 16. These memoranda underscore the importance of delivery of inactive records to the AIRR and set out the procedures for expeditiously accomplishing the objective.

(3) Opening of the AIRR and Development of the Box Inventory Search System "BISS"

In collaboration with NARA, Interior has built a state-of-the-art underground document storage facility to consolidate in a single location all inactive federal Indian records. See Ex. 13, Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003. The facility was built in Lenexa, Kansas, and completed in 2004. See Ex. 7, Abeita Decl. at paragraph 5. It is co-administered by the Office of Trust Records ("OTR") and NARA. The AIRR is a state of the art facility built to archive standards and is equipped with controls to regulate humidity, temperature, particulate matter and ultraviolet light. See id. at paragraphs 5- 6. The AIRR provides secure access for research by individual Indians, tribes, and historians, with permission from Interior, and for Interior staff conducting historical accounting work. The AIRR has sufficient future capacity to hold all of Interior's American Indian records. Id. at paragraph 6. Currently, the AIRR contains in excess of 150,000 boxes of inactive records of which approximately 15,000 boxes are BIA Navajo records. See id. at paragraph 9.

Records movement plans for delivery of Indian trust documents are described in the June 21, 2007 Abeita Decl. at Ex. 8, paragraphs 9-14. As noted in detail there, the Chain of Custody plan, pickup, delivery, and verification of contents of boxes shipped are all carefully confirmed, both at the point of origin and at the point of delivery. See id. at paragraphs 9-14. Ultimately, upon arrival of inactive boxes to the AIRR, the contents are indexed using the BISS, as described below. The indexed contents are then archived at the AIRR.

Inactive Indian trust records stored at the AIRR are electronically indexed to the document

level in the BISS. See id. at paragraph 11. If there are no file folders and the box is identified as coming from a trust program, a document level index is compiled for the entire box contents. Information as to where the records originated is printed on the outside of each box, and this information is also entered into the BISS. For example, this identifier could be an agency location code, a regional office location code or a Federal Records Center code. Typically, BISS entries will include a file title and the category of the document (such as a bill for collections or financial data reports) and will also capture date ranges of information contained in a file folder. See id. paragraphs 11-12.

(4) Training

The BIA also provides training to its personnel and to tribal records personnel with respect to the proper management of Indian trust records. The Office of Trust Records ("OTR") trains new employees as they are hired and provides advanced training to longer-term employees. Ex. 7, Abeita Decl. at paragraph 18 and Ex. 2 to Abeita Decl. In the previous year, OTR held over 100 training events. In the previous two and a half years, over 2,000 people have received records training. Ex. 7, Abeita Decl. at paragraph 18. In addition to training by OTR, courses are also offered by the Office of Trust Training of the Office of the Special Trustee for American Indians. See e.g., Ex. 17, 29th Interior Report at 23; Ex. 18, 23rd Interior Report at 7; Ex. 19, 28th Interior Report at 44. Courses offered under the Indian Fiduciary Trust Training Program include specialty courses ranging from "Trust Fundamentals" to "Trust Accounting." Additionally, there is a curriculum leading to a Certified Indian Fiduciary Trust Specialist certification.[9] See id.

---

[9] Data concerning the number of attendees for the various courses are also reported in the Quarterly Cobell Reports filed by the Department of the Interior under the "Office of Trust Records" and "Indian Fiduciary Trust Training Program" sections.

Efforts to provide training Interior employees are further reported by declarations of numerous Interior managers. See Exs. 27, 28, 29, 32, 33, 34.

(5) Additional Actions

In addition to all of the foregoing actions to ensure documents are preserved (some of which specifically included Seminole Nation documents, e.g., the Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007 ("Jensen Memo") (Ex. 1)), Interior has taken further steps focused on Plaintiff's documents. Those efforts include circulation of the Jensen Memo by various means such as requiring each employee to read it, placing it on an internal distribution center, circulation of the Memo by email, (Ex. 27, Declaration of Richard P. Fielitz, Jr.; Ex. 28, Declaration of Jeanette Hanna; Ex. 29, Declaration of Eddie Streater; Ex. 30, Declaration of Paulette L. Sanford; Ex. 31, Declaration of Brian B. McCauley; Ex. 32, Declaration of Lori Y. Vassar; Ex. 33, Declaration of Edward Keable; Ex. 34, Declaration of Charles E. Breece; Ex. 35, Declaration of Robert Doyle; Ex. 36, Declaration of Pamala R. Quallich); discussion of preservation policies at regularly scheduled meetings (Exs. 27, 31); distributing periodic email messages emphasizing the need to preserve Indian trust records (Exs. 31, 32); labels placed on investigative files noting that Indian tribal trust documents are not to be destroyed (Ex. 32); reminders before documents are disposed of or archived that those records containing Indian trust records are not to be destroyed (Ex. 32); policies and procedures for the movement of records to ensure preservation of records with continual reminders that no Indian records or documents for any Indian tribe may be destroyed (Ex. 36); a requirement for employees who are ending their employment to certify that they have identified to their supervisor all records in their possession that are the subject of litigation hold notices (Ex. 32) or to print and file all Federal records with their related records and comply with current litigation requirements (Ex. 33);

written communication reminding employees again about their responsibilities to preserve all Indian trust records (Exs. 34, 35), and a requirement for employees to report incidents involving destruction of documents (Exs. 27-31, 33-36). No reports of destroyed Seminole Nation of Oklahoma documents have been received. See Exs. 27-36.

(B) Department of the Treasury (Treasury)

Treasury's bureaus most likely in possession of potentially relevant materials are its Financial Management Service (FMS) and the Bureau of Public Debt (BPD). These bureaus have implemented document retention policies and procedures for documents potentially relating to Tribal trust fund that – due to the significant overlap of potentially relevant materials – rely on a successful structure developed to comply with retention obligations in the Cobell litigation. See generally Exs. 20-23. The bureaus issue reminders regularly to their employees concerning these policies and procedures, and have placed the policies and procedures on the bureaus' Intranets. Exs. 24-25. In addition to existing procedures for the retention of documents in paper format, both FMS and BPD have procedures in place to assure retention of electronic documents potentially relevant to Indian tribal trust funds. See id. In addition, Treasury's Departmental Offices has also instructed its employees to take steps to "preserve any potentially relevant documents," stressing that employees are to "retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules . . . ."[10/] Ex. 21 (with attachments). This directive remains in

---

[10/] Treasury applies its retention policies, described at Exs. 20-26, to records in a wide variety of media. Treasury defines "record" to include:

> any handwritten, typed or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies, writings, drafts, transcripts, and minutes). The term "record" also includes documentary material in other forms (such as electronic documents or

full force and effect today. Ex. 26.

(C) National Archives and Records Administration (NARA)

Pursuant to the Federal Records Act, the Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) & 2110. See Ex. 38, Declaration of Jason R. Baron. These records, including any relevant to the proceedings in the Seminole Nation case, are held on a permanent basis. Id. Further, all relevant Interior records have been under a "freeze" (equivalent to a litigation hold) since 2004. Id. Moreover, in response to on-going tribal trust litigation cases, NARA has issued a comprehensive nationwide notice to its heads of office and staff to alert them to the existence of records retention orders entered in various tribal trust lawsuits. Id. The notice further prescribed that each person had the duty to preserve relevant records and information for all tribes pursuing tribal trust claims. Id. Attached to the notice was a list of all known tribal trust cases, without regard to whether a retention record order was in place or not. Id. The Seminole Nation case appears on that list. Id. The notice also informs NARA's employees that failure to comply may lead to the imposition of sanctions. Id. NARA's Office of General Counsel continues to monitor efforts to comply with the requirement to preserve tribal trust records, including those of the Seminole Nation, and will participate in periodic meetings and nationwide conference calls to issue reminders of the continuing obligations. Id.

(D) United States Environmental Protection Agency (EPA)

EPA Region 6, which includes the territory in which the Seminole Nation of Oklahoma

---

presentations, electronic mail, magnetic tapes, computer disks, audio or video records, slides, microfilm and motion pictures).

resides, has distributed guidance to its management and staff about record retention requirements to include specific notice of the litigation between the Seminole Nation and the United States. Ex. 41, Declaration of Ben J. Harrison, Deputy Regional Counsel for EPA Region 6. Personnel have been instructed to report any destruction of materials related to the Seminole Nation. Id. No reports have been received. Id.

### B. PLAINTIFF'S PROPOSED DOCUMENT PRESERVATION ORDER IS FLAWED

Two principal problems make Plaintiff's proposed DPO unworkable. To begin, it is an anomaly. That is, the proposed order provides very little instruction about preserving documents. Indeed, the one provision that specifically addresses preservation – paragraph 1 ("General Obligation to Preserve") – does no more than re-state what a party's obligation already is. Instead, a cursory examination reveals that the vast majority of the proposed order's provisions govern discovery processes. Defendant suggests this is an inappropriate attempt to avoid the standard rules that govern discovery and that the parties and the Court are better served to have discovery issues and procedures addressed through the use of the established rules and procedures generally applicable to litigation before this Court. Significantly, no effort has yet been undertaken to follow those standard procedures. They include the Early Meeting of Counsel and the Joint Preliminary Status Report,[11/] both of which require the parties to address discovery and neither of which has been accomplished yet, as well as the rules governing the conduct of discovery. These standard processes allow the parties to address in an orderly and more conventional manner how discovery is to be conducted and identify actual issues before

---

[11/] See paragraphs 3 and 4, respectively, to Appendix A of the Rules of the United States Court of Federal Claims.

seeking the Court's intervention.

Plaintiff's desire to have the Government produce **all** documents (apart from those maintained at the AIRR) in the possession of the Government, no matter where located or how unduly burdensome, at the BIA office in Wewoka, Oklahoma, presents the second problem. Production of documents in discovery commonly results in documents being made available for inspection at any number of places, often including the facility or office that maintains those documents in the ordinary course of business. Here, with no showing whatsoever to justify it, Plaintiff would have the Cour t impose a truly onerous and unjustified burden.[12]

Defendant has attached detailed declarations from competent agency officials that describe the undue burden if required to comply with the terms of the DPO. See Defendant Exs. 27-32, 36-37, 39-41. In unmistakable terms, these officials from the Department of the Interior, Department of the Treasury, the National Archives and Records Administration, and the Environmental Protection Agency describe the tremendous adverse impact upon their office's operations if required to move their document holdings potentially relevant to this case from their present locations to Wewoka, Oklahoma. They describe the adverse impact in terms of:

* the substantial and extraordinary disruption caused to operations (See Ex. 37, Bratcher at paragraphs 14-15; Ex. 39, Tilley at paragraphs 2, 10, 15, 18-19, 21; Ex. 40, Pomicter at paragraphs 10, 18-20, 22; Ex. 27, Fielitz at paragraphs 4-5;

[12] Moreover, if the Seminole Nation plaintiff uses the same approach as the Kaw Nation plaintiff and seeks the production of literally all documents that have Seminole Nation written on them, then the problem is compounded twice over. See Ex. 6 (Kaw Nation plaintiff's request for "all documents referred to in the provided indices and inventories") and Ex. 5 at 29:15-30:14 and 33:23-35:24 (comments by counsel for Kaw Nation at oral argument regarding a desire to have any document that mentions the name of the tribe delivered to a central location close to the Plaintiff).

Ex. 28, Hannah at paragraphs 4-6; Ex. 29, Streater at paragraph 4; Ex. 30, Sanford at paragraphs 4-6; Ex. 31, McCauley at paragraph 5; Ex. 32, Vassar at paragraph 9; Ex. 36, Quallich at paragraph 4; Ex. 41, Harrison at paragraph 8);

* the enormous difficulties in identifying the relevant documents because of how the records are presently maintained (See Ex. 37, Bratcher at paragraphs 6-9; Ex. 39, Tilley at paragraphs 7-9, 11-14; Ex. 40, Pomicter at paragraphs 7-9, 11-12, 15; Ex. 30, Sanford at paragraph 5; Ex. 32, Vassar at paragraph 9);
* the lengthy amount of time it would take to conduct such a search to identify the relevant records (See Ex. 37, Bratcher at paragraphs 8-12; Ex. 39, Tilley at paragraphs 10, 15; Exh. 40, Pomicter at paragraphs 10, 12, 22; Ex. 30, Sanford at paragraph 6 [exhaustive search required]);
* the disproportionately large expenditure of thousands of employee hours and of dollar cost to locate those documents (See Ex. 37, Bratcher at paragraphs 8-10, 12-15; Ex. 39, Tilley at paragraphs 10, 13-15, 21; Ex. 40, Pomicter at paragraphs 10, 13, 15, 22; Ex. 28, Hannah at paragraph 6; Ex. 30, Sanford at paragraphs 5-6; Ex. 32, Vassar at paragraph 9; Ex. 36, Quallich at paragraph 4); and,
* the lack both of space to accommodate the documents and of personnel to supervise activities related to the documents at the BIA office in Wewoka, Oklahoma. (See Ex. 29, Streater at paragraph 4 (disruption caused by space limitations)).

As these declarations show clearly, Plaintiff's preference for reviewing materials in Wewoka, Oklahoma fails to consider and ignores the immense burden in time and expense

associated with producing all documents to Oklahoma that would be imposed on the Government, especially given the wide range of circumstances surrounding how different federal agencies maintain their documents. A critical consideration is the huge expenditure of time and resources that would be required to attempt to cull out responsive documents from collections that are not catalogued or maintained by the name of a specific tribe and then to be forced to transport the original or a copy of those documents to Oklahoma. Nor does Plaintiff's preference consider the undue disruption to ongoing business operations that would result if the Government was forced to accommodate Plaintiff's preference. It is quite common in discovery for a party to host an open-file inspection of its documents and allow the requesting party access to the records in the place where they are stored and maintained. That certainly would be most appropriate, minimally, with NARA documents which are available to the public and for which NARA personnel are available specifically to assist in locating requested documents. Some of these circumstances pertain to the widely disparate volumes of materials that might be responsive to a properly formed and not overly broad request for documents. For example, it is entirely probable that the volume of documents EPA possesses that may be responsive to a document request will be much less than compared with the volume of responsive documents that may be possessed by the BIA Office at Wewoka. Finally, Plaintiff's proposed DPO fails to take account of the fact that the materials they would require the Government to move to Oklahoma may be needed in other cases by other tribes who are not located in Oklahoma, another factor generally accommodated through the give-and-take of normal discovery processes. In short, without allowing the normal discovery processes to unfold in which conceivably the parties could attempt to reach a mutually satisfactory accommodation, Plaintiff's proposed order would work a

manifest injustice and undue burden on Defendant.

C. DEFENDANT'S PROPOSED DOCUMENT PRESERVATION ORDER[13]

On March 6, 2008, the Court conducted a telephonic status conference parties to discuss Plaintiff's motion. During that conference Defendant advised the Court that it opposed the motion. Understanding Defendant's position, the Court asked Defendant to provide a proposed document preservation order in the event the Court was inclined to enter one despite Defendant's objection.

To comply with that request, Defendant has attached a proposed document preservation order that we ask the Court to enter if the Court is not persuaded by Defendant's contention that an order is not appropriate. See Ex. 42. This proposed document preservation order possesses several virtues absent from the one proposed by Plaintiff. For one, the proposed DPO truly is a preservation order and does not incorporate provisions addressing discovery. This allows the conduct of discovery to be shaped by the normal processes defined under the Court's rules. It also avoids the interpretation disputes that have accompanied – and likely will continue – the Kaw Nation model of a DPO. Chief among those disputes is the parties' differing views on whether Defendant must produce all documents (other than those maintained at the AIRR) to Wewoka, Oklahoma no matter how burdensome or impractical. Plaintiff's proposed DPO

---

[13] As stated above, Defendant has shown that this Court should not enter a document preservation order. Plaintiff certainly has made no showing to sustain its burden in seeking one. (Subject to the Court's approval if leave is sought, Defendant reserves the right to file a sur-reply depending upon the contents of any reply by Plaintiff.) Further, Defendant has described the ample and abundant efforts to ensure documents are preserved. These efforts have been in place for a number of years. No showing has been made to demonstrate that they are not working satisfactorily. Nevertheless, in the event the Court believes entry of some form of DPO is appropriate, Defendant presents its version. See Ex. 42.

notably would have that exact consequence.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests the Court deny the Seminole Nation of Oklahoma's Motion for Document Preservation Order, Confidentiality Agreement and Protective Order.

Dated: April 25, 2008

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

*s/ Terry M. Petrie*

TERRY M. PETRIE
Environment and Natural Resources Division
U.S. Department of Justice
1961 Stout Street, 8th Floor
Denver, CO 80294
Tel: (303) 844-1369
Fax: (303) 844-1350
Terry.Petrie@usdoj.gov

Attorney of Record for Defendant

OF COUNSEL:

ANTHONY P. HOANG
JARED PETTINATO
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663

SHANI N. WALKER
Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

TERESA E. DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR DOCUMENT PRESERVATION ORDER, CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER** was served on August 6, 2007, by Electronic Case Filing, on the following counsel:

Sandra B. Harrison
Jacquelyn V. Duffy
Andrews Davis, P.C.
100 North Broadway
Suite 3300
Oklahoma City, OK 73012

*Counsel for Plaintiff*

*s/ Terry M. Petrie*
TERRY M. PETRIE