# List of Exhibits

| Exhibit | Document |
|---|---|
| 1 | Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007 |
| 2 | Order filed September 10, 2007 in Navajo Nation v. United States, No. 06-945 L |
| 3 | Document Preservation Order filed October 24, 2007 in Kaw Nation v. United States, No. 06-934 L |
| 4 | Order filed February 19, 2008 in Kaw Nation v. United States, No. 06-934 L |
| 5 | Excerpt of transcript of oral argument in Kaw Nation v. United States, No. 06-934 L, pages 1-4, 18-20, and 29-36. |
| 6 | Letter from counsel for Kaw Nation to counsel for United States in Kaw Nation v. United States, dated April 3, 2008 |
| 7 | Declaration by Ethel J. Abeita, June 20, 2007 |
| 8 | Memorandum of Steven Griles, Deputy Secretary of the Interior, April 6, 2004 |
| 9 | Department of Interior Memorandum, March 20, 2002 |
| 10 | Memorandum of Steven Griles regarding preservation obligations, July 9, 2004 |
| 11 | Memorandum of Steven Griles regarding preservation obligations, July 13, 2004 |
| 12 | Memorandum of Steven Griles regarding preservation obligations, October 26, 2006 |
| 13 | Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003 |
| 14 | Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005 |
| 15 | Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006 |
| 16 | Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007 |
| 17 | 29th Interior Report, May 1, 2007 |

18 23rd Interior Report, November 1, 2005

19 28th Interior Report, February 1, 2007

20 Treasury's April 2004 Status Report on Compliance with Retention Order in Pueblo of Laguna

21 Memorandum of Donald V. Hammond, April 1, 2002

22 Memorandum of Richard L. Gregg, April 2, 2002

23 Memorandum from Ann Meister, April 1, 2004

24 Memorandum of Kenneth R. Papaj, February 27, 2007

25 Memorandum of Nancy Fleetwood, February 23, 2007

26 Memorandum of Robert Hoyt, August 6, 2007

27 Declaration of Richard P. Fielitz, Jr., Chief of Staff for the Office of the Special Trustee for American Indians, April 16, 2008

28 Declaration of Jeanette Hanna, Regional Director, Eastern Oklahoma Region for the Bureau of Indian Affairs, April 16, 2008

29 Declaration of Eddie Streater, Superintendent of the Wewoka Agency for the Bureau of Indian Affairs, April 15, 2008

30 Declaration of Paulette L. Sanford, Information Technology Trust Program Manager for the Bureau of Land Manager, April 15, 2008.

31 Declaration of Brian B. McCauley, Records Officer for the Minerals Management Service, April 15, 2008

32 Declaration of Lori Y. Vassar, Associate General Counsel for the Department of Interior Office of the Inspector General, April 22, 2008

33 Declaration of Edward Keable, Associate-Solicitor for the Office of the Solicitor for the Department of the Interior, April 15, 2008

34 Declaration of Charles E. Breece, Principal Deputy Director for the Office of Hearings and Appeals for the Department of the Interior, April 16, 2008

35 Declaration of Robert Doyle, Deputy Director of the United States Geological Survey, April 17, 2008

36 Declaration of Pamala R. Quallich, National Business Center Records Officer, April 17, 2008

37 Declaration of Rita Bratcher, Assistant Commissioner, Debt Management Services for the Financial Management Service, Department of the Treasury, April 17, 2008

Tab A: Department of the Treasury Paragraph 19 Document Production Report

38 Declaration of Jason R. Baron, Director of Litigation in the Office of General Counsel, National Archives and Records Administration, April 15, 2008

Tab A: Notice to Inform All NARA Staff of Their Obligations To Preserve All Electronic Data in Connection With All Tribal Trust Lawsuits With Attached List of Tribal Trust Accounting And Mismanagement Cases.

39 Declaration of Steven D. Tilley, Director of the Textual Archives Services Divisioin in the Access Programs Unit, Office of Records Services, National Archives and Records Administration, April 15, 2008

Tab A: NARA Memorandum on Archival Storage Standards

Tab B: NARA Memorandum on Security for NARA Holdings

40 Declaration of Gregory Pomicter, Assistant for Operations in the Office of Regional Records Services, National Archives and Records Administration, April 10, 2008

41 Declaration of Ben J. Harrison, Deputy Regional Counsel for Region 6, U.S.. Environmental Protection Agency, April 17, 2008

42 Defendant's Proposed Document Preservation Order

43 Defendant's Proposed Confidentiality Agreement and Protective Order

# EXHIBIT 1:

# MEMORANDUM OF

# LAWRENCE JENSEN

# MARCH 12, 2008

**United States Department of the Interior**

OFFICE OF THE SOLICITOR

MAR 1 2 2007

MEMORANDUM

To:
Office of the Secretary
Office of the Solicitor
Office of the Special Trustee
Office of Historical Trust Accounting
Office of the Inspector General
Office of Assistant Secretary - Indian Affairs
Bureau of Indian Affairs
Office of Assistant Secretary - Policy, Management, and Budget
Office of Hearings and Appeals
Office of Assistant Secretary - Land and Minerals
Minerals Management Service
Office of Surface Mining
Bureau of Land Management
Office of Assistant Secretary - Fish, Wildlife, and Parks
Fish and Wildlife Service
Office of Assistant Secretary - Water and Science
Bureau of Reclamation
U.S. Geological Survey

From:
Lawrence J. Jensen
Deputy Solicitor

Subject: Litigation Hold: Preservation of Information in Tribal Trust Cases

As you may know, eighty Tribal plaintiffs, including some Indian groups that are not federally recognized, recently filed actions against the Department of the Interior ("Department") asserting claims of breach of trust and/or asset mismanagement (collectively, "Tribal Trust cases"). This gives rise to an extremely important obligation under Federal law to preserve material that is or may be relevant to the Tribal Trust cases.

The purpose of this Litigation Hold is to inform you of the scope of this obligation and what actions are required to comply with it. The preservation of information will primarily be carried out by individual employees and contractors (any reference herein to "employees" includes contractor employees). **Therefore, it is imperative that a copy of this Litigation Hold reaches every employee who may possess relevant information in your bureau or office.**

**Information To Be Preserved:**

The information that must be preserved consists of all "documents, data, and tangible things" in the possession, custody, or control of your bureau or office that are or may be relevant to the subject matter of the Tribal Trust cases. "Documents, data, and tangible things" encompass paper documents, electronically stored information (discussed below), and other materials, such as maps, videos, calendars, charts, and similar items.

Attached is a list identifying the individual Tribal plaintiffs whose information must be preserved. Additionally, the Native American Rights Fund has filed an action purporting to be on behalf of all other Tribes that received materials as part of the Tribal Reconciliation Project. Therefore, this Litigation Hold covers information concerning any Tribe or group of Indians for which the Department administers or has administered assets in trust.

The Tribal Trust cases concern the management and accounting of tribal resources and funds held in trust by the Department. Accordingly, information that is or may be relevant to these cases includes, without limitation, anything reflecting, referring or relating to:

1. any asset, such as funds, land, minerals, forestry, sand and gravel, or other resources, that is, or at any time has been, held in trust by the United States or its agents for Tribes or Indian groups ("trust asset");
2. policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets;
3. proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets;
4. reports, appraisals, reconciliations, or evaluations of any trust assets; and
5. information that serves to identify, locate, or link any relevant information, such as file inventories, file folders, and indices.

The timeframe of information that must be preserved is from a yet-to-be-determined beginning date through the present, which means that information created in the future must also be preserved.

**General Preservation Requirements:**

Employees are required to take "reasonable steps" to preserve the information described above. Reasonable steps, at a minimum, include ensuring that information is not purged pursuant to a records disposition schedule or otherwise inadvertently destroyed. This obligation also extends to records maintained in off-site storage facilities, which may include, in some instances, Federal Records Centers. At the present time, this obligation is only to identify and preserve the information. You will be notified if anything additional is required as the Tribal Trust cases proceed.

**Preservation of Electronically Stored Information ("ESI"):**

Under new amendments to the Federal Rules of Civil Procedure, the preservation requirement explicitly relates to electronically stored information. ESI can include, but is not limited to:

- E-mail (including attachments);
- Instant messages;
- Electronic calendars, task lists, and other organizational aids;
- Word processing documents;
- Spreadsheets;
- Databases;
- Audio and video recordings; and
- Voicemail.

ESI may be located on network systems and servers; local hard drives, laptops, storage media, (including flash drives, diskettes, and CD-ROMs), as well as on PDAs (such as Blackberries) and cell phones. Note that home computers, cell phones, and other devices used for work may also contain relevant or potentially relevant information that must be identified and preserved. Further, the hard drive and network files of departing employees must be identified and preserved.

Your IT personnel will be responsible for taking steps to preserve ESI from a technical standpoint. Employees should seek assistance from the IT personnel as necessary to preserve their ESI, and in no case should they delete any relevant information.

**Conclusion:**

Immediate compliance with this Litigation Hold is essential to protect the Department from lengthy—and avoidable—discovery disputes that consume bureau time and resources and other negative consequences, such as monetary sanctions and evidentiary inferences that would limit the Department's ability to defend against the claims in the cases. This Litigation Hold also protects individual managers and employees by providing them basic guidance on how to comply with their legal requirements.

Thank you for your prompt attention to this matter. Please direct any questions about this memorandum to Paul Smyth, Counselor to the Solicitor, (202-208-4307).

Attachment

**Tribes and Indian Groups with Pending Tribal Trust Cases (As of 3/06/2007)**

Ak-Chin Indian Community

Alabama Quassarte Tribal Town

Assiniboine & Sioux

Gros Ventre Tribe and Assiniboine Tribe

Blackfeet Tribe of the Blackfeet Indian Reservation

Cheyenne River Sioux Tribe

The Chickasaw Nation and Choctaw Nation

Chippewa Cree ("Pembina")

Chippewa Cree Tribe of the Rocky Boy's Reservation

Cocur d'Alene Tribe

Colorado River Indian Tribes

The Confederated Tribes of the Colville Reservation

Confederated Tribes of the Goshute Reservation

Confederated Tribes of the Warm Springs Reservation of Oregon

Crow Creek Sioux Tribe

Delaware Tribe of Indians and The Delaware Trust Board

Delawares of Idaho, Inc.

Eastern Shawnee Tribe of Oklahoma

Gila River Indian Community

Haudenosaunee, Onondaga Nation

Hoopa Valley Tribe

Hopi Tribe

Iowa Tribe of Kansas and Nebraska

Jicarilla Apache Nation

Kaw Nation of Oklahoma

Makah Indian Tribe of the Makah Indian Reservation

Miami Tribe of Oklahoma

Muscogee (Creek) Nation of Oklahoma

Navajo Nation

Nez Perce, et al (Class Action)
- Mescalero Apache Tribe
- Tule River Indian Tribe
- Hualapai Tribe
- Yakama Nation
- Klamath Tribes
- Yurok Tribes
- Cheyenne-Arapaho Tribe
- Sac and Fox Nation
- Santee Sioux Tribe of Nebraska

Nez Perce Tribe

Northern Cheyenne Tribe of Indians

Northwestern Band of Shoshone Indians

Oglala Sioux Tribe

Omaha Tribe of Nebraska

Osage Nation and/or Tribe of Indians of Oklahoma

Otoe-Missouria Tribe of Indians of Oklahoma

Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California

Passamaquoddy Tribe of Maine

Pawnee Nation of Oklahoma

Pechanga Band of Luiseno Mission Indians of California

Ponca Tribe of Indians of Oklahoma

Prairie Band of Potawatomi Nation

Pueblo of Laguna

Pueblo of Santa Ana

Quechan Tribe of the Fort Yuma Indian Reservation

Red Cliff Band of Lake Superior Chippewa Indians

Rosebud Sioux Tribe

Round Valley Indian Tribes

Salt River Pima-Maricopa Indian Community

San Manuel Band of Serrano Missions Indians

Seminole Nation of Oklahoma

Shoshone-Bannock Tribes of the Fort Hall Reservation

The Shoshone Indian Tribe and Northern Arapaho Tribe of the Wind River.
Reservation, Wyoming

Eastern Shoshone Tribe and Northern Arapaho Tribe

Soboba Band of Luiseno Indians

Sokaogon Chippewa Community (aka Mole Lake Band of Lake Superior
Chippewa Indians)

Standing Rock Sioux

Stillaguamish Tribe of Indians

Swinomish Indian Tribal Community

Te-Moak Tribe of Western Shoshone Indians (Class Action)

Three Affiliated Tribes of the Fort Berthold Reservation

Tohono O'odham Nation

Tonkawa Tribe of Indians of Oklahoma

United Keetoowah Band of Cherokee Indians in Oklahoma.

Ute Indian Tribe of the Uintah and Ouray Reservation

Winnebago Tribe of Nebraska

Wyandot Nation of Kansas

Yankton Sioux

Yomba Shoshone Tribe

# EXHIBIT 2:

# ORDER FILED

# SEPTEMBER 10, 2007

# Navajo Nation v. United States,

# No. 06-945 L

# In The United States Court of Federal Claims

No. 06-945L

(Filed: September 10, 2007)

NAVAJO NATION
f.k.a. NAVAJO TRIBE OF INDIANS,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**ORDER**

This matter comes before the court on plaintiff's Motion for Entry of Record Retention Order. Pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions, *see Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-137 (2004), the court hereby **ORDERS** as follows:

1. **General Obligation to Preserve.** During the pendency of this litigation or until further order of the court, defendant and its departments, agencies, employees, agents, and contractors must take reasonable steps to preserve every document, datum, or tangible thing in its possession, custody, or control containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation ("Relevant Records"). Plaintiff is reminded that it also has a similar duty to preserve evidence relevant to this case.

2. **Document Inspection and Production.**

   (a) Defendant shall move Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior ("Interior") Manual Part 303, Chapter 6, and located at the Bureau of Indian Affairs ("BIA") Navajo Regional ("Gallup") Office, the BIA Navajo Regional Realty Office, and the BIA Fort Defiance Agency, and any predecessor offices therefor to the Gallup BIA Warehouse in Gamerco, New Mexico, at which location such records shall be made available to plaintiff for purposes of inspection. At least 10 calendar days

before movement of the records from their present locations to Gamerco, defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

(b) After reviewing the above inactive Relevant Records for privileged material, if necessary, defendant shall make those records available for plaintiff's inspection, in accordance with the following schedule:

(i) Within 35 days after entry of this order, defendant shall provide to plaintiff any and all existing indices and inventories that include inactive Relevant Records or boxes thereof located at the above offices in the most useable form readily available. Defendant shall provide to plaintiff additional or supplemental indices or inventories of inactive Relevant Records within 21 days after the creation or discovery of such indices or inventories.

(ii) Within 35 days after receiving such indices or inventories from defendant or within some other time as agreed to by the parties, plaintiff shall designate boxes or records listed in the provided indices or inventories that plaintiff wishes to review for Relevant Records.

(iii) Within 63 days after the date on which plaintiff designates which boxes of one or more of the above offices it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the BIA warehouse in Gamerco.

(iv) Plaintiff generally shall have 63 days within which to inspect a designated record upon receiving notification from defendant that the designated record has become available for inspection, during which process plaintiff may identify records for production. This inspection period may be extended by agreement of the parties or by the court for good cause shown. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including without limitation through the use of audio recorders, digital cameras, or document scanning, provided that no such recordings made by plaintiff shall constitute production of records. Plaintiff's documentation shall be subject to the Protective Order entered by this court on May 11, 2007.

(c) After plaintiff has inspected and identified records for production pursuant to paragraph 2(b) above, defendant may move those records to the American Indian Records Repository ("AIRR") in Lenexa, Kansas, in accordance with defendant's

procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual. After such move(s), defendant shall scan the records identified by plaintiff; code the scanned images at the document level, including data fields as agreed to by the parties; and provide such images and coding to plaintiff within such schedule as agreed to by the parties. For documents originating in media other than paper, defendant shall provide the document in a reasonably usable form, including any form reasonably requested by plaintiff, and also shall provide an opportunity to plaintiff to test or sample such documents upon reasonable request. Defendant shall expedite and prioritize the scanning, coding, and production to plaintiff of identified records.

(d) In accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual, defendant may move any boxes that have been either: not designated for inspection within the time period provided for in or agreed to under paragraph 2(b)(ii); or designated but not reviewed by plaintiff within the applicable period provided for under paragraph 2(b)(iv). Nothing herein prevents plaintiff from also seeking to inspect records from the above offices in whatever location they may be found in the future.

(e) Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System ("BISS") data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to such BISS database at the Albuquerque office of plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders or digital cameras, provided that no such recordings made by plaintiff shall constitute production of records. Defendant also shall provide to plaintiff all manuals, training materials, and similar documents created by or for Interior which describe the BISS database and its manner of operation and access. Defendant shall provide to plaintiff additional or supplemental indices or inventories for the AIRR that include Relevant Records promptly after the creation of such indices or inventories.

(f) The parties shall meet and confer to discuss schedules and procedures to be used for defendant to make available to plaintiff, for purposes of inspecting active or inactive Relevant Records (determined as of the date of this order) of all of defendant's departments, agencies, offices, employees, agents, and contractors at offices other than those identified in paragraph 2(a) above, as follows:

(i) The parties shall expedite and prioritize inspection of Relevant Records that, as of the date of this order, are inactive and located at: (1) the offices

of the BIA Chinle Agency, the BIA Western Navajo ("Tuba City") Agency, the BIA Eastern Navajo ("Crownpoint") Agency, and the BIA Shiprock Agency, whether inspected at those offices, the BIA Gamerco warehouse, or other mutually agreed locations; (2) the Office of Trust Records ("OTR"), the Office of the Special Trustee ("OST"), and the BIA Land Titles and Records Office ("LTRO"), all located in Albuquerque, New Mexico; or (3) offices of the Department of the Treasury.

(ii) Defendant, after reviewing the records for privileged material, if necessary, shall make the respective record collections available to plaintiff for purposes of inspection and designation. Unless otherwise agreed by the parties, defendant shall provide existing indices or inventories for such records as soon as practicable and make such records available for plaintiff's inspection within 63 days of plaintiff's designation of them.

(iii) Plaintiff shall inspect the records upon receiving notification from defendant that the records have become available for inspection. If plaintiff identifies records for production, defendant shall make arrangements for scanned and coded images, or other data in a reasonably usable form, to be delivered to plaintiff as soon as practicable.

(iv) Unless otherwise agreed by the parties, moves of Relevant Records that are inactive as of the date of this order from the BIA Navajo Agencies identified in paragraph 2(f)(i) above, the OTR, the OST, and the LTRO to locations other than the AIRR shall be subject to the intermediate move plan requirement of section 2(a) above.

(g) The parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Relevant Records in a manner that will minimize the disruption of ongoing governmental activities.

3. **Indexation and Inventorying.**

(a) Within 126 days after entry of this order, the parties shall identify all of their respective repositories besides the AIRR and those addressed in section 2(a) above that are reasonably anticipated to be subject to discovery in this case and determine whether indices or inventories exist for each location. The parties also shall have ongoing duties to identify evidence relevant to this case in their respective possession, custody, or control.

(b) Within the same time period or as the parties may agree, the parties shall provide to each other existing indices and inventories for such repositories in the most

useful form readily available, except for indices and inventories previously provided pursuant to paragraph 2 of this Order.

(c) If a party is unable to provide the other with indices or inventories of its repositories containing evidence relevant to this case, then the parties shall meet and confer as soon as practicable about the possibility of using, as may be appropriate, a collection-by-collection approach, including on-site reviews, to address the sufficiency of existing indices or inventories and to discuss whether additional indexation of specific record collections is necessary and the scope, timing, and method of any additional indexation or elaboration of inventories at each location based on the particular facts relating to each repository and record characteristics. The parties shall provide additional or supplemental indices or inventories that include evidence relevant to this case within 21 days after the creation or discovery of such indices or inventories.

(d) The parties shall cooperate in good faith to attempt to reach agreement on all issues regarding the indexation and inventorying of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(i) the extent of the indexation and inventorying obligation, identifying the types of material to be indexed and inventoried, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

(ii) the identification of persons responsible for carrying out the indexation or inventorying;

(iii) whether indexation or inventorying will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(iv) the timing of the indexation or inventorying process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

(v) the methods to index or inventory any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(vi) the anticipated costs of indexation and inventorying and ways to reduce or share these costs; and

(vii) policies and procedures to review and modify the indexation and inventorying obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

(e) If, after conferring to develop an indexation plan, counsel do not reach agreement on the subjects listed under paragraph 3(d) of this order or on other material aspects of indexation, the parties shall file expeditiously with the court a statement of the unresolved issues together with each party's proposal for their resolution of the issues.

4. **Compliance.** The parties shall establish policies, procedures, and controls for monitoring compliance with this order and, on or before 63 days after entry of this order, file a status report with the court describing those policies, procedures, and controls. The parties' counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.*, the destruction or loss of documents).

5. **Definitions.** For purposes of this order:

(a) "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes. The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

(b) "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, mutation, negligent handling, or intentional mishandling of any documents, data, or tangible things, if such action would make that material incomplete or inaccessible.

6. **Further Instructions; Modification.**

(a) If, after counsel confer, unresolved issues remain but require resolution concerning matters arising under this order or other material aspects of preservation, inspection and production, or indexation and inventorying, the parties shall file with the court a statement of the unresolved issues together with each party's proposal for their resolution.

(b) Either party also may apply to the court for further instructions regarding, *inter alia*:

(i) defendant's obligation to preserve specific categories of documents, data, or tangible things;

(ii) any aspect of the inspection or indexation tasks not herein clearly defined; and

(iii) allocating copying costs and maintaining the confidentiality of information contained in various records.

(c) Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7. **Sanctions.** Failure to comply with this order may lead to the imposition of sanctions. *See Pueblo of Laguna*, 60 Fed. Cl. at 135-137; *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007).

8. **Dissemination.** This order shall be distributed by defendant and plaintiff to all relevant agencies, departments, offices, divisions, contractors, and individuals.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

# EXHIBIT 3:

# DOCUMENT

# PRESERVATION ORDER

# FILED OCTOBER 24, 2007

# Navajo Nation v. United States,

# No. 06-934 L

# In The United States Court of Federal Claims

No. 06-934L

(Filed: October 24, 2007)

THE KAW NATION OF OKLAHOMA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

## DOCUMENT PRESERVATION ORDER

This matter comes before the court after a joint status conference held on September 11, 2007, at which the parties were directed to attempt to negotiate a mutually agreeable Document Preservation Order. The parties were largely unsuccessful in this regard.

Nonetheless, the court finds that good cause exists for approval and entry of a Document Preservation Order pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions. *See Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-37 (2004). As such, the court hereby **ORDERS** as follows:

1. **General Obligation to Preserve.** During the pendency of this litigation or until further order of the court, defendant and its departments, agencies, employees, agents, and contractors must take reasonable steps to preserve every document, datum, or tangible thing in its possession, custody, or control containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation (Relevant Records). Plaintiff is reminded that it has a similar duty to preserve evidence relevant to this case.

2. **Document Inspection and Production.**

   (a) Defendant shall move Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior (Interior) Manual Part 303, Chapter 6, wherever located, to the Gallup BIA Warehouse in Gamerco, New Mexico, or such other location as may be agreed upon by the parties, at which location such records shall be made available to plaintiff for purposes of

inspection. At least 10 calendar days before movement of the records from their present locations to Gamerco (or as otherwise agreed), defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

(b) After reviewing the above referenced inactive Relevant Records for privileged material, if necessary, defendant shall make those records available for plaintiff's inspection, in accordance with the following schedule:

(i) Within 35 days after entry of this order, defendant shall provide to plaintiff any and all existing indices and inventories that include the inactive records referenced in paragraph 2(a), said documents to be provided in the most usable form readily available. Defendant shall provide to plaintiff additional or supplemental indices or inventories of inactive Relevant Records within 21 days after the creation or discovery of such indices or inventories.

(ii) Within 35 days after receiving such indices or inventories from defendant or within some other time as agreed to by the parties, plaintiff shall designate boxes or records listed in the provided indices or inventories that plaintiff wishes to review for Relevant Records.

(iii) Within 63 days after the date on which plaintiff designates the boxes it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the BIA warehouse in Gamerco.

(iv) Plaintiff generally shall have 63 days within which to inspect a designated record upon receiving notification from defendant that the designated record has become available for inspection, during which time plaintiff may identify records for production. This inspection period may be extended by agreement of the parties or by the court for good cause shown. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders, digital cameras, or document scanning, provided that no such recordings made by plaintiff shall constitute production of records. Plaintiff's documentation shall be subject to the Protective Order entered separately by this court this day.

(c) After plaintiff has inspected and identified records for production pursuant to paragraph 2(b) above, defendant may move those records to the American Indian

Records Repository (AIRR) in Lenexa, Kansas, in accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual. After such move(s), defendant shall scan the records identified by plaintiff; code the scanned images at the document level, including data fields as agreed to by the parties; and provide such images and coding to plaintiff within such schedule as agreed to by the parties. For documents originating in media other than paper, defendant shall provide the document in a reasonably usable form, including any form reasonably requested by plaintiff, and also shall provide plaintiff with an opportunity to test or sample such documents upon reasonable request. Defendant shall expedite and prioritize the scanning, coding, and production to plaintiff of identified records.

(d) In accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual, defendant may move any boxes that have been either: not designated for inspection within the time period provided for, or agreed to, under paragraph 2(b)(ii); or designated but not reviewed by plaintiff within the applicable period provided for under paragraph 2(b)(iv). Nothing herein prevents plaintiff from also seeking to inspect such records in whatever location they may be found in the future.

(e) Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System (BISS) data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to the BISS database at the Albuquerque office of plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders or digital cameras, provided that no such recordings made by plaintiff shall constitute production of records. Defendant also shall provide to plaintiff all manuals, training materials, and similar documents created by or for Interior which describe the BISS database and its manner of operation and access. Defendant shall provide to plaintiff additional or supplemental indices or inventories for the AIRR that include Relevant Records promptly after the creation of such indices or inventories.

(f) The parties shall meet and confer to discuss schedules and procedures to be used for defendant to make available to plaintiff, for purposes of inspecting active or inactive Relevant Records (determined as of the date of this order), as follows:

(i) Defendant, after conducting any necessary review of the records for privileged material, shall make the respective record collections available to plaintiff for purposes of inspection and designation. Unless otherwise agreed by the parties, defendant shall provide existing indices or

inventories for such records as soon as practicable and make such records available for plaintiff's inspection within 63 days of plaintiff's designation of them,

(ii) Plaintiff shall inspect the records upon receiving notification from defendant that the records have become available for inspection. If plaintiff identifies records for production, defendant shall make arrangements for scanned and coded images, or other data in a reasonably usable form, to be delivered to plaintiff as soon as practicable.

(iii) Unless otherwise agreed by the parties, moves of Relevant Records that are inactive as of the date of this order shall be subject to the intermediate move plan requirement of paragraph 2(a) above.

(g) The parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Relevant Records in a manner that will minimize the disruption of ongoing governmental activities.

3. **Indexation and Inventorying.**

(a) Within 126 days after entry of this order, the parties shall identify all their respective repositories besides the AIRR and those facilities addressed in paragraph 2(a) above that are reasonably anticipated to be subject to discovery in this case and determine whether indices or inventories exist for each location. The parties also shall have ongoing duties to identify evidence relevant to this case in their respective possession, custody, or control.

(b) Within the same time period or as the parties may agree, the parties shall provide to each other existing indices and inventories for such repositories in the most useful form readily available, except for indices and inventories previously provided pursuant to paragraph 2 above.

(c) If a party is unable to provide the other with indices or inventories of its repositories containing evidence relevant to this case, then the parties shall meet and confer as soon as practicable about the appropriateness of using a collection-by-collection approach, including on-site reviews, to address the sufficiency of existing indices or inventories and to discuss whether additional indexation of specific record collections is necessary and the scope, timing, and method of any additional indexation or elaboration of inventories at each location based on the particular facts relating to each repository and record characteristics. The parties shall provide additional or supplemental indices or inventories that include evidence relevant to this case within 21 days after the creation or discovery of such indices or inventories.

(d) The parties shall cooperate in good faith to attempt to reach agreement on all issues regarding the indexation and inventorying of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(i) the extent of the indexation and inventorying obligation, identifying the types of material to be indexed and inventoried, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

(ii) the identification of persons responsible for carrying out the indexation or inventorying;

(iii) whether indexation or inventorying will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(iv) the timing of the indexation or inventorying process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

(v) the methods to index or inventory any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(vi) the anticipated costs of indexation and inventorying and ways to reduce or share these costs; and

(vii) policies and procedures to review and modify the indexation and inventorying obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

4. **Compliance.** The parties shall establish policies, procedures, and controls for monitoring compliance with this order and, on or before 63 days after entry of this order, file a status report with the court describing those policies, procedures, and controls. The parties' counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.*, the destruction or loss of documents).

5. **Definitions.** For purposes of this order:

(a) "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets;

software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes. The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

(b) "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, mutation, negligent handling, or intentional mishandling of any documents, data, or tangible things, if such action would make that material incomplete or inaccessible.

6. **Further Instructions; Modification.**

(a) If after counsel confer, unresolved issues remain concerning matters arising under this order or other material aspects of preservation, inspection and production, or indexation and inventorying, the parties shall file with the court a statement of the unresolved issues together with each party's proposal for their resolution.

(b) Either party also may apply to the court for further instructions regarding, *inter alia*:

(i) defendant's obligation to preserve specific categories of documents, data, or tangible things;

(ii) any aspect of the inspection or indexation tasks not herein clearly defined; and

(iii) allocating copying costs and maintaining the confidentiality of information contained in various records.

(c) Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7. **Sanctions.** Failure to comply with this order may lead to the imposition of sanctions. *See Pueblo of Laguna*, 60 Fed. Cl. at 135-37; *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007).

8. **Dissemination.** This order shall be distributed by defendant and plaintiff to all relevant agencies, departments, offices, divisions, contractors, and individuals.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

# EXHIBIT 4:

# ORDER FILED

# FEBRUARY 19, 2008

# Kaw Nation V. United States,

# No. 06-934 L

# In The United States Court of Federal Claims

No. 06-934L

(Filed: February 19, 2008)

THE KAW NATION OF OKLAHOMA,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**ORDER**

On October 24, 2007, the court issued a document preservation order in this case. On December 17, 2007, defendant filed a motion to amend or correct this order. On December 21, 2007, plaintiff filed a motion to change the record review site to Pawnee Agency Office of BIA. As a result, the parties have been responding and replying to two separate, yet related, motions.

On February 15, 2008, a status conference was held in this case to discuss the pending motions. After reviewing the motions, defendant's motion is **GRANTED,** in part, and **DENIED,** in part, and plaintiff's motion is **GRANTED**. Accordingly:

1. Paragraph 2(a) is hereby modified to read as follows:

> Defendant shall maintain Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior (Interior) Manual Part 303, Chapter 6, are presently located at the Southern Plains Regional Office (BIA), Anadarko, Oklahoma, and Pawnee Agency Office (BIA), Pawnee, Oklahoma, or such other location as may be agreed upon by the parties, at which location(s) such records shall be made available to plaintiff for purposes of inspection. At least 10 calendar days before movement of the records from their present locations to such other location as may be agreed upon by the parties, defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the

chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

2. Paragraph 2(b)(iii) is hereby modified to read as follows:

Within 63 days after the date on which plaintiff designates the boxes it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the Southern Plains Regional Office (BIA), Anadarko, Oklahoma, and Pawnee Agency Office (BIA), Pawnee, Oklahoma.

3. Paragraph 2(e) is hereby modified to read as follows:

Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System (BISS) data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to the BISS database at the Oklahoma City, Oklahoma, office of the plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR.

4. In all other regards, defendant's motion is **DENIED**. The court reserves the right to modify these and other provisions in the document preservation order as circumstances warrant.

5. On or before, April 8, 2008, the parties shall file a joint status report discussing their compliance with the document preservation order. The court expects the parties to cooperate in good faith to resolve issues, recognizing that both parties have an interest in preserving documents here.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

# EXHIBIT 5:

# EXCERPT OF

# TRANSCRIPT OF ORAL

# ARGUMENT IN

# Kaw Nation V.United

# States,

# No. 06-934 L, Pages 18-20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KAW NATION OF OKLAHOMA, )
Plaintiff, )
)
v. ) Docket No.: 06-934
UNITED STATES, )
Defendant. )

Suite 709
National Courts Building
717 Madison Place NW
Washington, D.C.

Live Tape

(The following transcript was transcribed from a digital recording provided by the United States Court of Federal Claims to Heritage Reporting Corporation on February 20, 2008.)

BEFORE: HONORABLE FRANCIS M. ALLEGRA
Judge

APPEARANCES:
For the Plaintiff:
KENNIS M. BELLMARD, III, Esquire
For the Defendant:
TERRY M PETRIE, Esquire
ANTHONY HOANG, Esquire
Department of Justice
SHANEE WALKER, Esquire
Department of Interior
THERESA DAWSON
Department of Treasury

2:1 2

APPEARANCES: (Cont'd)

Also For the Defendant:

JASON BARRON, Esquire

JEAN WHITE, Esquire

National Archives and Records Administration

3:1

P R O C E E D I N G S

(3:00 p.m.)

THE COURT: This is Judge Allegra.

Mr. Bellmard, are you on the line?

MR. BELLMARD: Yes, I am.

THE COURT: Very good. Mr. Petrie, are you on the line?

MR. PETRIE: I am, Your Honor. I'm joined I think as you perhaps know by other colleagues.

THE COURT: And the colleagues I have, is it Mr. Hoang, H-O-A-N-G?

MR. HOANG: Yes, Your Honor.

THE COURT: Ms. Walker, Ms. Dawson.

MS. DAWSON: Yes, Your Honor.

THE COURT: Mr. Barron and Ms. White, is that correct?

MR. PETRIE: Correct, Your Honor.

THE COURT: All right, we are doing this using electronic digital recording. If you want, you can obtain a copy of the audio on a CD after this, or alternatively you can get an unofficial copy of a transcript. The official record would actually be the audio itself. But either one of those are available to you if for some reason you think you need to do so.

Let me just read into the record to make

4:1

sure I have it. We're here on the line to have a status conference in Kaw Nation of Oklahoma v. United States, Case No. 06-934L. On the line for Kaw Nation is Kennis Monte Bellmard, II. On the line for the United states is Terry M. Petrie. Separately on line for Department of Justice is Anthony Hoang. For the Department of Interior is Shanee Walker. Department of Treasury is Theresa Dawson. And for the National Archives and Records Administration is Jason Barron and Jean White.

I have before me the motion made by Defendant to modify the Document Preservation Order in this case and what I decided is rather than try to just rule on this motion based upon the various papers that I've received, I thought it would make more sense to climb on the phone here and make sure that we get this thing right.

Let me just say a couple of things here from the outset. One is that it certainly does appear there might have been some slippage here in trying to use the Navajo pattern into this context. Part of that slippage, of course, also is somewhat caused by the fact that if I can't get you all to agree to things I sometimes am going to make mistakes based upon information I simply don't have.

18:1

indices and inventories to Plaintiff?

MR. PETRIE: For the inactive records that are specified for purposes of Paragraph 2(a) under the government's interpretation of this order.

THE COURT: Okay.

MR. PETRIE: That's set forth, Your Honor, in Exhibit 1 to that January 30th filing.

THE COURT: I'm looking at it.

I take it we haven't hit yet, I'm guessing we haven't hit the 126 day target in Paragraph 3 yet, correct?

MR. PETRIE: That's correct, Your Honor. February 26th or 27th, I believe, is the date for that. I can inform the Court that the United States has taken steps to advise those agencies for those records to provide the indices and inventories, if any, that they have.

THE COURT: So that is in process.

MR. PETRIE: That's correct, Your Honor.

THE COURT: Mr. Bellmard's been patient so let's give him an opportunity to respond.

Mr. Bellmard, if you're picking up the gist of my conversation, convenience concerns I guess are not the ones that are sort of I'm concerned about. They are document integrity concerns.

19:1

So I guess one of the questions I have for you is fundamentally, does a process that leaves these records at 11 locations cause problems do you think from an integrity standpoint? But at the same time recognizing the point that consolidation does pose risk from the standpoint of document integrity as well.

So why don't you go ahead and I guess provide me with your general response to Mr. Petrie's points here.

MR. BELLMARD: I would say there apparently are 11 places that these records could be. My understanding would be that any one of those 11 places is just as safe for these records as any of the other 10, so our major concern is getting those into a central location that is sufficient to allow us to review those records. That's been our position from day one and that's what resulted in the Document Preservation Order that we originally ended up with with the wrong BIA office.

THE COURT: So if I'm hearing you, you actually don't have concerns based upon the integrity of the documents as they exist in those 11 locations, it's more a matter of consolidation for purposes of access.

20:1

MR. BELLMARD: Yes, Your Honor. And our problem, and one thing I will have to make some disagreement with, as far as the indexes and indices, I think related to what my understanding of what are relevant records and the issue of inactive records, I think we're not on the same page in that regard. So I think that's a big --

THE COURT: So what --

MR. BELLMARD: I would not agree with Mr. Petrie that the indexes and indices that they've provided to us are the ones we think are in line with our understanding of the DCO.

THE COURT: So in other words you don't think that the Paragraph 2 provision that we were discussing has been complied with yet?

MR. BELLMARD: I do not, Your Honor.

THE COURT: So as you envision this, then what? What about the notion, Mr. Bellmard, that we envisioned here a two-track approach. Sort of one for inactive records, one for active records.

MR. BELLMARD: That would be fine with me, Your Honor.

THE COURT: Wouldn't that necessarily mean you'd be dealing with multiple locations any how?

MR. BELLMARD: That could be the

29:1

indices and inventory, that we're going to have a dispute. Because my concern is that the intent here is that we have some ability to be able to identify the set of documents that's in existence so that we, without necessarily having to halt a whole bunch of document processes, can have some level of assurance that we know what's out there so that we know what might be missing.

Part of the reason we went to inventorying and indices was to avoid the situation where they had to be collected all in one location, they had to be pulled out of agency processes and cause disruption in those processes.

MR. PETRIE: Your Honor, I fully appreciate that, and please don't mistake my intent here. Certainly the United States is always and certainly in my case is very interested in complying with our obligations in litigation which includes discovery and the preservation of documents.

Yet, there is also a side to this that is a very real factor, not only the size of the document collections that these agencies maintain, but also the fact remains that it takes two to go through this dance. That necessarily is on the part of the party constituting the case, the Plaintiff, to articulate

30:1

with some specificity what kind of documents they seek.

Mr. Bellmard in our discussions over this issue about the Document Preservation Order has made it clear that he wants every scrap of paper which has the Kaw Nation's name written on it. With full respect to him and his right to prosecute a claim against the United States, that is an extremely broadly stated requirement. We need something that provides some specificity, unless every claim that the Plaintiffs are suing here upon truly encompasses the universe of every document that has the Kaw Nation name written on it. That, per se, is overly broad.

THE COURT: By the way, just for accuracy of the record, my recollection of your position regarding the initial Document Preservation Order comes from the document you filed on September 28, 2007 and in that document on page, just to be explicit, two, you say, "Defendant, in particular the United States Departments of the Interior and the Treasury, the two federal agencies that are principally involved in the trust accounting and trust management issues in claims that have been asserted by Plaintiff in this case, has taken reasonable steps to preserve documents and data that are relevant to or that may lead to the discovery

31:1

of information that is relevant to Plaintiff's issues and claims herein," then you detail those steps.

That's preceded, of course, by a statement in which you indicate that Defendant is not waiving its argument that there is no showing that a record retention order such as the one that the Court has determined to enter will be effective and not unduly burdensome as required under the applicable law.

So I guess maybe you can say that that came after the fact, but I do have you at least making one last attempt, it looks like, to convince me that the order was unnecessary.

MR. PETRIE: That's correct, Your Honor, and I don't disagree with your characterization. What you are reading there from the record reflects the truth that one, any party in litigation has an obligation to preserve documents, and that is a step that the United States had in place and would have taken anyway to ensure that appropriate documents, relevant documents, responsive documents, were not destroyed. The mere fact that the government took that position consistent with its conduct does not suggest in the least that it somehow would take its responsibilities less seriously in the absence of a Document Preservation Order.

THE COURT: That may be true. The purpose

32:1

of a Document Preservation Order, though, is two-fold. One, it's to provide more of a framework based upon concerns that general attempts to preserve documents have in the past been unsuccessful; and two, to lay the foundation for sanctions if despite the order documents are not preserved.

MR. PETRIE: I agree, Your Honor.

THE COURT: All right.

You list here, and let me just get this clear. You say that, and I'm still talking about page two of that document, and you're describing the steps that have been taken by the various agencies here. You say, "These steps include but are not limited to the promulgation of agency-wide guidelines and directives for the preservation of certain documents and data; periodic written reminders to employees regarding their preservation duties; training of agency and tribal employees in the opening, operation and maintenance of the American Indians Record Repository in Lenexa, Kansas, to consolidate and house in one sense a repository, the Interior Department's inactive Indian trust documents and data including the fiduciary records that are relevant or potentially relevant to the issues and claims herein."

What else has happened since the issuance of

33:1

the Document Preservation Order besides the things that you've listed there in terms of protecting the documents at these 11 locations?

MR. PETRIE: Your Honor, I cannot recite it off the top of my head as I speak. I would have to defer to those recitations of steps taken by the agencies that were submitted in the declarations as part of the December 26, 2007 submission to the Court.

THE COURT: Okay, we'll go back and take a look at those, rather than taking up time at this moment.

MR. PETRIE: Yes, Your Honor.

THE COURT: Back to Mr. Bellmard.

Can you give me a general sense, I guess, as to, we're getting very close to this 126 day deadline. After which as the order anticipates, you're supposed to sit down with Mr. Petrie and try to work your way through this.

Give me a sense, I guess, as to what your expectations are in terms of what, in your view, would satisfy the requirement to 3(c).

MR. BELLMARD: Your Honor, let me just, I want to clear something up that Mr. Petrie mentioned.

In our conversations I've asked that anything that says Kaw Nation on it, that that's

34:1

preserved, that's put in a safe place because I may need it later. I don't know that I need it now, but to me that was the whole sense of the Document Preservation Order, is to be able to take all records Kaw that may be part of this litigation. It wasn't that I'm going to ask for those now, but we're asking that those be preserved. But I don't see how the government can preserve them if they don't know what they are.

THE COURT: The order begins with the proposition which of course patterns the discovery rule, that it applies to evidence that is relevant to or is reasonably calculated to lead to discovery relevant to the subject matter involved in the pending litigation. I'm not sure that in my mind anything that has the word Kaw on it quite captures that sentiment.

Medical records they have that involve treatment of tribal members, would that be covered by your --

MR. BELLMARD: No, Your Honor. I guess my statement was overly broad. But these trust records, these records that go back to the 1800s that resulted in leasing and all those type of things. We don't know where they're at. We've just been told by the

35:1

federal government that they're taking steps to preserve them.

THE COURT: Bur Mr. Bellmard, what you just said is quite different from what you first said.

One of the things you need to keep in mind here is that if you don't narrow down what you want captured here, what's going to happen is you're going to find yourself in dispute instead of working on a settlement of this case.

All right, so on the one hand while I'm concerned about document preservation, on the other hand you're going to have to give Mr. Petrie a little bit better sense as to at least some generic categories of documents that you're interested in so as to give him some guidance as to the population of documents he needs to respond to.

MR. BELLMARD: I'd be happy to do that, Your Honor.

THE COURT: I think I need you to do that pretty quickly, because I don't want to be dealing with a situation where I hear somebody basically say that anything that's got the word Kaw on it is covered by this order, because I don't view that as the case. I think the effect of that is to not put Mr. Petrie in a position where he can actually be able to say to

agencies what they should be trying to obtain and preserve.

MR. BELLMARD: I'd be happy to put that kind of list together and discuss that list with the government.

THE COURT: All right.

Mr. Bellmard, anything else that you wanted to indicate?

MR. BELLMARD: No, Your Honor.

THE COURT: I'm going to go back and look at these things and I'm going to try to come up with some decision here as to what to do about this. I have to say that I guess I'm concerned with the level of cooperation here. It may not be a matter of intent, in other words I'm not suggesting that either of you is proceeding in bad faith, but I'm concerned on the one hand that we get some reasonable demarcation of the documents that could be relevant to the claims here for Mr. Bellmard, and on the other hand, Mr. Petrie, I'm concerned that essentially doing those things which sort of fall into the general nature of well, we've told people not to destroy documents, may not in the end be viewed I guess as being consistent with at least the spirit of the order and may unfortunately at some point, particularly if something

# EXHIBIT 6:

# LETTER FROM COUNSEL FOR KAW NATION TO COUNSEL FOR UNITED STATES IN

# Kaw Nation v. United States,

# DATED APRIL 3, 2008

ANDREWS DAVIS
A PROFESSIONAL CORPORATION
Attorneys & Counsellors at Law
100 North Broadway, Suite 3300 • Oklahoma City, Oklahoma 73102-8812
405.272.9241 • fax 405.235.8786 • andrewsdavis.com
MERITAS LAW FIRMS WORLDWIDE

J. EDWARD BARTH
KENNIS M. BELLMARD II
C. TEMPLE BIXLER
JAMES F. DAVIS
VALERIE R. DEVOL
ALAN C. DURBIN
MATTHEW H. GRIFFITH
TIMOTHY M LARASON
DAVID POMEROY
MARK H. PRICE
D. JOE ROCKETT
LEIF E. SWEDLOW
ROLAND TAGUE
ANNE E. ZACHRITZ
TIMOTHY D. BROWN
JACQUELYN V. DUFFY
SANDRA B. HARRISON
MICHAEL D. MCMAHAN
JUNE E. M. PHILLIPS

SENIOR COUNSEL
ROBERT B. MILSTEN

OF COUNSEL
CHERI K. GRAY
LYNN O. HOLLOMAN
JENNIFER HENSHAW MCBEE
STEPHEN. J. MORIARTY

L. KARLTON MOSTELLER (1895-1966)
JOHN C. ANDREWS (1926-2001)
MONA S. LAMBIRD (1938-1999)

Kennis M. Bellmard, II
Writer's Direct Contact: 405.235.8735
kmbellmard@andrewsdavis.com

April 3, 2008

Terry M. Petrie
U.S. Department of Justice
Environment and Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294

Re: Kaw Nation of Oklahoma v. U.S., Civ No. 06-934L- Document Preservation Order: Paragraphs 3(a), (b) and (c)

Dear Terry:

On February 28, 2008, we received certain indices and inventories required under paragraphs 3(a) and 3(b) of the Document Preservation Order entered on October 24, 2007 and modified on February 19, 2008. We have reviewed the indices and inventories. We request all documents referred to in the provided indices and inventories be made available for our review. We believe the United States Department of Interior, United States Department of Treasury, National Archives and Record Administration and Oklahoma Historical Society may have Relevant Records as defined by the Document Preservation Order.

Please advise if you have any questions.

Very truly yours,

K Bell

Kennis M. Bellmard, II

# EXHIBIT 7:

# DECLARATION OF

# ETHEL J. ABEITA

# JUNE 20, 2007

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **NAVAJO NATION, f.k.a. NAVAJO TRIBE OF INDIANS,** Plaintiff | ) | Case No. 1:06-cv-00945-L |
| | ) | Judge Francis Allegra |
| v. | ) | **DECLARATION OF ETHEL ABEITA** |
| **UNITED STATES,** Defendant | ) | |

I, Ethel Abeita, as Director of the Office of Trust Records, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I have held the position of Director, Office of Trust Records (OTR), Office of the Special Trustee for American Indians (OST), Department of the Interior (Interior), since August 2002. OTR is responsible for the management of the Bureau of Indian Affairs (BIA) and OST records programs consistent with the requirements of 44 U.S.C. Chapter 31.

2. I have worked for the Federal Government for over twenty years. I was formerly the Assistant Regional Solicitor of the Southwest Regional Office in Albuquerque, New Mexico. In January 2000, I became the Deputy Regional Director for the BIA's Southwest Regional Office and held that position until I was detailed to the Office of Trust Records in August 2002.

3. In my new position at OTR, I immediately began working with the Assistant Deputy Secretary, Dr. Abraham Haspel, to develop a Strategic Plan ("OTR Work Plan") to identify and address specific weaknesses in BIA's and OST's records management programs.

4. A key component of the OTR Work Plan was to centralize all Indian Affairs records in a safe and secure storage facility. Centralization had already begun when I joined OTR. Indian Affairs records located at the various regional Federal Records Centers were being transshipped to the Federal Records Center at Lee's Summit, Missouri.

5. On September 12, 2003, Interior and the National Archives and Records Administration ("NARA") signed a Memorandum of Understanding ("MOU") to consolidate all inactive Indian records in the possession of BIA and OST, and related Interior fiduciary trust records at a new Federal Records Center, the American Indian Records Repository ("AIRR") in Lenexa, Kansas.

6. The AIRR was dedicated on May 4, 2004. It is a state-of-the-art facility, built to archive standards. This underground record center maintains the documents in a secure, climate-controlled environment, with controls for particulate matter and ultraviolet light. The AIRR has sufficient future capacity to hold Interior's American Indian records, as projected for the immediate future.

7. Access to the AIRR is strictly controlled. The stacks are closed to all but NARA staff members. An advance appointment is required to do research at the AIRR, and everyone is required to sign an agreement to handle the documents in accordance with

proper procedures. A copy of the Research Agreement is attached as Exhibit 1. All visitors must also watch a training video which advises on those procedures, and also the criminal penalties for theft or destruction of federal records.

8. All research at the AIRR is conducted in monitored rooms. Each researcher may work on only one box and one file at a time, to preserve the integrity of the boxes.

9. Because of the superior conditions for preserving records at the AIRR , Interior has a strong policy of shipping inactive records to the AIRR as soon as possible. This policy was articulated in a May 5, 2005 memorandum from James Cason, Associate Deputy Secretary, and reiterated in memoranda circulated in 2006 and 2007. Over 150,000 boxes of inactive BIA and OST records have been shipped to Lenexa, Kansas. These boxes have been indexed, including 14,086 boxes of records from the BIA Navajo Region.

10. Inactive records are moved from BIA and OST locations in compliance with "Guidance and Procedures" issued by OTR. A copy of The Guidance and Procedures is attached as Exhibit 3. These procedures include detailed instructions for completing a Move Request which must be approved before records can be sent to the AIRR and how each box is to be labeled, inventoried, and prepared for shipment.

11. When boxes of inactive records are received at the Lenexa Annex, the shipment is verified for completeness. The boxes are then indexed and the data is input in the Box Index Search System ("BISS"), an electronic file level index which lists the contents of the boxes. The index provides information at the file level for general trust program records (i.e., the Office of Law Enforcement Services).

12. Fiduciary trust program records are indexed at the document level, meaning that every document in a file folder, or where there are no folders, every document in a box is indexed. Each fiduciary trust document is assigned its own standard identifiers, such as document type, date and account number if available. The BISS classifies 5754 specific types of documents in 30 identified document categories.

13. Boxes of inactive records are shipped from the originating offices by accession, which could consist of a shipment of only one box. The indexers open each box within an accession, record box and file title information, determine the document types within the file/folder, and categorize these documents within the 30 document-type categories by date, when indexing trust records. All information on the outside of the box, typically including where it originated and its accession, is entered into the BISS as a part of the box title. The boxes undergo quality control as the indexers finish each box, and the contractor has a quality assurance process in place. Upon request, BISS training is provided to researchers at the AIRR.

14. OTR's contractor, Labat Andersen, provides assistance to the BIA and OST Offices in preparing inactive records for shipment to the AIRR. A move schedule is developed by OTR in consultation with the contractor. Several factors are considered in scheduling a site for shipping assistance, including readiness of the BIA/OST records in the field, any urgent needs to move documents at risk, and weather conditions as they relate to the working environment for the contractors that will be preparing the boxes for shipment. The BIA Navajo Region has communicated to OTR that it has approximately 2,000 boxes of inactive records to be transferred to the AIRR. Upon

availability of OTR contractor resources, we anticipate providing the BIA Navajo Regional staff with assistance to prepare the inactive records for shipment and arrange for delivery to the AIRR. This includes: inventorying, packing, shrink-wrapping and completion of move request paperwork. Once a firm moving date had been established for the Navajo inactive records, in part based on contractor availability, the contractor will be sent to complete those actions. Timely shipment to the AIRR of inactive records such as those currently in the BIA Navajo Region is an important priority of OTR.

15. Although the AIRR's principal purpose is not litigation-related, it provides a superior environment for the production and examination of documents in that context as well.

16. In addition to providing a safe storage and research facility for inactive records at the AIRR, OTR has taken steps to preserve and protect active records. 16 BIAM contains NARA-approved records retention schedules that call for the indefinite retention of all categories of Indian fiduciary trust records. Agency personnel are made well aware of this permanent institutional policy.

17. Additionally, in March 2007, I received a notice sent out by Larry Jensen, the Deputy Solicitor, advising of the new tribal trust litigation, including this case filed by the Navajo Nation. The notice was addressed to all employees and contractors at all Interior offices and bureaus that handle Indian trust documents, reminding them that all such records must be preserved, including electronically stored information.

18. OTR conducts records training for BIA and tribal personnel on the proper management of Indian trust records. Over 100 different training events were held last

year, at OTR headquarters and various locations around the country. Between October 2004 and May 2007, OTR trained 1,630 personnel from BIA and OST, and 586 tribal personnel. 156 records contacts were trained from the BIA Navajo Region. OTR trains new records contacts as they are identified, and also provides continuing training for those previously trained. An overview of OTR records training, the table of contents from OTR's records training manual, and a topical agenda are attached as Exhibit 2.

19. OTR has adopted and implemented policies and procedures that are intended to and succeed in preserving Indian trust records for future generations, and making them accessible in an organized way for all interested parties. These purposes would be thwarted by the entry of the order requested by plaintiff in this case, which would require BIA to maintain documents on the Navajo reservation for up to five months, whether or not OTR was ready to assist in moving them to the AIRR. Leaving the inactive records in the field locations would place the records at greater risk of destruction by accidental causes.

ETHEL J. ABEITA
Director
Office of Trust Records

Executed this 20th day of June, 2007

# Abeita Declaration

# Exhibit 1

**Office of the Special Trustee for American Indians**
**American Indian Records Repository**

**Research Agreement**

The purpose of this research agreement is to establish research requirements for individuals that use and handle records at the American Indian Records Repository (AIRR); ensure that records at the AIRR are safeguarded, preserved and prevent the destruction of federal records; to document the name and organization that access the AIRR for research purposes; and ensure that all researchers are subject to the provisions of 41 CFR subpart 101.20.3, Conduct on Federal Property, and to all rules and regulations issued and posted or distributed by the Office of the Special Trustee for American Indians (OST) and Office of Trust Records (OTR). Removal and mutilation of records is forbidden by law and is punishable by fine or imprisonment or both (18 U.S.C. 2071).

This information may be transferred to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions; the information may be disclosed by OST/AIRR to an expert, consultant, or a contractor of OST/OTR to the extent necessary for them to assist OST/OTR in the performance of its duties; the information may be disclosed to the U.S. Department of Justice or to a court or adjudicative body in cases involving the mutilation or unlawful removal of records.

**RESEARCH ROOM RULES (Public use of records will be made available in conformance with National Archives Records Administration guidelines)**

The following research requirements must be adhered to in order to conduct research at the AIRR. These requirements are:

1. The AIRR premises are protected by electronic and video surveillance systems. Upon arrival at the AIRR, all visitors are required to report to the main entrance. Thereafter, all authorized individuals will be informed to use designated entry points to enter and exit the facility.

2. Only authorized individuals are allowed access into the AIRR. No other visitors are allowed to accompany the authorized individual. A federal or state issued photo identification card must be presented upon entering the AIRR.

3. Authorized individuals are assigned an OTR AIRR Temporary Visitor's Badge which must be visible and worn above the waist at all times while in the facility.

4. Established research hours are Monday thru Friday from 8:00 a.m. – 4:30 p.m. Anyone scheduled to research earlier or later than the identified time will need to make prior arrangements with the Chief for the Division of Records Operations (or designee) of the AIRR.

5. Personal property is subject to inspection by the On-Duty Security Guard or an AIRR employee. (41 CFR 102.20.301) Personal property is defined as jackets, coats, purses, backpacks, handbags, brief cases, attaché bags, lunch bags, authorized laptop computers, etc. Weapons such as firearms, knives (including small pocket and steak knives), tazers, stun-guns, mace and pepper spray are not allowed in federal government facilities. Possession of a firearm or weapon in this Federal facility is a federal crime regardless if a license to carry a concealed handgun is authorized (Title 18 ISC, Sec. 930).

6. Personal property such as purses, backpacks, brief cases, etc., must be stored in lockers which are available in designated areas only. You will need to bring your own lock to secure your personal belongings. Coat racks are available to hang overcoats, raincoats and similar apparel.

7. At no time are personal computers, laptops, personal digital assistants (PDA's), tape recorders, and hand held photo taking devices allowed in the facility. Official use laptop computer must be authorized by the Chief for the Division of Records Operations (or designee) and subject to inspection upon entry into the AIRR.

8. Notes, references, lists of records to be consulted and other materials may be admitted if they are essential to the authorized individual's research work. However, the authorized individual must present these materials to the Chief for the Division of Records Operations (or designee) upon entrance into the AIRR. These materials will be subject to inspection by the On-Duty Security prior to exiting the AIRR.

9. Use of pens, markers, highlighters and colored pencils are prohibited. AIRR provides Number 2 pencils and paper upon request.

10. Eating, drinking, smoking, chewing gum, smokeless tobacco or disruptive behavior is prohibited.

11. Phone calls are limited to **brief** **<u>local calls only.</u>**

12. Researchers must exercise all possible care to prevent damage to the records. Prior to returning to the research room, authorized individuals must ensure hands are clean and free from lotions and hand sanitizers. Disposable gloves and masks are available upon request.

13. Records must not be leaned on, fastened with clips or rubber bands, written on, folded, traced, or handled in anyway to cause damage. Use only stainless steel staples or stainless steel paper clips to reassemble documents back together. If documents are rubber banded together, remove the rubber band then place documents into an accordion file then re-file back into the box. All of these supplies will be furnished upon request.

14. Limit your research to one box at a time. Further limit your researching to one folder within the box. Use a Charge-Out card as an indicator to return the research folder to its original order within the box. Do not leave folders out and boxes open for any period of time while away from the research room. Boxes must be returned to shelving at the end of the day.

15. Microfilm readers are limited. A researcher may use a reader as long as necessary if no one else is waiting. If others are waiting, a three (3) hour limit per day will be imposed, which may be reserved prior to the research. If others are waiting, a reservation will be held for 15 minutes before being relinquished to the next researcher. Microfilm must be handled with white or plastic gloves to avoid smudging the film.

16. Researchers whose duties require handling Privacy Act records shall take care to protect the integrity, security, and confidentiality of the records at all times. Researchers shall not disclose any information contained in a Privacy Act systems of record by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of the individual to whom the record pertains. The Privacy Act of 1974, Title 5, U.S.C. 552a, contains provisions for criminal penalties for knowingly and willfully disclosing information unless properly authorized.

17. Duplication fees can be obtained from the AIRR.

18. When in doubt on how to handle records within a box, consult an AIRR employee.

Failure to abide by these rules, written or reference above, or if a researcher by his/her actions demonstrates that they present a danger to the records or annoyance to other researchers or employees, may result in the revocation of the researcher's rights and privileges.

Researchers can have their research privileges revoked for sixty (60) days if they refuse to follow the rules of the AIRR records center. The researcher's organization will receive a written notice from the Director of OTR within five (5) working days of the decision to revoke the privilege. Revocations may be appealed to the Office of Trust Records within thirty (30) days of the effective date of revocation. If the revocation is upheld or if no appeal is made, the researcher's organization may apply for research privileges after the ending date of the revocation. Access to the AIRR will be denied during any appeal period.

**I HAVE READ AND AGREE TO ABIDE BY THE RULES AND REGULATIONS, AS IDENTIFIED IN THIS AGREEMENT.**

PRINTED NAME SIGNATURE DATE

ORGANIZATION CONTACT NUMBER

**FOR AIRR USE ONLY**
(DO NOT WRITE BELOW THIS LINE)

NOTES (Include identification credentials, letters of authorization, etc)

# Abeita Declaration

# Exhibit 2

Office of the Special Trustee
OFFICE OF TRUST RECORDS
Division of Records Management Policies, Procedures and Training
4400 Masthead, NE, Room 130I.
Albuquerque, NM 87109

## BIA/OST RECORD CONTACT RECORDS TRAINING - 2 ½ Days

This training is designed to provide Bureau of Indian Affairs and the Office of the Special Trustee for American Indian (OST) policy, guidance and support for records management activities within the BIA and OST. In January, 2004, OTR requested that BIA and OST name a Records Contact for their respective regional or program offices. The Records Contact must attend the Records Contact Records Training which will outline their responsibilities for Records Management Activities.

The responsibilities of these records contacts is to be the first point of contact for information regarding records management for their organization by being able to field general records questions; direct more complex records questions from staff to the appropriate OTR records contact; coordinate and assist the OTR Field Records Liaisons with any special projects or issues related to records; and disseminate all records management policy, guidance, instructions to all employees in their regional or program office. This training comprises of hands-on activities for identifying administrative and program records; preparing labels for folders; preparing a file maintenance and disposition plan; and preparing and submitting inactive records to the American Indian Records Repository (AIRR).

In this training session, Records Contacts will:

- Learn how to distinguish a record from a non-record
- Become familiar with record schedules
- Learn the basic principles of Files Management
- Learn how to identify a Trust Record
- Know what a Trust Record is
- Set up and maintain files
- Create a Files Plan
- Ship inactive records to the AIRR
- Prepare a Records Move Plan
- Research & Retrieve records form the AIRR

## TRIBAL RECORDS MANAGEMENT BRIEFING – 2 Days (Introduction to the Action Plan)

This briefing provides records management awareness on policy, guidance and support for records management activities for Tribal governments. This briefing is designed to inform tribal leaders, program managers and designated record keepers of the importance of creating a good recordkeeping program which will preserve and store important documents, pictures and other record types, and provide guidance on setting up and maintaining a records management program that will best fit the need of their organization. This briefing targets tribal governments that have not established a records management program but are interested in obtaining technical assistance from OTR in establishing and implementing a records management program.

Topic discussions include:

- **Office of Trust Record Responsibilities:** Overview on the Office of Trust Records (OTR) responsibility for providing policy, guidance and directives on records management programs to the Tribes.
- **Indian Affairs Records Management Manual:** Participants are provided recommendations on the use of policies and procedures.
- **Life Cycle of Records:** Concept discussion on records that are processed through the three stages of a lifecycle. These stages include creation, maintenance and use, and the disposition (storage or destruction) of records.
- **Records:** What is a record? Processes for identifying record material.

- **Non-Records:** Processes for identifying, and managing non-record materials within program offices.
- **Record Schedules:** An overview on the importance of developing, implementing and using a records schedule to cycle active and inactive records within a program office that will identify records to preserve and store and identify which records to destroy.
- **Storage and Safeguarding Records:** Discussion includes establishing and maintaining internal and external controls for the storing, preserving, and safeguarding active and inactive records.
- **Vital Records:** A summary on establishing and implementing a vital records program to ensure the continuity of program operations in the event of an emergency or disaster.
- **Litigation Records:** Participants will receive recommendations on handling and managing records that pertain to litigation cases.
- **Privacy Act Records:** The importance of establishing, maintaining and complying with tribal laws for records that contain Privacy Act information.

## TRIBAL RECORDS MANAGEMENT TRAINING – 2 Days (Utilizing the BIA/OST Records Training Workbook)

This training is designed for tribal governments that are interested in adopting the BIA and OST policy, guidance and recordkeeping requirements for establishing and implementing a records management program. This training comprises of hands-on activities for identifying administrative and program records; preparing labels for folders; and preparing a file maintenance and disposition plan.

In this training session, Records Contacts will:

- Learn how to distinguish a record from a non-record
- Become familiar with record schedules
- Learn the basic principles of Files Management
- Learn how to identify a Trust Record
- Know what a Trust Record is
- Set up and maintain files
- Create a Files Plan

## BEST RECORDS MANAGEMENT PRACTICES FOR AMERICAN INDIAN TRIBES (Implementation of Action Plan

This briefing provides basic records management recordkeeping requirements on developing and establishing policy, guidance and support for records management activities for Tribal governments. This course is designed to inform tribal leaders, program managers and designated record keepers of the basics of establishing and implementing sound recordkeeping requirements. <u>This training targets tribes that have an interest in further developing their own records management program based upon the assessment needs of the tribe and with technical assistance from the Office of Trust Records (OTR).</u>

Topic discussions include:

- **Employee Responsibilities:** Employees are taught in the briefing, of the responsibilities and accountability of ensuring adequate and proper documentation of organization, functions, policies, decisions, procedures and essential transactions of office operations and activities.
- **Life Cycle of Records:** Concept discussion on records that are processed through the three stages of a lifecycle. These stages include creation, maintenance and use, and the disposition (storage or destruction) of records.
- **Determine Records from Non-Records:** What is a record? Processes for identifying record material and managing non-record materials within program offices.
- **Record Schedules:** An overview on the importance of developing, implementing and using a records schedule to cycle active and inactive records within a program office that will identify records to preserve and store and identify which records to destroy.
- **Storage and Safeguarding Records:** Discussion includes establishing and maintaining internal and external controls for the storing, preserving, and safeguarding active and inactive records.

- **Vital Records:** A summary on establishing and implementing a vital records program to ensure the continuity of program operations in the event of an emergency or disaster.
- **Litigation Records:** Participants will receive recommendations on handling and managing records that pertain to litigation cases.
- **Privacy Act Records:** The importance of establishing, maintaining and complying with tribal laws for records that contain Privacy Act information.

# TABLE OF CONTENTS


| Section | Page No. |
|---|---|
| Terminology and Acronyms | *Pages 1-5* |
| Introduction | *Page 6-18* |
| Regional Records Liaisons | *6* |
| Records Contacts Responsibilities | *10* |
| Indian Affairs Records Management Manual (IARMM) | *15* |
| Teamwork | |
| Narrative | *Page 1* |
| MODULE A- Records Management (IARMM 1.1) | *Page A-1 thru A-19* |
| Records Management Goals | *A-2* |
| Record Life Cycle | *A-3* |
| Ways to Improve Records Management | *A-5* |
| Record Schedules | *A-6* |
| Narrative | *Pages 1-3* |
| MODULE B - Creation (IARMM 2.0) | *Page B-1 thru B43* |
| What is a Record? | *B-2* |
| What is an Indian Fiduciary Trust Record? | *B-4* |
| Personal Papers vs Government Papers | *B-34* |
| E-mail | *B-39* |
| Permanent vs. Temporary Records | *B-39* |
| Administrative vs. Program Papers | *B-40* |
| Files Types | *B-40* |
| *Activity 1 – Identifying Administrative Documents* | *Activity 1-1 thru 1-4* |
| *Activity 2 – Identifying Program Documents* | *Activity 2-1 thru 2-8* |
| Narrative | *Pages 1-5* |

| Section | Page No. |
| --- | --- |
| MODULE C - Records Maintenance and Use (IARMM 3.0) ........ | *C-1 thru C-44* |
| Record Maintenance Requirements | |
| File Folder Labels | *C-8* |
| Files Maintenance & Disposition Plans | *C-13* |
| Storing & Safeguarding | *C-21* |
| Records in Jeopardy | *C-30* |
| Freedom of Information Act | *C-40* |
| Privacy Act Records | *C-42* |
| *Activity 3 – Preparing Administrative Labels* .................... | *Activity 3-1 thru 3-3* |
| *Activity 4 – Preparing Program Labels* .................... | *Activity 4-1 thru 4-6* |
| *Activity 5 – Preparing a Files Maintenance & Disposition Plan* | *Activity 5-1* |
| Narrative ................................................................ | *Pages 1-7* |
| MODULE D – Records Disposition (IARMM 4.0) .................... | *Page D-1 thru D-61* |
| Records Transfer | *D-3* |
| Box Inventory | *D-7* |
| Record Move Plan Package | *D-19* |
| Interfiles | *D-30* |
| Records Retrieval | *D-33* |
| Removal and Destruction | *D-58* |
| *Activity 6 – Preparing an Inventory*.............................. | *Activity 6-1 thru 6-17* |
| *Activity 7 – Preparing a Record Move Request Form*........ | *Activity 7-1* |
| Narrative................................................................ | *Pages 1-7* |
| MODULE E - Vital, Frozen & Litigation Records (IARMM 5.0 & IARMM 8.0) ........................................ | *Page E-1 thru E-15* |
| Vital Records | *E-2* |
| Emergency Operating or Critical Period Records | *E-6* |
| Legal & Financial Rights Records | *E-6* |
| Litigation & Frozen Records | *E-8* |
| Narrative ................................................................ | *Pages 1-3* |
| GLOSSARY................................................................ | *PageG-1 thru G-11* |

**AGENDA**
**RECORDS CONTACT TRAINING**

| | |
|---|---|
| **DAY ONE**<br>**8:30 a.m. – 4:30 p.m.** | |
| 8:30 a.m. | Opening Remarks<br>(Housekeeping Rules, Introductions, Pre-Test ) |
| 9:00 a.m. | **MODULE A - RECORDS MANAGEMENT** |
| 10:00 a.m. | **MODULE B - CREATION**<br>*Quiz: Is it a Record?* |
| Lunch<br>11:30am – 12:45pm | |
| 12:45 p.m. | *Activity 1- Identifying General Admin. Documents*<br>*Activity 2 – Identifying Program Documents* |
| 2:00 p.m. | **MODULE C - RECORDS MAINTENANCE AND USE**<br>*Activity 3 – Preparing file labels (General Admin. Documents)*<br>*Activity 4 – Preparing file labels (Program Documents)* |
| **DAY TWO**<br>**8:30 a.m. – 4:30 p.m.** | |
| 8:30 a.m. | Records Maintenance continued |
| 10:00 a.m. | Files Maintenance and Disposition Plan<br>*Activity 5 – Preparing a Files Plan* |
| Lunch<br>11:30am – 12:45pm | |
| 12:45 p.m. | **MODULE D - RECORDS DISPOSITION**<br>*Activity 6 – Preparing an Inventory and an SF-135* |
| 2:30 p.m. | Records Disposition continued<br>*Activity 7 – Preparing a Record Move Plan* |
| **DAY THREE**<br>**8:30 a.m. – 12:00 p.m.** | |
| 8:30 a.m. | Records Disposition continued |
| 10:00 a.m. | **MODULE E - VITAL, FROZEN & LITIGATION RECORDS** |
| 11:00 a.m. – 12:00 p.m. | Wrap-Up, Review, Post-Test, Evaluations, Certificates |

** 10 minute breaks scheduled on the hour.*

# Abeita Declaration

# Exhibit 3

United States Department of the Interior
OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS
Albuquerque, NM 87109

TAKE PRIDE IN AMERICA

Division of Records Management Policies,
Procedures and Training

MAR 24 2006

Memorandum

To: Director, Bureau of Indian Affairs
Director, Office of Law Enforcement Services
Director, Office of Indian Education Programs

Through: Chief Information Officer, Office of the Special Trustee for American Indians

From: Director, Office of Trust Records (OTR)

Subject: Guidance and Procedures to Follow when Requesting Approval to Move Records

On July 19, 2004, OTR issued guidance and procedures to be used to obtain approval to move inactive records to the American Indian Records Repository (AIRR) – Annex in Lenexa, Kansas. Effective immediately, this memorandum supersedes the July 19, 2004 guidance. The Record Move Plan Package (Move Request form, Chain of Custody Plan, and records inventory) is to be used for all record moves that require approval from OTR. The only exceptions are identified as follows:

- Paragraph 19 Cobell Records
- Records of Tribes named in the Assistant Deputy Secretary's December 16, 2003 Memorandum:

  "Active and inactive Tribal records of the Standing Rock Sioux Tribes, the Assiniboine and Sioux Tribes of the Fort Peck Reservation, the Shoshone-Bannock Tribes of the Fort Hall Reservation, Jicarilla Apache Nation, Pueblo of Laguna, and the Delaware Tribe of Oklahoma."

Records for above listed Tribes still require the Associate Deputy Secretary's approval and use of the Associate Deputy Secretary's Record Move Request form and Chain of Custody Plan.

The attached guidance and procedures are to be used to obtain approval for moving inactive records to the AIRR-Annex in Lenexa, Kansas. The guidance and procedures are provided to assist you and your staff in preparing the Records Move Plan Package. The records inventory, Chain of Custody Plan and Record Move Request forms are available in electronic format on the BIA Intranet under category *Data Management*. **All Records Move Plan Packages must be forwarded to the OTR Regional Records Liaison (RRL) for processing and not directly to**

**the OTR office in Albuquerque, NM. This will provide the RRL the opportunity to review the Move Plan Packages prior to submission and to correct errors if necessary.**

OTR Records Management Specialists both in Albuquerque and in the field are available to provide technical assistance or any other information you may need as you develop and prepare your requests. Please contact your RRL or call the Division of Records Management Policies, Procedures and Training at (505) 816-1620 if you have any questions.

Attachments:

1. Guidance and Procedures to Follow when Requesting Approval to Move Records to the AIRR-Annex in Lenexa, Kansas
2. Instructions for Preparing a Records Inventory with two examples
3. Record Move Request **Revision 2** (form) – Director, OTR Approval and Chain of Custody Plan
4. Listing of Regional Records Liaison's (RRL's)

cc: Acting, Deputy Assistant Secretary for Information Resources Management – Indian Affairs
Director, Office of Information Policy – Indian Affairs
Central Office Directors
Regional Directors
Agency Superintendents

*Attachment 1*

**<u>Guidance and Procedures to Follow when Requesting Approval to Move Records To the American Indian Records Repository</u>**

1. The BIA Originating Responsible Official (ORO) will prepare the following (Records Move Plan Package) for submission to the Regional Records Liaison:

   1) Record Move Request form
   2) Chain of Custody Plan
   3) Records Inventory
   4) <u>The Records Transmittal and Receipt (SF-135) is not required by OTR but may be prepared as an option by the ORO.</u>

2. The ORO must forward all original documentation to the OTR/Regional Records Liaison (OTR/RRL) for processing:

3. The OTR/RRL will review the Record Move Request form, Chain of Custody Plan, and Records Inventory for completeness. The OTR/RRL will contact the ORO to discuss and clarify discrepancies and/or necessary changes.

4. After review, the OTR/RRL will forward all original documentation for approval to:

   Office of Trust Records
   Division of Records Management Policies, Procedures and Training
   4400 Masthead N.E.
   Albuquerque, NM 87109
   (505) 816-1620

*Note: <u>The ORO should not seal box one of the accession.</u> Upon receipt of approval, place the Move Plan Package in box one of each accession. The ORO may prepare the boxes for shipment but <u>must not</u> ship the boxes to AIRR without an <u>approved</u> Record Move Request form.*

5. When the Record Move Plan Package has been <u>approved</u> by the Director, OTR, a copy of the approved Records Move Request form will be provided to the OTR/RRL and the OTR/RRL will provide a copy to the ORO.

6. If the Record Move Request has been *disapproved* by the Director, OTR, the Records Management Specialist will fax a copy of the disapproved Record Move Plan Package along with a disapproval explanation to the OTR/RRL.

7. The OTR/RRL will contact the ORO to discuss the disapproval and, if applicable, clarify discrepancies and/or changes. The ORO will either complete a new Move Plan Package, or modify the existing Package.

8. The ORO will send the new or modified Record Move Plan Package to the OTR/RRL for review and processing.

9. The ORO must include a copy of the *approved* Record Move Request form and all supporting documentation (Chain of Custody Plan and Records Inventory) in box one of

the accession. After all required documents have been placed inside box one, the box should then be sealed.

10. The ORO will mark the boxes with the Accession Numbers provided on the Record Move Request form from OTR. The "Accession Number" should be written on the upper left hand corner and the "Agency Box Number(s)" should be written in the upper right hand corner of the FRC boxes.

11. The ORO will notify the Destination Responsible Official (DRO), when the shipment has left its office and provide the DRO, with an approximate date for arrival at the destination office.

Destination Responsible Officials:
Lena Mills, (913) 825-7800; Fax: (913) 825-7875

12. The DRO is responsible for certifying the successful move by completing and signing item 5 of the Record Move Request and ***within two working days of the successful move***, the DRO is responsible for forwarding a ***copy***, via fax, of the completed Record Move Request form to the ORO, respective RRL and to the Division of Records Management Policies, Procedures and Training Office at (505) 816-1653, Attention: Marsha Ruiz.

13. If for any reason the shipment is unsuccessful, the DRO must contact the ORO immediately. The ORO will contact the carrier immediately to initiate the trace for the boxes not received.

14. The ORO and DRO will document actions taken to resolve the unsuccessful shipment until the situation is corrected and include the documentation as part of the file to document the records transfer process as described in item 15 below.

15. The DRO will prepare a report with documentation to the Director, OTR, if the transfer cannot be corrected and is unsuccessful for more than 5 days from the date the shipment should have been received by the DRO.

16. The ORO and DRO are responsible for creating and maintaining a file to document the records transfer process. The Record Move Request form, Chain of Custody Plan, Records Inventory and other supporting documentation will be maintained in accordance with GRS 16 item 2a (2).

*Attachment 2*

## INSTRUCTIONS FOR PREPARING A RECORDS INVENTORY

1. The Records Inventory should be typed or generated with word processing software.
2. **You must choose one of the options below for the inventory of your boxes:**

**Detailed Inventory.** The following information must appear on ***all pages when the detailed inventory option is selected (See attached Example 1):***

a. Records Series Number (Schedule number); if there is no current Records Series Number, list as "Unscheduled" with a brief description of the records;
b. Record Series Title. (If the title does not adequately describe the records, you should provide a brief description of the contents of the documents);
c. The originating office names (i.e., Bureau of Indian Affairs or Office of the Special Trustee, Trust Funds Management, Region or agency office and program);
d. City and State;
e. Box number(s) that the inventory is for;
f. Box contents listing. This listing includes important file folder identifiers such as dates, contract numbers, names, or any information that specifically identifies **all the file folders in the order they appear in the box.**

**High-Level Inventory.** The following information must appear on ***all pages when the high level inventory option is selected (See attached Example 2):***

a. Records Series Number (Schedule number); if there is no current Records Series Number, list as "Unscheduled" with a brief description of the documents;
b. Record Series Title. (If the title does not adequately describe the records, you should provide a brief description of the documents);
c. The originating office names (i.e., Bureau of Indian Affairs or Office of the Special Trustee, Trust Funds Management, Region or agency office and program);
d. City and State;
e. Box number(s) that the inventory is for;
f. Box contents listing. This listing includes important file folder identifiers such as dates, contract numbers, names, or any information that specifically identifies the **first and last file folders as they appear in the box. Number the first and last file folder to indicate the total of file folders in each box.**

3. When determining the Records Category, Section 2 (a, b and c) on the Record Move Request form, please use the Trust Definition Matrices to make the determination. If a

file folder or record within a box is determined to be an Indian Fiduciary Trust Record (IFTA), the entire accession should be considered as trust records.

For example, the accession is comprised of 8 boxes of records/file folders. Box 2 contains IFTA records according to the Trust Definition Matrices. All 8 boxes are to be considered as trust records. Section 2a or 2b of the Record Move Request form should be checked. On the inventory you should write "TR" in bold letters next to the file or record identifier. It is only necessary to mark one file or folder identifier on the inventory with the "TR". (See Note in Example 2, *High Level Records Inventory*).

4. For records listed in the trust matrices with an asterisk (*), examine the files to determine if the records are trust or non-trust and following the guidance in item 3 above, check the appropriate box in Section 2 of the Record Move Request form (Trust or Non-Trust box).

**EXAMPLE 1** *Attachment 2*

# DETAILED RECORDS INVENTORY

**2306-P3 {2a} (Indian Self-Determination Grant/Contract Files) {2b}**
**Bureau of Indian Affairs,{2c} Great Plains Regional Office {2d}**
**Aberdeen, South Dakota {2e}**

**BOX NUMBER 1 {2f}**

{The below section is in reference to 2g}

FY 1985 Contract No. 12345678A Red Scaffold School Board
Lump Sum Incremental Cost Program

{The below bold section is in reference to 3 and 4}
**TR – FY 1985 Contract No. 23456781B Three Affiliated Tribes**
**Jailer/Dispatcher Program**

**FY 1985 Contract No. 34567812C Three Affiliated Tribes**
**Fish, Game and Recreation Program**

**FY 1985 Contract No. 45678123D Three Affiliated Tribes**
**Criminal Justice Program**

FY 1985 Contract No. 56781234E Three Affiliated Tribes
Home Improvement Program

**BOX NUMBER 2**
FY 1985 Contract No. 87654321G Three Affiliated Tribes
Social Service Program

FY 1985 Contract No. 76543218H Three Affiliated Tribes
Mineral Lease Compliance Program

FY 1985 Contract No. 65432178I Twin Buttes School District #37
Academic Instructional, Food, and Transportation Services Program

FY 1985 Contract No. 54321678J Twin Buttes School District #37
Facilities Management Services Program

FY 1985 Contract No. 43215678K Mandaree School District #36
Academic Instructional, Food, and Transportation Services Program

FY 1985 Contract No. 11145678L UTETC
Operation of UTETC

**EXAMPLE 2** *Attachment 2*

HIGH LEVEL RECORDS INVENTORY

**2306-P3 [2a] (Indian Self-Determination Grant/Contract Files) [2b]**
**Bureau of Indian Affairs, [2c] Great Plains Regional Office [2d]**
**Aberdeen, South Dakota [2e]**

**BOX NUMBER 1** [2f]

[The below section is in reference to 2g]

1 - (First file folder) FY 1985 - Contract No. 12345678A - Red Scaffold School Board - Lump Sum Incremental Cost Program

[The below bold section is an example for paragraphs 3 and 4]

**20 - (Last file folder) TR – FY 1985** - Contract No. 23456781B - Three Affiliated Tribes - Jailer/Dispatcher Program

**BOX NUMBER 2**

1 - (First file folder) FY 1985 - Contract No. 87654321G - Three Affiliated Tribes - Social Service Program

25 - (Last file folder) FY 1985 - Contract No. 11145678L – UTETC Operation of UTETC

Note: *Using this option of inventory will not allow you to identify whether the records in the boxes are trust records or not unless the first or last file is in fact a trust record according to the Trust Definition Matrices. If it is known that one file between the first and last file is a trust record, write on the face of that file folder "TR" and identify the entire accession as trust records.*

UNITED STATES
DEPARTMENT OF THE INTERIOR

# RECORD MOVE REQUEST
# OFFICE OF TRUST RECORDS APPROVAL

## 1. ORIGINATING RESPONSIBLE OFFICIAL INFORMATION: (Please Print)

| Date: | First Name: | MI: | Last Name: |
|---|---|---|---|
| Office: | Address: | | |
| Originating Responsible Official's Signature: | Telephone: | Fax: | |

## 2. RECORDS CATEGORY (Check One)

a. ☐ Inactive Trust Records to the American Indian Records Repository (AIRR)

NOTE: Paragraph 19 Cobell Records require Associate Deputy Secretary's approval
**DO NOT USE THIS FORM**

b. ☐ Inactive Trust Records within BIA, crossing regional boundaries

c. ☐ Inactive Indian/Non-Trust Records to the AIRR

**CERTIFICATION: I certify that these records and boxes being transferred across regional boundaries or to the American Indian Records Repository (AIRR) are NOT trust records.**

Originating Responsible Official's: Phone #: Signature: Date:

## 3. MOVE AND CHAIN OF CUSTODY PLAN INFORMATION

| | |
|---|---|
| a. Address where records are currently located: | b. Quantity of boxes to be moved: (Attach description, e.g., inventory or box lists) |
| c. Schedule or Series Number: | d. Method of Transportation (Identify carrier and attach written chain of custody plan) |
| e. Accession Numbers (To be completed by ORO) | |
| f. Receiving Office Phone #:<br>Address: | g. Responsible Official's Name Receiving Box(es): |

## 4. APPROVAL BY OTR

| Director, Office of Trust Records signature: | Date: |
|---|---|

## 5. AIRR DESTINATION CERTIFICATION: I certify all records and boxes have been moved successfully and were accounted for at the intended destination location.

Date Records Received at the AIRR:

| AIRR Destination Responsible Official's Signature: | Date: |
|---|---|

**TO BE COMPLETED BY OTR**

Date Record Move Request Received: ID#:

☐ Chain of Custody Plan ☐ Inventory or Box Lists

IARM Form 4004 Records Retention Instructions: Retain Record Move Request Form and copies of all supporting documentation (i.e., SF-135, Chain of Custody Plan, Inventory/Box List, etc) in accordance with GRS 16, item 2a(2). REVISION 2 (July 14, 2004).

# CHAIN OF CUSTODY PLAN

Upon receipt of approval of the Record Move Request form, the Responsible Officials at the originating and destination offices will ensure that the following procedures are followed during the transportation and transfer of the records being moved.

## Transporting Records Procedure (Chain of Custody)

1. Records are packed in appropriate storage boxes.

2. Box lists or inventory of records for each box are included inside the first box (box #1).

3. Each box is sealed with tape and boxes are numbered sequentially (e.g. box 1 of 5, box 2 of 5, etc.).

   Number of Boxes: Schedule or Series Number:

4. Check one box only:

   ☐ a. Boxes are taken to (Carrier) pick up location <u>or</u>

   ☐ b. (Carrier) is called to pick-up boxes at sender's office.

5. (Carrier) shipment form is completed and provided to carrier personnel.

6. The ORO, , (item 1 of form) will notify the DRO, Lena Mills at (913) 825-7869 (voice), (913) 825-7875 (fax) when shipment left location and approximate date of arrival at the AIRR.

7. The ORO, , (item 1 of form) retains a copy of the shipment form for tracking purposes in the event that a shipment item is missing.

8. The ORO, , contacts the DRO, Lena Mills at (913) 825-7869 to verify that the records and boxes have been moved successfully and are accounted for at the AIRR.

9. The DRO, Lena Mills is responsible for certifying the successful move by completing and signing item 5 of the Move Request form. ***Within two working days***, the DRO, Lena Mills must forward ***copies***, via fax, to the ORO, the RRL, and to the Division of Records Management Policies, Procedures, and Training, Attn: Marsha Ruiz at (505) 816-1631.

10. The ORO, and the DRO, Lena Mills, will create and maintain a file to document the records transfer process (by shipment). The Record Move Request form, records inventory, Chain of Custody plan and other supporting documentation will be maintained IAW GRS 16 item 2a (2).

# EXHIBIT 8:

# MEMORANDUM OF

# STEVEN GRILES

# APRIL 6, 2004

D

# United States Department of the Interior

THE DEPUTY SECRETARY
Washington, D.C. 20240

APR - 6 2004

Memorandum

To: Secretary
Acting Solicitor
Assistant Secretary – Fish and Wildlife and Parks
Assistant Secretary – Indian Affairs
Assistant Secretary – Land and Minerals Management
Assistant Secretary – Policy, Management and Budget
Assistant Secretary – Water and Science
Inspector General
Deputy Assistant Secretary – Policy
Director, U.S. Geological Survey
Director, Bureau of Land Management
Director, Minerals Management Service
Commissioner, Bureau of Reclamation
Acting Director, Bureau of Indian Affairs
Special Trustee for American Indians
Director, Office of Trust Records
Director, Office of Historical Trust Accounting
Director, Office of Trust Fund Management
Associate Director, Minerals Revenue Management, MMS
Manager, Indian Oil and Gas Compliance and Asset Management, MMS
Regional Director, Southwest Region, BIA
Superintendent, Jicarilla Agency, BIA
Superintendent, Laguna Agency, BIA
Superintendent, Southern Pueblos Agency, BIA

**Return Receipt Requested**

From: J. Steven Griles

Subject: **Court Orders regarding the Pueblo of Laguna and the Jicarilla Apache Nation**

To all Department of the Interior employees,

On March 19, 2004, the United States Court of Federal Claims, issued TWO orders regarding *The Pueblo of Laguna v. United States*, Docket No. 02-24 L (Court of Federal Claims) and *Jicarilla Apache Nation, formerly Jicarilla Apache Tribe v. The United States of America*, Docket No. 02-25 L (Court of Federal Claims).

In general, the orders require every office and employee of DOI to take reasonable steps to preserve every document, data, or tangible thing in its possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation. The subject matter of the pending litigation is the management and accounting of the tribal resources and funds of the Pueblo of Laguna and the Jicarilla Apache Nation from August 13, 1946, to January 8, 2002.

Every employee and office within DOI is already under an obligation to preserve all such documents in accordance with my memorandum of March 20, 2002, regarding the preservation of tribal trust documents generally. Please note, however, that the attached orders impose additional requirements.

**Under the orders, DOI employees are now required to preserve a broad range of "Documents, data, and tangible things" that are relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation. "Documents, data, and tangible things" is defined in the order to include voicemail messages, message and activity logs and information that "serves to identify, locate, or link such" relevant material.**

The precise manner in which you preserve relevant voicemails will vary depending on your circumstances. We appreciate that DOI's phone systems are limited in their ability to preserve voice messages. If the system cannot preserve a voicemail, you must record the message in a way that can preserve the message or transcribe the message on to paper. If you chose this method, please make a record of the date and time of the message – the so-called "envelope."

Larry Jensen, Counselor to the Solicitor, has earlier forwarded a similar communication concerning the matter. This memorandum merely reinforces that earlier memorandum.

The Department of Justice requests that this memorandum and its attachments be disseminated to each of the units and/or individuals that are responsible for the handling and preservation of the relevant records at the subagencies. It also requests that we draw your attention to paragraph 7 of the orders which indicate that a "failure to comply may lead to the imposition of sanctions." Any questions about this memorandum should be directed to Cristobal Alvarez at (202) 208-6966.

Please indicate your receipt of this memorandum by returning a signed copy of this memorandum, without attachments, to my office.

Attachments

RECEIVED:________________________ DATE:______________________

# EXHIBIT 9:

# DEPARTMENT OF INTERIOR MEMORANDUM

# MARCH 20, 2002

A

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

MAR 20 2002

Memorandum

To: All Employees

From: J. Steven Griles, Deputy Secretary of the Interior

Subject: Preservation of Tribal Trust Documents

Preserving Indian trust documents continues to be essential to the Department of the Interior. This Memorandum instructs all Interior employees to immediately preserve all documents, e-mail, and other records relating to Indian Tribal trust funds and Tribal trust assets, even if record retention schedules or other rules, manuals, or handbooks would allow their destruction. A number of Indian Tribes have filed lawsuits against the Federal Government and the Department of the Interior ("Interior") alleging a failure to properly account for Tribal trust funds and assets.

Pursuant to previous guidance related to the individual Indian trusts, all employees were directed to retain all documents relating to the following three areas: 1) American Indian trust reform, including the High Level Implementation Plan or any of its subprojects; 2) the Cobell v. Norton litigation pending in the U.S. District Court for the District of Columbia; and 3) administration of Individual Indian Money (IIM) accounts. Given the importance of preserving these documents and given the Tribal lawsuits, it is appropriate to issue this Memorandum to remind Interior employees about our document retention requirements.

This Memorandum does not change the prior guidance. All Interior offices, bureaus, and employees must continue to preserve all documents and e-mail relating to the three areas mentioned above. *All Interior offices, bureaus, and employees must also immediately preserve documents, e-mail, data, and records relating to Tribal trust assets and Tribal trust funds, even if record retention schedules or other rules, manuals, or handbooks would allow their destruction.*

What Tribal documents must be preserved? All documents related to: 1) the management and administration of Tribal trust fund accounts and funds and/or 2) Tribal trust assets. Such documents are referred to in this Memorandum as Tribal Trust Documents and include:

> All documents, data, and records upon which the Government must rely to fulfill its trust duties to recognized Indian Tribes pursuant to the American Indian Trust Fund Management Reform Act of 1994 (P.L. No. 103-412), and other applicable statutes; for example, those which evidence the existence of Tribal trust assets (e.g., ownership data, trust patents, plot descriptions, surveys, jacket files,

statement of accounts, etc.), the collection of income from Tribal trust assets (e.g., deposit tickets, journal vouchers, schedule of collections, etc.), the use of Tribal trust assets (e.g., leases, sales, rights-of way, investment reports, production reports, sales contracts, etc.), the management of Tribal trust assets (e.g., daily ledgers, investment reports, production verification reports, trespass enforcement, timber stumpage reports, royalty production reports, etc.), or the disbursement of Tribal trust assets (e.g., transaction ledgers, check registers, transaction registers, or lists of canceled or undelivered checks, etc.). Tribal trust assets are lands, natural resources, money, or other assets that are or were held by the Federal government in trust, or that are or were restricted against alienation, for Indian Tribes.

You must preserve Tribal Trust Documents involving all Tribes. Preserving Tribal Trust Documents is essential to enable Interior to fulfill its obligations.

If you are a supervisor, you are responsible for assuring that subordinate employees who are in possession, custody, or control of Tribal Trust Documents understand the importance of preserving Tribal Trust Documents. Supervisors, as well as employees, are held accountable for compliance. Supervisors must ensure that their employees comply with this Memorandum. If you are a Contracting Officer or a Contracting Officer's Technical Representative, you must notify contractors who are in possession, custody, or control of Tribal Trust Documents that they must preserve Tribal Trust Documents.

If you have any questions, please contact Sabrina McCarthy, Solicitor's Office, (202) 219-2139, or Debbie Meisner, Office of Trust Records, Office of the Special Trustee for American Indians, (505) 816-1600.

Report Fraud, Waste & Abuse: Toll-Free (800) 424-5081; Local (202) 208-5300; Toll-Free TDD (800) 354-0966; or Local TDD (703) 235-9221.