# EXHIBIT 20:

# TREASURY'S APRIL 2004 STATUS REPORT ON COMPLIANCE WITH RETENTION ORDER IN Pueblo of Laguna

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PUEBLO OF LAGUNA,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 02-24 L<br>Judge Francis M. Allegra |

**DECLARATION OF DEBRA DIENER**

I, Debra Diener, hereby declare, pursuant to 28 USC § 1746, as follows:

1. I currently am employed by the Department of the Treasury, Financial Management Service (FMS), as Chief Counsel. I have coordinated Treasury's efforts at the development of reasonable steps to comply with the orders of this Court, issued on March 19, 2004.

2. The Department of Treasury herewith submits its status report on the development of "a mechanism for monitoring compliance" with this Court's order of March 19, 2004. Each section of the status report was prepared by employees within the affected bureaus of the Department of the Treasury with personal knowledge of the facts set forth therein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2004.

Debra Diener

DEBRA DIENER

**Status Report on the U.S. Department of the Treasury's Compliance Monitoring Mechanism for <u>The Pueblo of Laguna v. United States</u>**

In an order issued on March 19, 2004, the Court imposed several obligations on the United States. One of these obligations is to establish a mechanism for monitoring the government's compliance with its obligation to preserve documents, data, and tangible things. Another of these obligations is to file a status report with the Court describing that mechanism.

This status report describes (1) the plan that the U.S. Department of the Treasury ("Treasury") has established to satisfy its preservation obligation under the Court's order (the "preservation plan"), and (2) the mechanism that Treasury has established to satisfy its obligation to monitor its compliance with the plan (the "compliance monitoring mechanism"). This report has three parts:

- Because both the preservation plan and the compliance monitoring mechanism necessarily must describe the subject matter of the documents to be preserved, we discuss that topic first.
- The second part of this report describes Treasury's preservation plan.
- The third part of this report describes Treasury's compliance monitoring mechanism, *i.e.*, how Treasury will ensure and demonstrate that these documents are being preserved.

**I. Documents Covered by the Preservation Plan and <u>Compliance Monitoring Mechanism</u>**

In Treasury's view, an effective plan for preserving documents and monitoring compliance requires that the documents covered by the plan be described clearly. The Court's order requires the Government to "take reasonable steps to preserve every document, data, or tangible thing in its possession, custody, or control, containing information that is relevant to, or may reasonably lead to discovery of information relevant to, the subject matter of the pending litigation." The boundaries of this broad description are inherently ambiguous, because no party can confidently identify all documents that might be subject to discovery at the outset of a case. At Treasury, there are literally thousands of good people, from clerks to managers, who need more certain guidance in order to apply this order to their daily business operations.

For these reasons, Treasury's report begins by defining more certainly the subject matter of documents, data, and tangible things covered by its preservation plan and compliance monitoring mechanism. This definition is overly broad, and we fully expect that Treasury will need further clarification from the Court as this case proceeds. We put

the definition forward now, however, in order to show our good faith efforts to comply with the Court's order.[1]

To the extent this litigation involves Treasury, its subject matter pertains to Treasury's asserted role as a co-trustee for funds belonging to the Pueblo of Laguna tribe. Our preservation plan and compliance mechanism cover documents pertaining to the activities we have undertaken, and will undertake, in this role:

- *The establishment of accounts in Treasury's central accounting and financial reporting accounting system.* In this regard, Treasury establishes accounts in Treasury's central accounting and financial reporting system for holding tribal trust funds, including funds belonging to the Pueblo of Laguna tribe.

- *The funding of government accounts.* In this regard, based on Interior's reporting, Treasury records the receipt of deposits, the classification (allocation) of those deposits to accounts, and the transfer of appropriated funds to accounts.

- *The investment of amounts in government accounts.* In this regard, at the request of Interior, Treasury invests amounts from the accounts in U.S. Government securities.

- *The redemption of investments in government accounts.* In this regard, at the request of Interior, Treasury redeems investments held in the accounts.

- *Assisting Interior with the disbursement of moneys.* Interior has authority to disburse funds from the accounts through the issuance of Treasury checks. At the direction of Interior, Treasury makes electronic payments and may issue check payments to recipients identified by Interior.

- *The government's accounting activities.* In this regard, Treasury produces account statements and posts account information for deposit-receipt, investment, redemption, and disbursement transactions of the accounts.

[1] The document retention order in *Cobell v. Norton* shows the benefit of defining the subject matter of covered documents. In that case, Judge Lamberth required Treasury to retain specific categories of financial records pertaining to the Indian plaintiffs. These categories, while overly broad and sometimes unclear, have been specific enough for Treasury to successfully administer the retention order. An excerpt from the *Cobell* order is attached.

We note that the documents, data, and tangible things described above may pertain to accounts that are specifically in the name of the Pueblo of Laguna tribe, as well as to summary level accounts. Prior to 1973, Treasury maintained in its central accounting and financial reporting system separate accounts for Indian tribes. In 1973, with the concurrence of the U. S. General Accounting Office, these separate accounts (totaling approximately 1,500 at that time) were consolidated on Treasury's books into summary level accounts. Treasury's preservation plan and compliance monitoring mechanism cover existing documents, data, and tangible things created before 1973 and after.

Treasury may also have processed purchases of marketable securities and savings bonds by Interior in trust for the Pueblo of Laguna tribe, and payments relating to Judgment Fund awards. Treasury's preservation plan and compliance mechanism covers any documents, data, and tangible things pertaining to these types of investments and payments that are in our possession, custody, or control.

## II. Treasury's Preservation Plan

### A. Treasury's Current Preservation Plan

Treasury's preservation plan relies in part on a successful structure that we developed to comply with a retention order in the *Cobell* case. Prior to that case, Treasury's practice had been to comply with record retention schedules approved by the National Archives and Record Administration ("NARA"). These schedules permitted Treasury to dispose of records – both trust and non-trust records – at the end of an approved retention period. Treasury ceased this practice for relevant records during *Cobell*, and instituted a rigorous program for protecting them.

The following practices developed during *Cobell* are part of our preservation plan for this case:

- Identifying those records, or systems containing records, that may reflect Treasury's activities as a co-trustee for Indian trust funds. Treasury's Financial Management Service ("FMS") and Bureau of the Public Debt ("BPD") are the Treasury bureaus that have the vast majority of such records for tribal trust funds. Each of these bureaus has created written inventories or narratives describing these records and their locations.

- Providing guidance and reminders, with periodic follow-up, to managers, employees, and relevant third parties about their obligation to preserve and maintain records covered by court orders.

- Maintaining back-up systems or procedures already in place for disaster recovery purposes.

- Suspending the disposal of pertinent records at federal record centers. As part of its normal practice in managing documents, Treasury sends records to NARA for maintenance in federal record centers under approved retention schedules. To preserve documents in *Cobell*, Treasury directed NARA to suspend destruction of documents in certain record groups, and Treasury issues periodic reminders to that effect. Some records relating to tribal funds may be in these record groups. If there are additional record groups that may contain materials covered by our preservation plan, we will issue additional instructions to NARA to preserve these documents.

**B. New Components of Treasury's Preservation Plan**

Treasury has instituted additional practices to ensure compliance with the Court's March 19, 2004 order:

- Following entry of the Court's March 19, 2004 order, FMS, BPD, and Main Treasury's Departmental Offices ("DO") each established a dedicated e-mail archive mailbox to house tribal-related e-mails and a dedicated repository to store voicemail messages related to this case. FMS, BPD, and DO distributed detailed, written instructions for using these storage mechanisms to their respective employees, and directed that they begin using those mechanisms immediately. FMS, BPD, and DO will issue periodic reminders to their employees to continue using these storage mechanisms.

- Following entry of the March 19, 2004 order, FMS, BPD, and DO each issued written directives to pertinent officials concerning the requirements in the Court's order. FMS, BPD, and DO will issue periodic written reminders to their employees.

In sum, Treasury has been, and continues to be, retaining vast categories of documents, data, and tangible things related to Treasury's activities in its role as a co-trustee for Indian tribal trust funds. The above-described preservation plan has proven to be effective and will continue to be employed in a good faith effort to fulfill Treasury's preservation obligations in this case.

## III. <u>Treasury's Compliance Monitoring Mechanism</u>

**A. Treasury's Current Compliance Monitoring Mechanisms**

Treasury has been employing several mechanisms for monitoring compliance in *Cobell* that will continue in this case. These mechanisms are the following:

- DO, FMS, and BPD have established a clear expectation within their offices that any questions or concerns regarding record retention should be

raised with their legal counsel. These expectations have been set forth in writing and during briefings.

- Senior management at DO, FMS and BPD have been, and continue to be, actively involved in Indian tribal trust fund (and *Cobell*) litigation matters, including record retention. For example, retaining records subject to a court order has been, and continues to be, included as a managerial effectiveness element for annual performance ratings of the Assistant Commissioners at FMS and BPD. Assistant Commissioners are held directly accountable to the Commissioner of their bureau for monitoring and controlling their own office's compliance with retention orders and directives.

- Treasury utilizes orientation briefings, meetings, and periodic reminders to inform employees (including senior Treasury officials and political appointees) about the importance of preserving documents covered by a preservation order, and the importance of promptly reporting any destruction incidents involving such documents. DO employees have been instructed to notify the General Counsel's Office, and FMS and BPD employees have been instructed to notify their Chief Counsel's Office, if such records are destroyed. Treasury will continue to use these mechanisms to keep its employees mindful of these important requirements.

- Upon learning of any destruction incident involving documents, data, or tangible things covered by Treasury's preservation plan, Treasury will promptly report the incident to the Department of Justice. Treasury will subsequently follow up with a written report to the Department of Justice, analyzing the records that were destroyed (such as, whether they contained relevant information and whether the information can be obtained from other records).

**B. New Components of Treasury's Compliance Monitoring Mechanism**

In addition to measures already in place from *Cobell*, Treasury will be taking additional measures to monitor compliance with the Court's order and our preservation plan:

- We will periodically monitor dedicated e-mail and voicemail mailboxes to ensure they have no storage problems.

- We will issue periodic reminders that describe the documents we must preserve to all relevant employees. Copies of these notices will be available for inspection upon request.

- We will ensure that we are keeping necessary electronic information pertaining to the trust functions listed above by querying the systems that retain this information. The ability of these systems to produce necessary data and documents upon request will demonstrate that these systems comply with the Court's order.

# EXHIBIT 21:

# MEMORANDUM OF

# DONALD V. HAMMOND

# APRIL 1, 2002

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

ASSISTANT SECRETARY

IMPORTANT: FOR IMMEDIATE ATTENTION

April 1, 2002

MEMORANDUM FOR: RICHARD L. GREGG
COMMISSIONER, FINANCIAL MANAGEMENT SERVICE

VAN ZECK
COMMISSIONER, BUREAU OF THE PUBLIC DEBT

ROBERT N. REID
DEPUTY ASSISTANT SECRETARY FOR
ACCOUNTING OPERATIONS

DAVID LEBRYK
DEPUTY ASSISTANT SECRETARY FOR
FISCAL OPERATIONS AND POLICY

DAVID J. MONROE
DIRECTOR, OFFICE OF CASH AND DEBT MANAGEMENT

FROM: DONALD V. HAMMOND
FISCAL ASSISTANT SECRETARY

SUBJECT: Preservation/Retention and Identification of Documents Related to Tribal Trust Funds

Attached is a memorandum, dated March 29 from General Counsel Aufhauser, regarding the retention and identification of documents relating to Tribal trust monies. Recently, litigation has been initiated against the government including the Treasury Department with respect to the accounting for certain Tribal trust funds. It is imperative that we immediately take steps to preserve any potentially relevant documents and to perform an initial identification of what we documents we have. Please instruct your respective organizations to preserve these records and

review the records that you have. The results of your initial review must be completed by April 11. In conducting your review, please keep in mind that prior to 1973 Treasury maintained accounts at the individual tribe level so the nature of the records in your possession could be significantly different for different time periods. I will schedule a briefing on this request in the very near future.

As noted in the memorandum, if you have any questions about this request, please call Brian Ferrell, Senior Counsel for Litigation on 622-8236.

Attachment

**Attachment 2**

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

GENERAL COUNSEL

March 29, 2002

**MEMORANDUM FOR** THE CHIEF OF STAFF
THE EXECUTIVE SECRETARY
UNDER SECRETARY FISHER
ASSISTANT SECRETARY CLARIDA
ASSISTANT SECRETARY DUNCAN
ASSISTANT SECRETARY HAMMOND
ASSISTANT SECRETARY WEINBERGER
ASSISTANT GENERAL COUNSELS
COUNSELOR TO THE GENERAL COUNSEL

**FROM:** David D. Aufhauser
General Counsel

**SUBJECT:** *Identification and Retention of Tribal Trust Fund Records*

Numerous Indian tribes have filed lawsuits against the Government relating to its administration and management of tribal trust funds and property. To date, 18 lawsuits have been filed, 17 since the beginning of January 2002. The number could, however, reach as many as 274.

The cases assert that the government has failed to provide the "Tribe with an accounting of the Tribe's trust funds." The complaints assert that "the Secretary of the Treasury of the United States is custodian of tribal trust funds, and has responsibility with regard to the administration of such funds and the preparation and maintenance of records in connection with those funds." The allegation is similar to what was alleged in Cobell.[1]

[1] The wave of tribal trust fund cases that have recently been filed are outside the scope of the claims brought by the individual Indian trust beneficiaries in Cobell v. Norton, which is currently being litigated in the Federal District Court here in Washington, D.C. District and Appellate court decisions in Cobell confirm the Government's fiduciary obligations to Indian trust beneficiaries, and in particular, the duty to account. See, Cobell v. Babbitt, 91 F.Supp.2d 1 (D.D.C. 1999), aff'd sub nom Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001).

Prior to 1973, Treasury maintained in the central accounting system separate accounts for the tribal activity. In 1973, with the concurrence of GAO[2], these separate accounts (totaling approximately 1,500 at that time) were consolidated. We request your assistance in identifying what, if any, records[3] and groups of records may exist concerning the separate accounts held by Treasury prior to 1973, as well as the accounts that exist post 1973. Please provide your preliminary findings, including the location of these records, by April 12, 2002.[4]

Also, I ask that you take steps to retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules. Please distribute this memorandum to the offices for which you are responsible. Please also take steps to ensure these records are retained and maintained. If you have any questions, please do not hesitate to contact Brian Ferrell of my office at (202) 622-8236.

---

[2]Treasury sought GAO concurrence with the consolidation based upon concerns with the historical commingling of tribal funds with "Indian Money, Proceeds of Labor" allowed for by a 1930's statute. GAO provided such concurrence on October 18, 1973. On November 26, 1973, Treasury adopted the consolidation of accounts effective July 1, 1973 by Treasury Directive No. 12499.

[3]The term "record" includes any handwritten, typed, or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies, writings, drafts, transcripts, and minutes). The term "record" also includes documentary material in other forms (such as electronic documents or presentations, electronic mail, magnetic tapes, computer disks, audio or video recordings, slides, microfilm, and motion pictures.

[4]The first of the government's responsive pleadings in these matters is due on April 26, 2002.

## ATTACHMENT 3: TRIBES CURRENTLY IN LITIGATION

The following tribes have filed suit:

- Assiniboine And Sioux Tribes of Fort Peck Indian Reservation
- Chippewa Cree Tribe of the Rocky Boy's Reservation
- The Crow Tribe of Indians
- Three Affiliated Tribes of the Fort Berthold Reservation
- Shoshone-Bannock Tribes of the Fort Hall Reservation
- Standing Rock Sioux Tribe
- Rosebud Sioux Tribe
- Confederated Tribes of the Warm Springs Reservation of Oregon
- Confederated Tribes and Bands of the Yakima Nation
- The Quapaw Tribe of Oklahoma
- The Blackfeet Tribe of the Blackfeet Indian Reservation
- The Delaware Tribe of Indians and the Delaware Trust Board
- Jicarilla Apache Nation
- Pueblo of Laguna
- Osage Nation and/or Tribe of Indians of Oklahoma
- Seminole Nation of Oklahoma
- Shoshone Tribe of the Wind River Reservation
- Arapaho Indian Tribe of the Wind River Reservation

**MEMORANDUM FOR DAVID D. AUFHAUSER**

**SUBJECT:** **Certification of Search for Tribal Trust Fund Records**

In accordance with the instructions provided in the April __, 2003 memorandum from the General Counsel, the undersigned, representing the Office of the

- ☐ Chief of Staff
- ☐ Executive Secretary
- ☐ Under Secretary for Domestic Finance
- ☐ Fiscal Assistant Secretary
- ☐ Assistant Secretary for Economic Policy
- ☐ Assistant Secretary for Legislative Affairs
- ☐ Assistant Secretary for Public Affairs
- ☐ Assistant Secretary for Management
- ☐ General Counsel

certifies (1) that a copy of the General Counsl's April __, 2003 memorandum was distributed to each supervisor in the office and (2) that this office has conducted a search for records responsive to the request. That search produced

- ☐ no responsive records
- ☐ responsive records that are attached to this memorandum.

This office searched (describe the scope of the search and the locations searched)

______________________
Name (please print)

______________________ Date

______________________
Signature

TOTAL P.10

# EXHIBIT 22:

# MEMORANDUM OF

# RICHARD L. GREGG

# APRIL 2, 2002

Financial Management Service
# memorandum

Date: April 2, 2002

To: Scott Johnson, Assistant Commissioner Management
Tony Torrice, Assistant Commissioner Regional Operations
Bettsy Lane, Assistant Commissioner Federal Finance
Nancy Fleetwood, Assistant Commissioner Information Resources
Judy Tillman, Assistant Commissioner Financial Operations
Larry Stout, Assistant Commissioner Governmentwide Accounting

From: Richard L. Gregg
Commissioner

Subject: Preservation/Retention and Identification of Documents Related to Tribal Trust Funds

Attached is a memorandum dated March 29 from General Counsel Aufhauser and a memorandum dated April 1 from Donald V. Hammond, Fiscal Assistant Secretary. Please take whatever action is necessary to preserve any potentially relevant documents pertaining to tribal trust funds. Based on a recent review conducted by Rita Bratcher and your individual offices a tribal trust fund records inventory listing was prepared. The document retention order that you have been following as a result of the Cobell litigation to a very great extent covers the same records as those pertaining to the tribal trust funds.

In addition to preserving tribal trust fund records, Don Hammond also asked us to conduct an initial review of these records by April 11. Please have your staff work with Rita Bratcher to ensure that the list of records that could be potentially relevant to tribal trust funds is accurate and comprehensive. Please send to me by April 11, a memo verifying that tribal trust fund records are being preserved and that the listing of documents prepared by Rita Bratcher with the assistance from each of your offices is accurate and comprehensive.

Also by April 11, I will request that Rita Bratcher forward to me a listing of the records that may be potentially relevant to tribal trust funds, including the location of such records.

Attachments

cc: Ken Papaj
Debra Diener
Rita Bratcher

*FMS — Quality People — Quality Service*

6

# EXHIBIT 23:

# MEMORANDUM OF

# ANN MEISTER

# APRIL 1, 2004

**Anne Meister**

04/01/2004 06:47 PM

To: All - BPD (Business use only!)
cc: Tribal Mail@BPD
Subject: SPECIAL NOTICE TO ALL EMPLOYEES

**MEMORANDUM FOR** **All BPD EMPLOYEES**

FROM: ANNE MEISTER

SUBJECT: RETENTION OF DOCUMENTS AND DATA RELATING TO INDIAN TRIBES

DATE: April 1, 2004

On March 22, 2004, we received two court orders that require BPD employees to retain documents and data relating to claims brought by the Jicarilla Apache Nation and the Pueblo of Laguna tribe. To ensure compliance with these court orders, and orders we may receive in cases with other Indian tribes, BPD is instituting an additional document retention policy. This policy applies to documents and data relating to Indian tribes that we handle in our role as a trustee, and supplements our existing policy for documents in the *Cobell* case.

Until further notice, please retain **all documents and data,** including duplicates, e-mails, and voice mails, that relate to the following subjects:

- The receipt, investment, and disbursement of trust funds belonging to Indian tribes.
- Procedures for managing Indian tribal trust funds, including procedures relating to the payment of interest.
- Accounting for Indian tribal trust funds.
- Litigation concerning the government's trust responsibilities towards Indian tribes.
- Treasury's trust responsibilities towards Indian tribes.
- Management of Indian tribal assets, such as land, timber, oil, and mineral rights.
- Document retention policies and practices pertaining to the subjects above.

Where possible and consistent with your normal business practices, please segregate the material you are retaining from other documents and data. This will help us to identify information pertaining to the litigation, as well as documents that can be safely destroyed at the end of the normal retention cycle.

To assist you in this effort, we have set up dedicated mailboxes for e-mails and voice mails. To retain existing and future e-mails, you should forward them to this address: **Tribal Mail.** If the e-mails pertain to a particular tribe, please put the tribe's name in the subject heading. To retain voice messages, please use the following procedure:

(1) Press 1 at the end of the message.

(2) Press 2 to forward the message with comments.

(3) Add your comments to the recording by saying the information in the message's header (e.g., the time and date of the message and the duration of the message). The voice mail system provides this information before each recorded message. If the message relates to a particular tribe, please mention that as well. Then press #.

(4) Enter extension 2000, then press #.

(5) Press # twice. When the message has been forwarded, you may delete it from your personal voice mailbox.

You may find it helpful to put this procedure by your phone. You may also wish to inform your colleagues that, because of the additional complications in retaining voice mail, you prefer to receive messages on Indian tribal matters by e-mail.

Please interpret your obligations under this policy broadly. If you need clarification or assistance, please contact BPD's Chief Counsel, Brian Ferrell (x3715), or Paul Wolfteich (x3715) or Brian Self (x3670) of his staff. Thank you for your continued cooperation and assistance with this policy.

# EXHIBIT 24:

# MEMORANDUM OF

# KENNETH R. PAPAJ

# AUGUST 27, 2007

# Official FMS Business

**To:** Office of the Commissioner Debt Management Services Federal Finance Financial Operations Governmentwide Accounting Information Resources AC Management Regional Operations HQ Austir Birmingham Kansas City Philadelphia San Francisco

**Date:** 08/30/2007

**From:** William Higgins

**Subject:** Cobell and Tribal Trust Litigation – FMS Retention Requirements

Date: August 27, 2007

To: All FMS Employees

From: Kenneth R. Papaj
Commissioner

Subject: Cobell and Tribal Trust Litigation – FMS Retention Requirements

All FMS employees are again reminded that FMS remains subject to continuing court orders and Treasury directives, requiring us to retain and safeguard all documents, data and tangible things that relate to Individual Indian Money (IIM) and Tribal trust funds and assets, indefinitely.

Due to the large number of new tribal lawsuits that were filed in December 2006, new retention orders are now being entered in additional tribal cases (i.e., in addition to the orders entered in the Jicarilla and Laguna cases). As a result, ***this reminder includes one important change: the instruction to preserve voicemail messages now applies to all tribal-related voicemail messages, not just to Jicarilla- and Laguna-related voicemails.***

To ensure that we remain in compliance with all court orders and directives, please continue to adhere to the following FMS requirements:

Do not destroy any documents, data or tangible things unless you have received written approval from the Chief Counsel. This rule applies to all documents, data and tangible things, whether litigation-related or not. Prepare a disposition request, following the instructions contained in the Chief Counsel's March 7, 2000 memorandum entitled "Process for Obtaining Disposition Approval" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page). The only exception to this rule is for "obvious non-record materials," as described in the attached "Quick Reference Guide."

Continue copying or forwarding all Cobell-related and Tribal-related e-mail and other electronic documents to their respective dedicated mailboxes ("Cobell Archive@fms" for IIM-related e-mail/electronic documents and "Tribal Mailbox@fms" for Tribal-related e-mail/electronic documents). To insert a mailbox address on an e-mail, simply type "Cobell" or "Tribal" and press the "Enter" key. You may delete your copy of any e-mail or other electronic document sent to these mailboxes.

Promptly forward any voicemail messages that relate to ***any tribe*** to FMS' dedicated "Tribal" voicemail repository. Following are step-by-step instructions for forwarding voicemail messages to the repository:
Press "1" after (or while listening to) a new or saved message;
Then press "2" to forward with comment;
Voice a comment to include (1) the tribe's name when applicable, e.g., "Message for Tribal mailbox-Crow tribe," (2) the identity of the caller, (3) the time and date of the message, (4) the duration of the message, and (5) the caller's extension, and press #;
Enter extension 91313, and press #;
After the prompts, press #, and then press # again to send (forward).

Do not archive (move) data from any FMS electronic production systems that contain litigation-related data, except pursuant to a written archive plan that has been approved by the Commissioner's Office. Please refer to the Deputy Commissioner's March 24, 2000 memorandum entitled "Maintenance of Data on FMS Systems" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page) for more information about this requirement.

Do not attempt to give guidance on record retention matters to Federal Reserve Bank personnel. Please refer all such questions to Terri Dawson at (202) 874-6877 or to Beth Kramer at (202) 874-7036.

I appreciate your continued compliance with these instructions and encourage you to review the pertinent memoranda posted on the FMS intranet. To locate the memoranda, double click on the icon for Internet Explorer. This moves you to FMS' intranet. Under "News" or "Hot Topics," click on "Cobell/Tribal Litigation."

If you have questions or need assistance regarding any of these retention requirements, please do not hesitate to contact Terri Dawson at (202) 874-6877 or Beth Kramer at (202) 874-7036.

Thank you.

Attachment

# "A Quick Reference Guide"

**REMEMBER: PRESERVE ALL INTERIOR/INDIAN-TRUST-RELATED MATERIAL!!**

## OBVIOUS NONRECORD MATERIALS

These may be destroyed without the approval of the Chief Counsel

| Categories | Examples |
| --- | --- |
| 1. Non-Treasury/FMS Material | Office supply catalogs<br>vendor marketing materials<br>non-FMS publications/manuals, such as phone books, Federal Register, dictionaries, "Lotus Notes for Dummies," etc. |
| 2. Treasury/FMS Distribution/ Reference Material | attendee's copy of handouts received at meetings, training, etc.<br>employee's copy of work-related organization charts, phone lists, Treasury Correspondence Manual, etc.<br>employee's copy of FMS publications, such as "Fiscal Scene"<br>excess stocks of FMS marketing materials, such as Direct Deposit brochures<br>notices received re: IT security, scheduling of meetings & van rides, training, "acting" managers, voting leave, etc. |
| 3. Personal Papers | notices received re: retirements, deaths, TSP, CFC, PTI, Flex Account, etc.<br>employee's copy of T&A, payroll, personnel, etc. records ( except travel records/receipts)<br>printouts of non-Federal Web pages that were not used for FMS business<br>non-FMS-related calendars/reminders<br>recipes, poems, cartoons, etc. |
| 4. Other | printer banner pages and printer failure reports<br>interim drafts created but never circulated to anyone<br>duplicates of any of the examples in these four categories. |

Click here for more information on Cobell Litigation

# EXHIBIT 25:

# MEMORANDUM OF

# NANCY FLEETWOOD

# AUGUST 29, 2007

Nancy Fleetwood/BPD
08/29/2007 12:09 PM

To All - BPD (Business use only!)
cc Tribal Mail@BPD
bcc
Subject Retention notice

The Department of the Treasury remains involved in numerous lawsuits filed by Indian tribes alleging that the U.S. Government owes an accounting for their trust funds or has mismanaged their trust funds and property. To ensure compliance with court retention orders and other litigation responsibilities, Bureau employees must comply with the following requirements.

Until further notice, please retain **all documents, data, and tangible things**, including duplicates, e-mails, and voice mails, that relate to the following subjects:

- The receipt, investment, and disbursement of trust funds belonging to Indian tribes;
- Procedures for managing Indian tribal trust funds, including procedures relating to the payment of interest;
- Accounting for Indian tribal trust funds;
- Treasury's trust responsibilities towards Indian tribes, and litigation concerning these responsibilities;
- Management of Indian tribal assets, such as land, timber, oil, and mineral rights; and
- Document retention policies and practices pertaining to the subjects above.

Please interpret your obligations under this policy broadly. Where possible and consistent with your normal business practices, please segregate the material you are retaining from other documents and data. This will help us identify information pertaining to the litigation, as well as documents that can be safely destroyed at the end of the normal retention cycle. Attached are instructions for retaining e-mails and voice mails by forwarding them to dedicated mailboxes.

These instructions supplement the retention requirements for the *Cobell* litigation. You can find copies of the retention orders for the tribal litigation on the Chief Counsel's web page, available on BPD's intranet. If you need clarification or assistance, please contact BPD's Chief Counsel, Paul Wolfteich (x3705), or Brian Self (x3670) of his staff. Thank you for your continued cooperation and assistance with this policy.

Attachment: Instructions for using the dedicated tribal mailboxes to retain e-mails and voice mails.

**Attachment**

**Instructions for Retaining E-Mails and Voice Mails**
**For the Indian Tribal Litigation**

To retain e-mails, you should forward them to this address: **Tribal Mail.** If the e-mails pertain to a particular tribe, please put the tribe's name in the subject heading.

To retain voice messages, please use the following procedure:

(1) Press 1 at the end of the message.

(2 Press 2 to forward the message with comments.

(3) Add your comments to the recording by saying the information in the message's header (e.g., the time and date of the message and the duration of the message). The voice mail system provides this information before each recorded message. If the message relates to a particular tribe, please mention that as well. Then press #.

(4) Enter extension 2000, then press #.

(5) Press # twice. When the message has been forwarded, you may delete it from your personal voice mailbox.

You may find it helpful to put this procedure by your phone. You may also wish to inform your colleagues that, because of the additional complications in retaining voice mail, you prefer to receive messages on Indian tribal matters by e-mail.

# EXHIBIT 26:

# MEMORANDUM OF

# ROBERT F. HOYT

# AUGUST 6, 2007

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

GENERAL COUNSEL

AUG 6 2007

**MEMORANDUM TO ALL DEPARTMENTAL OFFICES EMPLOYEES**

**FROM:** **ROBERT F. HOYT**

**SUBJECT:** Obligation to Retain Materials for Indian Litigation

The Department of the Treasury remains involved in numerous lawsuits filed by Native American individuals and tribes alleging that the U.S. Government owes an accounting for their trust funds or has mismanaged their trust funds and property. To ensure compliance with court retention orders and other litigation responsibilities, **Departmental Offices employees must retain all materials -- whether in paper, electronic (including e-mail or voice-mail), or tangible form – that meet <u>any</u> of the criteria described below.** These criteria are broader than legally required and are designed only for Departmental Offices materials.

1. Materials that mention or relate to Individual Indian Money or Individual Indian Money accounts.

2. Materials that mention or relate to tribal funds or tribal fund accounts. For example, material relating to the depositing, investing, disbursing, or accounting of tribal funds must be retained.

3. Materials that mention or relate to any delay between the issuance of government checks and the redemption of investments in government accounts to cover those checks -- sometimes called "check float." This criterion is not limited to Indian or tribal trust funds.

Attached are instructions for retaining e-mails and voice-mails by forwarding them to dedicated mailboxes.

You are required to retain these materials until further notice from this Office. If you have questions regarding the retention of particular materials, please contact Peter Bieger, Deputy Assistant General Counsel (Banking and Finance) at (202) 622-1975. The retention orders from *Cobell v. Kempthorne* and the tribal trust lawsuits are located on Treasury's intranet at *http://home.do.treas.gov/litigations* and are incorporated herein by reference. This memorandum takes the place of earlier instructions issued in connection with the *Cobell* and tribal trust lawsuits. Thank you for your continued attention to this important matter.

Attachment: Instructions for using the dedicated Cobell and tribal mailboxes for retaining e-mails and voice mails.

## Attachment

### Instructions for using the dedicated Cobell and tribal mailboxes for retaining e-mails and voice-mails

*Cobell* materials retention procedures

To retain e-mails:

1. Send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to Individual Indian Money or Individual Indian Money accounts, to the dedicated e-mailbox at the following mailbox address: *cobell@do.treas.gov* or just *Cobell*.

2. Forward any e-mail that you receive, or have previously received and not already forwarded, (including attachments and retaining forwarding history) that relate in any way to Individual Indian Money or Individual Indian Money accounts, to the dedicated e-mailbox at the following mailbox address: *cobell@do.treas.gov* or just *Cobell*, unless you can tell from the message that the e-mail has already been sent to the dedicated e-mailbox.

Tribal trust materials retention procedures

To retain e-mails:

1. Send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated e-mailbox at the following mailbox address: *tribal@do.treas.gov* or just *tribal*. Please ensure that the tribe's name, if any, is included in the subject heading.

2. Forward any e-mail that you receive, or have previously received and not already forwarded, (including attachments and retaining forwarding history) that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated e-mailbox at the following mailbox address: *tribal@do.treas.gov* or just *tribal*, unless you can tell from the message that the e-mail has already been sent to the dedicated e-mailbox.

To retain voice-mails:

Forward all applicable voice messages that relate in any way to (a) tribal funds or tribal fund accounts or (b) any check float afforded to any invested government account, to the dedicated voice-mailbox in accordance with the following instructions:

- press 1 after (or while listening to) a new or saved message;
- press 2 to forward with comment;
- voice a comment and identify the relevant tribe, if any (e.g., "Message for tribal mailbox-Jicarilla Tribe"), then press #;
- enter extension 91313, then press #;
- press #, then press # again to send (forward).

At the request of the Department of Justice, please review the header of each voice message being forwarded and, when voicing a comment include the identity of the caller, the time and date of the message, the duration of the message, and the extension of the caller.

Please note that the *Cobell* and tribal e-mailboxes have been copied on the e-mail message conveying this memorandum.

# EXHIBIT 27:

# DECLARATION OF

# RICHARD P. FIELETZ, JR.

# APRIL 16, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA<br><br>Plaintiff<br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant | ) ) ) ) ) ) ) ) ) ) | Case No. 06-cv-00935<br><br>DECLARATION OF RICHARD P. FIELITZ, JR. |

I, Richard P. Fielitz, Jr., pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Chief of Staff for the Office of the Special Trustee for American Indians ("OST") in the Department of Interior. I have held this position since October 28, 2007, and I have been employed by OST since May 2004. My duties include oversight responsibilities for various OST functions including litigation support. Seminole Nation of Oklahoma records are currently maintained in the following locations: OST Albuquerque, New Mexico, OST and Office of Historical Trust Accounting ("OHTA") in Washington, DC; American Indian Records Repository ("AIRR") in Lenexa, Kansas; Office of Appraisal Services-Eastern Oklahoma Region in Muscogee, OK and the Bureau of Indian Affairs ("BIA"), Wewoka Agency in Wewoka, OK and Eastern Oklahoma Regional Office in Muscogee, OK.

2. OST is aware of the Department-wide policy to preserve all Indian trust records. On or about March 12, 2007, OST received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus ("Jensen Memo"). It directed those offices and bureaus to, among other things, preserve information potentially relevant to *any* tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. A copy of the Jensen Memo was then circulated through our Office of Trust Records ("OTR") to Records Liaisons for OST. Margaret Treadway, my predecessor as Chief of Staff, sent an email to OST Senior Managers directing them to ensure each employee read the Jensen Memo, and on April 4, 2007, OTR certified to the Office of Chief Information Officer that all OTR employees had read the Memo. The Jensen Memo was also placed on OST's internal Trust Portal for ready access by OST employees and it was discussed again in regularly scheduled Senior Managers meetings on December 4, 2007 and March 25, 2008. Copies of the Memorandum were again handed out in the December meeting. Compliance issues and our existing preservation policies were discussed in both meetings.

3. The Jensen Memorandum further reiterated Interior's preexisting policy requiring the indefinite retention of all categories of Indian fiduciary trust records, regardless of the existence of any pending litigation. That policy is detailed in the record retention schedules contained in 16 Bureau of Indian Affairs Manual, expressly applicable to records maintained by BIA and OST. The Indian Affairs Records Management Manual specifically states that BIA and OST records retention policy for all records is permanent for all records, including any identified as temporary. In other words, no records may be destroyed. OST further supports and carries out Interior's records retention policy by, among other measures, extensive records training for Interior employees that is conducted by OTR and by the policy of shipping all inactive records from various Interior facilities to the AIRR, an archival-quality facility, when the period for these records to be retained onsite has expired.

4. OST already has efficient policies and procedures to continue preserving Indian trust documents. If each office is required to move documents from where they are currently maintained to another location, further delays are inevitable. For example, additional time is necessary for employees to consolidate boxes by tribal name within the same Region. Currently, boxes are organized by Tribe, program office and records series.

5. Additionally, the time period that may be set aside for Plaintiffs to inspect documents at another location (than where documents are currently maintained) may be extended if Plaintiffs are unable to review all the request documents within the time frame allotted. Unfortunately, if this occurs, boxed records will sit in conference rooms or other locations until Plaintiffs are able to "observe" the movement of those boxed records from office to office, city to city. The observation process simply allows the Plaintiffs to watch closed boxes being loaded into trucks and unloaded at the interim destination. A simple move can take weeks to coordinate because of conflicting schedules of those involved in the move process. Additionally, OTR contractor costs would be increased because the contractor must be present not only for interim moves, but also for the final preparation and shipment of records to Lenexa, Kansas.

6. OST employees have been directed to forward any questions about records preservation policies and procedures to me. Employees have also been directed to report suspected incidents of alteration, mistreatment or destruction of Relevant Records for the Seminole Nation of Oklahoma to me. I will promptly report any questions and/or suspected incidents to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records for Seminole Nation of Oklahoma have been reported to me. The records for Seminole Nation of Oklahoma continue to remain preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our preservation policies and procedures, and I am prepared to fully implement such guidance, as well.

Executed this 16th day of April, 2008.

RICHARD P. FIELITZ, JR.

# EXHIBIT 28:

# MEMORANDUM OF

# JEANNETTE HANNA

# APRIL 16, 2008

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SEMINOLE NATION OF OKLAHOMA** ) | **Case No. 06-cv-00935** |
| **Plaintiff** ) | **DECLARATION OF JEANETTE HANNA** |
| **v.** ) | |
| **UNITED STATES OF AMERICA** ) | |
| **Defendant** ) | |

I, Jeanette Hanna, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Regional Director, Eastern Oklahoma Region for the Bureau of Indian Affairs (BIA). The Regional Director is responsible for representing the Bureau on behalf of the Secretary of the Interior in its interaction with Tribal, state and local governments, other Federal agencies, and the general public within the assigned jurisdiction. I have oversight responsibility in the application and implementation of overall policies and programs at the Region, including Agency offices, where I am tasked with providing technical advice and review, evaluating performance, coordinating those features of Bureau programs which extend beyond the jurisdiction of a single Agency and making final decisions on behalf of the Department as delegated by the Secretary and recommending to Headquarters revisions of policies, programs, procedures and regulations. As the Regional Director, I am in the front line position, delegated the authority from the Secretary to commit the United States Government in Government-to-Government relationships with Federally recognized Tribes, sister Federal agencies and other local and state governments and municipalities. Agencies included under the jurisdiction of the Eastern Oklahoma Region are the Wewoka Agency, Talihina Agency, Chickasaw Agency, Miami Agency, Osage Agency and Okmulgee Agency.

2. BIA is aware of the Department-wide policy to preserve all Indian trust records. On or about March 12, 2007, the BIA received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any Tribal trust litigation, including, but not limited to this case. The Memo identified common issues in Tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The Memo was reissued via e-mail and a hard copy was distributed to all Regional Managers to share with their respective staff as well as the reiteration of the Department-wide policy on trust records.

3 The Department's record management policy is reiterated to all Managers with standing direction that they and their respective staff are fully aware of and in compliance with the policies and procedures as issued by the Department in the handling of trust records in the Bureau. Any movement of records, including the archiving of a record or from office to office, is coordinated through the Office of the Special Trustee for American Indians (OST), Office of Trust Records (OTR), Records Management Specialist, Ms. Julie Kelley, who is duty stationed at the Regional Office. Further, Records Plans are prepared (pursuant to Department policy and procedures) by each office and provided to Ms. Kelley for concurrence on the handling and storage of records housed within each office. Additionally, mandatory training has been held for employees on the Department's Records policy and procedures with either Ms. Kelley or another official from the OTR providing the training. New employees are also briefed on the existing records preservation policies and procedures.

4. The Document Preservation Order, as proposed, would impose several burdens on the Eastern Oklahoma Regional Office due to limited resources. Prior to transferring any trust records, the Bureau must first obtain clearance from OTR. A chain of custody plan must be prepared for the movement of records from one location to another and cleared with OTR. This process could take anywhere from two weeks to a month, depending on OTR's workload and availability. Once approval of the plan is received, the Bureau may then proceed with moving files to the Wewoka Agency, as Plaintiff's Proposed Document Preservation Order suggests (see Paragraph 2(b)(iii)).

5. Additionally, the Eastern Oklahoma Regional Office is located in Muskogee, OK, which is approximately 90 miles from the Wewoka Agency in Wewoka, Oklahoma. The transporting of such files from Muskogee to Wewoka must either be conducted by staff with cleared background security checks and/or hired contractors who have received clearance to transport trust records. It is preferred that the Bureau utilize professional movers, however, the time constraints do not allow the Region proper time to solicit bids in order to obtain transport services. Also, the Region would need additional time to process background checks and obtain clearance for each of the drivers/crew members who will need to be involved in the movement of the records.

6. The burden of transporting documents would be left with existing staff members who possess the appropriate security clearances, resulting in a loss of several regular work hours for each staff. This would create and/or add a backlog of unfinished projects, because of lack of additional staff available to handle the work. Entering a document preservation order would interfere with the already existing preservation policies and procedures BIA has in place. Further, this will cause existing staff to be responsible for ensuring the safeguarding and maintenance of these files at the Agency location. This creates an additional burden to the Region. The Regional Office staff would also be burdened by the time and expense if the need arises to access the proposed transferred records. Constant access to records is necessary, as litigation continues

with interrogatories, discovery requests, etc. The Regional Office could not respond as timely if the records are no longer on-site for available and/or immediate access.

7. BIA employees have been directed to forward any questions about records preservation policies and procedures to the immediate Office of the Regional Director and/or to their Division Manager. Employees are also directed to report any suspected incidents of alteration, mistreatment or destruction of Relevant Records to myself, the Deputy Regional Directors (DRDs) or to their Division Manager. The Managers must promptly report those questions or suspected incidents to me and/or either of the DRDs and all questions and incidents will be immediately reported to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records have been reported to me. The records for Seminole Nation of Oklahoma continue to remain preserved per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with the Department's preservation policies and procedures, and I am prepared to fully implement such guidance, as well.

Executed this 16 day of April, 2008.

JEANETTE HANNA

# EXHIBIT 29:

# DECLARATION OF

# EDDIE STREATER

# APRIL 15, 2008

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SEMINOLE NATION OF OKLAHOMA** ) | **Case No. 06-cv-00935** |
| **Plaintiff** ) | **DECLARATION OF EDDIE STREATER** |
| v. ) | |
| **UNITED STATES OF AMERICA** ) | |
| **Defendant** ) | |

I, Eddie Streater, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Superintendent of the Wewoka Agency for the Bureau of Indian Affairs ("BIA"). My responsibilities as Superintendent include serving as the line officer responsible for the planning, implementing, directing, monitoring and evaluating of the Bureau of Indian Affairs trust responsibilities and program services within the Wewoka Agency service area. The Seminole Nation of Oklahoma is the only tribe that is serviced by the Wewoka Agency and our responsibilities to the Tribe include Agriculture, Certificates of Degree of Indian Blood (CDIBs), Code of Federal Regulations Court, Fire Program and Real Estate Services. Programs under the Tribe's P.L. 93-638 Contract include Aid to Tribal Government, Indian Child Welfare, Indian Reservation Roads, Job Placement & Training and Social Services.

2. The Wewoka Agency is aware of the Department-wide policy to preserve all Indian trust records. On or about March 12, 2007, the Wewoka Agency received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus ("Jensen Memo"). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The Memorandum was shared with respective staff as well as reiteration of the Department wide policy on retention of trust records.

3 Respective staff is fully aware of and in compliance with the policies and procedures as issued by the Department in handling and preservation of trust records in the Agency. Any movement of records, including the archiving of a record or from office to office, is coordinated through the Office of the Special Trustee for American Indians (OST), Office of Trust Records (OTR), Records Management Specialist, Ms. Julie Kelley, who is duty stationed at the Regional Office. Further, Records Plans are

prepared (pursuant to Department policy and procedures) by each office and provided to Ms. Kelley for concurrence on the handling and storage of records house within each office. Additionally, mandatory training has been held for employees on the Department's Records policy and procedures with either Ms. Kelley or another official from the OTR providing the training. New employees are also briefed on the existing records retention policy and are provided mandatory records training.

4. The Document Preservation Order, as proposed, would impose several burdens on the Wewoka Agency, due to limited staff resources. For example, there are approximately ten staff members/employees who manage the daily operations of the Agency. If the Agency had to make arrangements to accommodate records/documents from other offices and bureaus of the Department for purposes of Plaintiff's inspection, we would have to detail employees from the Regional Office and/or surrounding agencies to cover the supervision, preservation and maintenance of those documents. Any additional contracted staff would first have to receive background clearances, which could take anywhere from 6-8 weeks; this process would disrupt the on-going daily operations of the Agency, because of space limitations.

5. BIA Agency employees are required to forward any questions about records preservation policies and procedures to myself, or a designated Acting Superintendent. The Acting Superintendent is directed to promptly report any suspected incidents of alteration, mistreatment or destruction of Relevant Records to me and I will immediately report any such incidents to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records have been reported to me. The records for Seminole Nation of Oklahoma continue to be preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed this 15 day of April, 2008.

Eddie Streater

EDDIE STREATER

# EXHIBIT 30:

# DECLARATION OF

# PAULETTE L. SANFORD

# APRIL 15, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| **Plaintiff** | ) | **DECLARATION OF PAULETTE L. SANFORD** |
| v. | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

I, Paulette L. Sanford, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Information Technology (IT) Trust Program Manager for the Bureau of Land Management (BLM), a position I have held since October 8, 2006. I have been employed by BLM since April 13, 1997, and my responsibilities incl ude the coordination and management of BLM's IT programs, as they relate to Indian trust issues and the implementation of applicable Department of Interior (DOI) policies and directives. BLM's IT programs conduct backup and recovery activities for electronic data processing applications, and electronic mail operations. BLM is a complex organization that includes Offices throughout the Mid-west and Eastern states and has a unique mission to protect and preserve our nation's lands for future and present generations. Because of this, BLM has implemented a robust Records Management Program that is aimed at ensuring all BLM's records are maintained at secure locations. Prior to my employment with BLM, I worked in various federal service positions, and used records retention and disposition schedules as they relate to records. I am familiar with how these record retention and disposition schedules relate to Indian trust records.

2. The BLM is aware of the Department-wide policy to preserve all Indian trust records. On or about March 12, 2007, the BLM received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. BLM immediately reminded its employees of their responsibility to preserve all information potentially relevant to any tribal trust litigation. On or about March 18, 2008, BLM also appointed Tara Jones, Management Analyst, to assist in the oversight of our preservation policies.

3 BLM maintains several file rooms that contain paper documents and electronic records (microfiche) for Seminole Nation of Oklahoma at the BLM offices in Farmington, New Mexico and Tulsa and Moore, Oklahoma. The type of records BLM currently maintains for Seminole Nation of Oklahoma at these locations include, but are not limited to: oil & gas or mining activity case files. In addition to Seminole Nation of Oklahoma records, these file rooms also contain records for other Tribes. In 2001, inactive records for Seminole Nation of Oklahoma were classified as "permanent" and are currently maintained at the local Farmington, New Mexico, Tulsa and Moore, Oklahoma locations.

4. Seminole Nation of Oklahoma oil & gas and mining activity case files must be maintained at their current locations because they are used to conduct regular BLM business. On a daily basis, these records are used to assist BLM in their ability to review Indian materials for diligent development and to conduct associated activities for operations. Maintaining oil & gas and mineral records at these Farmington, New Mexico, Tulsa and Moore, Oklahoma sites, enables BLM to update the records for day to day operations. Also, BLM may receive a request from the Bureau of Indian Affairs (BIA) to conduct a cadastral survey on a piece of land for a Tribe. After the surveys are completed, BLM retains the survey information and the cadastral survey.

5. The BLM does not file its records by tribal affiliation. In order to make records available for inspection by the Plaintiffs, BLM will need to divert resources from other Program areas to review all files to label them Tribal name. Additionally, requiring BLM to move records from its Farmington, Tulsa and Moore locations and shipping those records to Wewoka Agency in Wewoka, OK, will create a financial hardship by diverting financial resources from other business programs. The initial step of copying these records is an overwhelming burden to BLM. One or more current employees would be moved from handling their existing responsibilities and tasked with searching through all the existing BLM records at these locations where records are currently maintained for Seminole Nation of Oklahoma records.

6. Until an exhaustive search is made, BLM can not ascertain an exact number of records that exist for the Seminole Nation of Oklahoma at these locations. Depending on how many records are found, those would have to be copied and shipped, which creates an additional burden on BLM's already diminishing budget, resources and limited staff. Most importantly, a transferring of such records to the BIA Wewoka Agency in Wewoka, OK will interfere with BLM's ability to handle its daily responsibilities of resolving issues as they relate to oil & gas and minerals activities.

7. All BLM employees have been directed to forward any questions about records preservation policies and procedures, as well as suspected incidents of alteration, mistreatment or destruction of Relevant Records to myself or Ms. Jones. She has been directed to forward these incidents to me and I will immediately report all such incidents to the Office of the Solicitor. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records have been reported to

me. The records for Seminole Nation of Oklahoma continue to remain preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our existing preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed on April 15, 2008.

PAULETTE L. SANFORD

# EXHIBIT 31:

# DECLARATION OF

# BRIAN B. MCCAULEY

# APRIL 15, 2008

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| **Plaintiff** | ) | **DECLARATION OF BRIAN B. MCCAULEY** |
| **v.** | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

I, Brian B. McCauley, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Records Officer for the Minerals Management Service (MMS) in the Department of the Interior. I have been employed in this capacity at the MMS since June 2005. My main duties include coordinating records management operations throughout MMS, by ensuring that all employees understand and follow all applicable requirements for the preservation of Indian trust records within the possession, custody or control of MMS.

2. MMS is aware of the Department-wide policy to preserve all Indian trust records. In my role as the MMS Records Officer, one of my responsibilities is to ensure that MMS employees understand and follow all applicable requirements for the preservation of Indian trust records within MMS possession, custody, or control. This is accomplished in part by distributing periodic e-mail messages to MMS records personnel emphasizing the critical importance of the preservation of Indian trust records. These personnel are comprised of program records officers, specialists, coordinators and custodians tasked by their programs with providing guidance and requesting compliance with Department of the Interior and MMS records management procedures and policies within their respective program areas. They are members of the MMS Records Management Committee (MMSRMC), a chartered committee that includes as part of its mission, conducting monthly teleconferences to review critical ongoing records management topics such as records preservation orders related to ongoing litigation of which the Department of the Interior is a named party. The MMSRMC also posts information and compliance requirements regarding litigation holds and records freezes in force on its intranet web-site.

3. On or about March 12, 2007, MMS received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other

things, preserve information potentially relevant to *any* tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The Jensen Memo was distributed to the members of the MMSRMC and the bureau eDiscovery liaisons.

4. As a policy, MMS employees cannot dispose of or destroy any Federal or Indian records. This policy is posted on the Bureau intranet site for informational purposes. Periodic reminders of the policy are issued in records management bulletins, which clearly stipulate that no Indian Trust Records may be destroyed, and that there are strict procedural requirements put in place regarding the movement of those types of records.

5. MMS has records retention policies in place to ensure that Indian Trust records are safeguarded and appropriately preserved. The proposed Seminole Nation of Oklahoma Document Preservation Order (DPO) outlines a process that would place an unduly burden on MMS with regard to the time required for planning, document preparation, staffing and other related costs. For example, if the additional requirement of retrieving boxes and shipping such from the Federal Records Centers to the Plaintiff's designated location (Wewoka, OK) is entered, this procedure would disrupt daily operations and undermine services supported by an already limited budget and staff.

6. MMS employees have been directed to forward any questions about records preservation policies and procedures to me. Employees have also been instructed to report any suspected incidents of alteration, mistreatment or destruction of Relevant Records to me. I will promptly report those questions or suspected incidents to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records have been reported to me. The records for Seminole Nation of Oklahoma continue to remain preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed this 15th day of April, 2008.

BRIAN B. MCCAULEY

# EXHIBIT 32:

# DECLARATION OF

# LORI Y. VASSAR

# APRIL 22, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| **Plaintiff** | ) | **DECLARATION OF LORI Y. VASSAR** |
| v. | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

I, Lori Y. Vassar, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Associate General Counsel for the U.S. Department of Interior Office of the Inspector General (OIG). I have been employed by the OIG since March 10, 2002 to the present. My duties include providing independent legal advice to all components of the OIG on a variety of substantive and procedural matters relating to the OIG's audit, inspection and evaluation and investigation activities. I review Freedom of Information Act and Privacy Act responses and administrative subpoena requests, produce reports in response to official requests for information and represent the OIG in litigation. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity. This declaration describes the current OIG record retention procedures relating to Indian trust litigation.

2. Since approximately October 1999, Sandra Perkins, the OIG Records Management Specialist, routinely provided guidance to OIG offices and employees on the requirement to preserve and retain Indian tribal trust records. She advised the OIG Offices of Investigations, Audits and Management to identify and distinguish every record that contained Indian trust or BIA records, which was done with stamps, labels, or handwritten notations. Prior to the storage of records, labels were placed on investigative files relating to Indian tribal trust matters, noting that they are not to be destroyed. Audit files containing tribal trust records are segregated and preserved. E-mail retention notices are periodically sent to all OIG employees, as required by the U.S. District Court for the District of Columbia in the currently captioned case, *Cobell, et al. v. Dirk Kempthorne, et al.* (*Cobell*). Questions with respect to Litigation Hold notices are directed to me or Ms. Perkins. Regional Administrative Records Contacts in OIG field offices receive reminders prior to any records, including non-Indian trust records, being

disposed of or archived that steps must be taken to ensure that the Indian Fiduciary Trust Records (IFTR) are not included. Originating offices make preliminary determinations on whether records constitute IFTR and consult with OIG attorneys or Ms. Perkins if questions arise. Certifications must be made that records do not contain IFTR information prior to consideration for destruction. Preservation and record retention orders and guidance received from the Department officials are conveyed to the OIG managers for dissemination to relevant offices or to all OIG employees, when appropriate.

3. The OIG is also aware of the Department-wide policy to preserve all Indian trust records. On or about March 20, 2007, the OIG received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Jensen Memo identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. In response to the Jensen Memo, Ms. Perkins e-mailed a copy of this Memo to all OIG employees, along with the attachment that reflected all on-going tribal trust cases, as of March 6, 2007. Seminole Nation of Oklahoma was among the tribes included on the attachment. Ms. Perkins reminded all employees to identify records if they contain any individual or tribal trust information, when forwarding records to the OIG Records Section, and to contact her if any employees had questions regarding the e-mail.

4. OIG electronic records are maintained on the OIG network system and electronic mail system. Within the network system, employees retain records on their personal network drive and on a shared office network drive (e.g., Office of Audits, Office of Investigations). Records on the network system, including personal and shared office drives, are backed up every Sunday through Friday night, and a "snapshot" of all records is retained separately for a minimum of twelve months and may then be recycled. This does not mean that data is erased after twelve months, only that a particular night's "snapshot" may be erased. The network drive for the Office of Investigations, the Case Management System (CMS) is likewise backed up each night. The CMS system tracks changes to records and the employee who last updated a record, when records are revised and updated. This system of records is used by supervisors to review drafts. These procedures ensure that the OIG is able to provide relevant e-mails and records relating to trust litigation as requested.

5. In response to a court order issued on August 12, 1999, arising out of the Cobell litigation, OIG electronic mail was, and still remains, backed up six nights a week

and is currently being maintained. AutoAudit, the OIG system for retaining electronic audit files, except for individual Indian and tribal trust records, is a separate application that is integrated into the same groupware software as the e-mail system. AutoAudit is also backed up and retained in the same manner as the e-mail records.

6. The OIG provides mandatory, on-line training on records management, which apprises all OIG employees of their duty to retain tribal trust records. Also, the Contracting Officer's Technical Representatives have ensured through contract provisions that each contract employee working on the Department-wide financial statement is required to sign a Confidentiality Agreement and Acknowledgment of Consent Order Concerning Information Technology to be eligible to work on the contract. Each Confidentiality Agreement contains notice of the Consent Order issued on December 17, 2001, in the case. The notice states that any system that houses individual Indian trust data or Indian tribal trust data or copies of this data must be secured and cannot be destroyed. The Agreement also provides further information security instructions.

7. Additionally, OIG requires exiting employees to complete an Employee Exit Clearance Form. This form requires exiting employees to certify that they have identified to their supervisor(s) all records in their possession that are the subject of litigation hold notices and the location of such records. Records management training will specifically be addressed in new employee orientations, beginning in May, the next scheduled orientation briefing.

8. OIG maintains very few audit records that pertain only to the Seminole Nation of Oklahoma. OIG audit report titles usually do not reference a specific tribe. Rather, many of these historic reports address programmatic reviews of the Bureau of Indian Affairs Regional or Agency Offices that service multiple tribes. Thus, for example, the audit reports that relate to the financial statement audits of Bureau of Indian Affairs over several years may potentially be responsive to request made by over one hundred tribes. Therefore, shipping records to the Wewoka Agency, where there is currently no OIG office, would cause an undue burden and expense to the OIG. More importantly, shipping records to the Wewoka Agency would adversely affect the OIG's ability to respond to discovery requests that relate to other tribal trust litigation and cause undue delays and expense in sending OIG personnel and computer equipment to the Wewoka Agency to review and copy records and process discovery requests of other tribes. Because OIG does not have an office at Wewoka Agency, additional steps, such as purchasing locked cabinets, would be required to ensure that records containing proprietary, personal or privileged information are adequately protected and to maintain the integrity of the OIG records. Specific discovery requests have not

been made by the Plaintiffs; therefore, the OIG is unable to ascertain the scope of records that may be subject to the proposed order.

9. OIG employees have also been instructed to forward questions about records preservation policies and procedures to OIG attorneys or to Ms. Perkins. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with Departmental preservation policies and procedures, and I am prepared to fully implement such guidance or alternative procedures that will more effectively ensure the preservation of OIG records. Current procedures implemented by the OIG highlight the importance of preserving tribal trust records to all OIG employees. The OIG continues to execute policies and procedures to preserve tribal trust records.

Executed this 22nd day of April, 2008.

Lori Y. Vassar

LORI Y. VASSAR
Associate General Counsel

# EXHIBIT 33:

# DECLARATION OF

# EDWARD KEABLE

# APRIL 15, 2008

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| **Plaintiff** | ) | |
| v. | ) | **DECLARATION OF EDWARD KEABLE** |
| **UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

I, Edward Keable, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Associate Solicitor-Administration for the Office of the Solicitor ("SOL"), a position I have held since January 6, 2003. I have been employed by SOL since November 9, 1997. My duties include administration of the SOL human resources, budget, facilities, contracting and information management. Included within SOL are eight regional offices, 10 field offices and the Washington office. The Washington office includes five legal divisions, the administrative division and the Immediate Office (which includes the Indian Trust Litigation Office ("ITLO").

2. I am aware of the Department of Interior's policy that requires that all Indian fiduciary trust records be preserved, and forbids their destruction in any case. On or about March 12, 2007, Lawrence L. Jensen, Deputy Solicitor, issued a memo entitled: Litigation Hold: Preservation of Information in Tribal Trust Cases, which was addressed to all Interior offices and bureaus. It reminded addressees of the preexisting duty to preserve records and more specifically then directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. ITLO distributed this memo on March 12, 2007.

3. Additionally, SOL currently has performance measures designed to hold employees accountable for records management. New employees are provided records management training within the first 30 days of their employment with SOL. The records management training includes: an overview of the federal agency and employee's statutory obligations to preserve federal records. This training also provides new employees with an extensive overview on the definition of federal record, the preservation policies and the procedures required to maintain records. I also generally interview every new employee in the Office on their first day during

which I highlight the importance of records management generally and preservation of trust records specifically. Upon departure from SOL, employees are directed to print and file all Federal records with their related records and comply with current litigation requirements. Currently, the SOL Records Officer conducts a quality review of the exiting employee's work environment.

4. Christina Bartlett is the Law Practice Support Lead for SOL. On or about March 20, 2008, Ms. Bartlett issued an email communication in which she directed all SOL staff members to forward any questions about SOL's preservation policies and procedures to herself.

5. Ms. Bartlett has also directed all SOL staff members to promptly report any suspected incidents of alteration, mistreatment or destruction of Relevant Records to myself or Ms. Bartlett. She has been directed to forward any reports of suspected incidents to me, and I will immediately forward all reported incidents to ITLO and will refer any questions regarding compliance with the Court's Order to them as well. No such incidents of alteration, mistreatment or destruction have been reported to myself or Ms. Bartlett as of the date of this filing. I understand that further guidance may be issued from time to time by ITLO on compliance with our preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed this 15th day of April, 2008.

EDWARD KEABLE

# EXHIBIT 34:

# DECLARATION OF

# CHARLES E. BREECE

# APRIL 16, 2008

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff** | ) | **DECLARATION OF CHARLES E. BREECE** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

I, Charles E. Breece, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the Principal Deputy Director for the Office of Hearing and Appeals ("OHA"), a position I have held since October, 2000 and I have been employed by Office of Hearings and Appeals since March, 1998. My duties include overseeing OHA's administrative operations, including oversight of OHA's records management functions and responsibilities.

2. The Office of Hearings and Appeals is aware of the Department-wide policy to preserve all Indian trust records. On or about March 15, 2007, the Office of Hearings and Appeals received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus ("Jensen Memo"). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The contents of the Jensen Memo were discussed in staff meetings with OHA supervisors and staff upon receipt of the memo.

3. OHA has taken other preservation measures and safeguards to ensure compliance with our current preservation policies. OHA employees must report the existence of relevant Tribal trust information in OHA files and preserve, transport and handle information in accordance with Departmental guidance. Currently OHA has approximately 118 employees and one contractor on board and the majority of them have been trained concerning the Department's policy to preserve Indian trust records, OHA's records retention policies and procedures, and OHA employees' responsibilities to comply with currently entered Records Retention Orders in other Indian trust cases. Training for the remaining employees is scheduled for this month.

4. On December 13, 2007, I sent a written communication to all OHA employees, reminding them of their responsibilities regarding the preservation of all Indian trust records. I have requested each office to designate a point of contact to document the distribution of currently entered Record Retention Orders in other Indian trust cases, to monitor compliance issues and to serve as the conduit of information to and from me or my alternate, Mary Thorstenson, who is located in our Rapid City, South Dakota office.

5. OHA employees are directed to forward any questions about records preservation policies and procedures to myself or to Ms. Thorstenson. OHA employees are also directed to report any suspected incidents of alteration, mistreatment or destruction of Relevant Records to myself or Ms. Thorstenson. Ms. Thorstenson has been directed to promptly report any questions and/or suspected incidents of alteration, mistreatment or destruction of Relevant Records to me, and I will immediately report any such incidents to the Solicitor's Office. I will refer any questions regarding existing preservation policies and procedures there, as well. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records have been reported to me. The records for Seminole Nation of Oklahoma continue to be preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our preservation policies, and I am prepared to fully implement such guidance.

Executed this 16 day of April, 2008.

Charles E. Breece

CHARLES E. BREECE

# EXHIBIT 35:

# DECLARATION OF

# ROBERT DOYLE

# APRIL 17, 2008

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **SEMINOLE NATION OF OKLAHOMA** | ) | **Case No. 06-cv-00935** |
| **Plaintiff** | ) | |
| **v.** | ) | **DECLARATION OF ROBERT DOYLE** |
| **UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

I, Robert Doyle, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am employed as the Deputy Director of the United States Geological Survey (USGS). I serve as the Chief Operating Officer of the USGS, responsible for implementing USGS programs. I am also the USGS senior contact that is tasked with coordinating searches in the USGS for documents potentially responsive to discovery requests and for ensuring USGS compliance with Congressional and FOIA requests, as well as various preservation policies and procedures. I have been employed by USGS for five years.

2. On or about December 10, 2007, the USGS received a memorandum with attachment signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Department of the Interior (DOI) offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other things, preserve information potentially relevant to *any* tribal trust litigation, including, but not limited to, this case. The Jensen Memo identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The attachment to the Jensen Memo provided a list of Tribes and Indian Groups with pending tribal trust cases (as of 03/06/07), including the Seminole Nation of Oklahoma. The USGS has an internal Records Management website that is dedicated to document production, searches and other legal matters. The Jensen Memo and accompanying attachments is posted on the internal website for all USGS employees to access. The Jensen Memo was distributed to all employees that were found to hold potentially relevant information for the Seminole Nation of Oklahoma, along with a reminder to preserve such information.

3. USGS has approximately 8,500 employees and approximately 400 facilities nationwide. The USGS is a world leader in the natural sciences and has produced, and will continue to produce, many studies and products which are publically available on the Internet, in public libraries or in USGS libraries. USGS may also have information which is not publically available. For the Seminole Nation of Oklahoma, the USGS maintains such information as scientific studies or data on natural resources such as mineral resources and aeromagnetic studies that may cover Seminole Nation of Oklahoma lands.

4. The Document Production Team (DPT) is a bureau-wide team created to lead and oversee bureau searches for records in response to court-related requests, as well as Congressional and other legal inquiries. USGS employees or offices that may have potentially relevant information have been directed by their DPT member to forward any questions relating to Departmental preservation policies and procedures to them.

5. USGS employees have been directed to immediately forward reports of any suspected incidents of alteration, mistreatment or destruction of Relevant Records for Seminole Nation of Oklahoma to me. I will immediately report any such incidents to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records for Seminole Nation of Oklahoma have been reported to me. Potentially relevant information related to the Seminole Nation of Oklahoma and maintained by USGS continues to remain preserved, per Departmental policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with the Department's preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed this 17 day of April, 2008.

ROBERT DOYLE

# EXHIBIT 36:

# DECLARATION OF

# PAMELA R. QUALLICH

# APRIL 17, 2008

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SEMINOLE NATION OF OKLAHOMA** **Plaintiff** ) | **Case No. 06-CV-00935** |
| **v.** ) | **DECLARATION OF PAMALA R. QUALLICH** |
| **UNITED STATES OF AMERICA** **Defendant** ) | |

I, Pamala R. Quallich, pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I am the National Business Center (NBC) Records Officer with records responsibility for the Office of the Secretary (OS), a position I have held since July 13, 2003, and I have been employed by the Department of Interior (DOI) since April 17, 1988. My duties include oversight and management of Records, Freedom of Information Act, Privacy Act and the Information Management Budget for the DOI NBC with responsibilities for those areas within the OS. There are several separate offices within the Immediate Office of the Secretary (IOS); the Office of the Assistant Secretary for Policy, Management and Budget (PMB), and the NBC that may or may not have relevant documents for the Seminole Nation of Oklahoma, specifically:
   - Offices within the IOS: Office of Alaskan Affairs, Office of Executive Secretariat and the Office of Congressional and Legislative Affairs, all of which are located in Washington, D.C.
   - Offices within the PMB: Office of Financial Management, Office of Budget, the Information Management Branch of the NBC, all located in Washington, D.C. and the Acquisition Directorate of the NBC, located in Herndon, Virginia.

2. The OS, PMB and the NBC are aware of the Department-wide policy to preserve all Indian trust records, and understand that no Indian records or documents may be destroyed. To ensure continued records preservation, I have instituted policies, procedures and maintain oversight for any and all records and document moves within the OS, PMB and NBC. Records that are inactive may be retired to the American Indian Records Repository (AIRR) in Lenexa, Kansas, if they have a current records schedule. Other records may be retired to the local Federal Records Center (FRC) or to the National Archives and Records Administration (NARA). Any records retired must first be separated by Trust and Non-Trust; an Indian Fiduciary Trust Records Certification must be on file at the Office of Trust Records (OTR) and

the Offices must complete a SF-135 (Records Transmittal and Receipt Form), a chain-of-custody plan and a box list. The OS Records Office will forward this package to the Director of OTR (if trust holdings) for review and signature and once returned from OTR, the OS Records Officer will forward the package to NARA for approval. The records are then authorized for shipment to the AIRR, a local Federal Records Center (FRC) or NARA. The shipment and/or pick-up is also coordinated through the OS Records Office to ensure compliance with the handling and shipping requirements for NARA, the AIRR and the Department of Interior (DOI).

3. On or about March 20, 2007, the OS received a Memorandum signed by Lawrence L. Jensen, Deputy Solicitor, subject: Litigation Hold: Preservation of Information in Tribal Trust Cases, dated March 12, 2007, which was addressed to all Interior offices and bureaus (Jensen Memo). It directed those offices and bureaus to, among other things, preserve information potentially relevant to any tribal trust litigation, including, but not limited to, this case. The Memorandum identified common issues in tribal trust cases and directed the continued preservation of electronic and paper records potentially relevant to these cases. The Jensen Memo and attachment was emailed to all OS, PMB and NBC Records Contacts and PMB Heads of Offices with instructions on compliance with the contents of the memo.

4. A document Preservation Order would create an unnecessary burden on OS, PMB, and NBC. For example, most of the Indian records and document holdings are located at the AIRR. For inspection purposes, Plaintiffs would have to submit their requests to the OTR in Albuquerque, New Mexico. As for the records currently maintained at the separate offices under the OS, PMB and NBC, each office would have to assign at least one records-trained individual to review all the records to ensure their relevancy. If records are ordered to be moved from their current location to another for review, the records person would be required to make copies of such documents. The records person would sign the requisite chain-of-custody form, which tracks the movement of records (how and where the records were shipped). The records person would then transfer the records to the proposed separate location for Plaintiff's review, using our current procedures. This procedure would take no less than eight weeks to complete. The costs associated with this workload would include the following: the hourly rate of one of the four organization's records employee, the hourly rate of one of the three organization's records employee, the hourly rate of the OS Records Office staff (two individuals for review) and the actual cost of the transfer to and from the proposed additional location.

5. Employees and Records Contacts for the OS, PMB and the NBC were directed to forward any questions about records preservation policies and procedures to Dawn Boswell, the OS Records Section Chief. Employees and Records Contacts have been instructed and continually reminded that NO records may be destroyed and specifically reminded that NO Indian records or documents for any Tribe may be destroyed. All employees and Records Contacts must immediately report any suspected incidents of alteration, mistreatment or destruction of Relevant Records of

Seminole Nation of Oklahoma to Ms. Boswell, who will immediately report all incidents to me. I will immediately report any such incidents to the Solicitor's Office. As of the date of this filing, no such incidents of alteration, mistreatment or destruction of Relevant Records for the Seminole Nation of Oklahoma have been reported to me. To my knowledge, the records for Seminole Nation of Oklahoma continue to be preserved, per Departmental and OS policy. I understand that further guidance may be issued from time to time by the Solicitor's Office on compliance with our preservation policies and procedures, and I am prepared to fully implement such guidance.

Executed this 17 day of April, 2008.

Pamala R. Quallich

PAMALA R. QUALLICH

# EXHIBIT 37:

# DECLARATION OF

# RITA BRATCHER

# APRIL 17, 2008

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA<br>*Plaintiff,*<br>v.<br>UNITED STATES OF AMERICA<br>*Defendant.* | ) | No. 06-cv-00935 L<br>Judge George W. Miller |

## DECLARATION OF RITA BRATCHER

I, Rita Bratcher, hereby declare, pursuant to 28 U.S.C. §1746, as follows:

1. I am currently employed by the Department of the Treasury, Financial Management Service ("FMS"), as the Assistant Commissioner, Debt Management Services. I have been employed at FMS for over 35 years, and I served as the Document Production Coordinator for the *Cobell* litigation from March of 1999 through April of 2003. *Cobell v. Kempthorne*, No. 1:96CV01285 (JR). As the Document Production Coordinator, under the direction of the Commissioner of FMS, I coordinated efforts within FMS related to the "Paragraph 19" search in support of the Defendants' Response to the Court's First Order for the Production of Information, and the development of FMS' Inventory of Summary Level Accounting Records, dated June 21, 2000.

2. The "Paragraph 19 search" refers to an effort undertaken in response to a document request in *Cobell* which called upon the Government to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM

[Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest."

3. I have personal knowledge of FMS's document production protocols and efforts with respect to Indian litigation. The facts set forth below are true to the best of my information, knowledge, and belief, or are as provided to me by employees of FMS based on their knowledge, information, and belief.

4. This declaration is based on my knowledge of FMS's documents, systems, and retention and preservation protocols and practices, my general familiarity with the process used to plan and execute the Paragraph 19 search in *Cobell*, and facts about that search gathered by others that were included in Treasury's Paragraph 19 Document Production Report, filed in *Cobell* on January 31, 2001.

5. I understand that it is Plaintiff's position that all documents subject to the Plaintiff's proposed retention order in this case ("Relevant Documents") are to be moved to Wewoka, Oklahoma. I further understand that the "Relevant Documents" are those "containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation." Proposed Document Preservation Order at 1.

6. Treasury's retention and preservation protocols and practices have been designed to retain a much larger group of documents than would be considered "Relevant Documents," because Treasury is unable to pinpoint with accuracy its "Relevant Documents." Treasury's difficulty in identifying its "Relevant Documents" stems

primarily from the fact that Treasury's program activities and related documents do not match up well with Plaintiff's claims.[1]

7. As an example, Plaintiff's case concerns Plaintiff, the Seminole Nation. However, the documents Treasury is retaining do not, as a general matter, identify a specific tribe. Instead, since 1973, most of Interior's reporting to Treasury has been at the level of the "Tribal Trust Fund," one account in Treasury's Government-wide accounting system. Whether or not such documents are "Relevant Documents" is unclear; however, in an abundance of caution, Treasury has instructed its employees to retain these documents.

8. This level of reporting is similar to that done by Interior for the Individual Indian Money ("IIM") accounts at issue in *Cobell*. (For those, Interior reports at the level of the "Individual Indian Money" fund.) As a result, the effort to locate "Relevant Documents" for this case would be substantially similar to the effort to locate "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM [Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest." The Paragraph 19 search done in *Cobell*, therefore, provides a useful reference for evaluating the work, time, and cost that would be involved in finding the documents Plaintiff asserts should be moved to Wewoka, Oklahoma.

9. Treasury's Paragraph 19 search was designed to locate documents pertaining to the IIM accounts of particular individual Indian beneficiaries. A search of the same records collections would be conducted in looking for the records of an Indian

---

[1] The claims asserted relate predominantly to activities by the Department of the Interior, for which Treasury happens to be in possession of some documentation (most of which consists of duplicate copies of documents in the possession, custody, or control of the Department of the Interior).

tribe, such as Plaintiff in this case. The attached Executive Summary of the Department of the Treasury Paragraph 19 Document Production Report prepared and filed in connection with the *Cobell* case, describes, in summary fashion, the methodology for the Paragraph 19 search and some of the burdens that it entailed.

10. In 1999, Treasury began a comprehensive search for documents responsive to Paragraph 19. The search took 14 months, required research at 37 facilities in 24 cities, considered over 6 billion records, involved the work of 2,200 people, and cost over $3,900,000. For all this effort, the search found only 2,296 documents, for five individuals and their predecessors in interest.

11. If Treasury were required to repeat a Paragraph 19-type search to locate "Relevant Records" to be moved to Wewoka, Oklahoma, I would recommend that Treasury prepare a search protocol and plan as it did in 1999. Treasury would in all likelihood hire a contractor to assist in development of the plan. I estimate that it would take several months to prepare a thorough search plan, depending on the search scope (including locations to be searched), the contractor's schedule, cost, and other factors.

12. The burden of undertaking a new Paragraph 19-type search would depend on assumptions in the search plan, and Treasury would propose a somewhat different plan than it used in 1999-2000 in *Cobell* by requesting that the Court impose appropriate limitations on the search, based on an analysis of the cost and burden of the search as compared to the likelihood of finding discoverable documents in certain types of record collections (for example, the Complaint in this case is unbounded in time, and therefore implicates all active and historical documents of the Department). However, if the Court

required Treasury to undertake the same search again,[2] based on my experience with the planning and execution of the Paragraph 19 Report and my review of that Report, I estimate that the following data contained in the Paragraph 19 Document Production Report would roughly approximate some of the burden involved in the new search:

a. During the Paragraph 19 production, Treasury searched 84,730 cubic feet of records (about 188 million pages) at the National Archives. These records took thousands of hours to search and contained only 1,573 responsive documents.

b. During the Paragraph 19 production, Treasury searched 374,072 cubic feet of records (about 1 billion pages) at Federal Record Centers in 11 different locations. These records took thousands of hours to search and contained no responsive documents.

c. During the Paragraph 19 production, Treasury searched 454 boxes at Federal Reserve Banks in 8 cities. No responsive documents were found.

d. During the Paragraph 19 production, Treasury searched 250 boxes of check-related records, and 3 billion check-related records that can only be searched with predicate information from the Interior Department (check symbol and serial number). The search found 222 checks and 492 check-related records.

---

[2] The search procedure would be the same except for substituting "Seminole Nation" for the five named Plaintiffs and their predecessors in interest in *Cobell*. Although there would only be one name being searched, and therefore certain aspects of the search would be less time consuming, other aspects of the search would be more time consuming because of the greater number of disbursing officers servicing the tribe over time, so I estimate that the search time would be similar.

13. The cost of conducting another Paragraph 19-type search is difficult to estimate, because it depends heavily on assumptions in the search plan, such as the locations to be searched, the years to be searched, and many other factors; however, the original Paragraph 19 search, which is similar in scope to the search that would be required to locate all "Relevant Documents," cost approximately $3.9 million.

14. In addition to the burdens described above, attempting to locate and move all "Relevant Documents" would substantially disrupt Treasury Department operations, in that human resources currently performing core Treasury functions would need to be diverted to assist in the planning and execution of the search. While contractors were used for some portions of the Paragraph 19 search, thousands of hours were devoted by Treasury personnel to the search as well, which extended over 14 months.

15. In summary, the search and other measures required by Plaintiff's position that Treasury's "Relevant Documents" are required by the proposed retention order to be moved to Wewoka, Oklahoma, would impose heavy burdens on Treasury, in terms of dollar cost and the diversion of human and other resources from the day-to-day operations and responsibilities of the Department.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of April, 2008.

Rita Bratcher

Rita Bratcher

# TAB A

# TO

# DECLARATION OF

# RITA BRATCHER

# DEPARTMENT OF THE TREASURY
# PARAGRAPH 19 DOCUMENT PRODUCTION REPORT
*COBELL ET AL. v. SECRETARY OF THE INTERIOR, ET AL.*

**Date:** January 31, 2001

The Department of the Treasury ("Treasury") has completed its searches for, and production of, records responsive to Paragraph 19 of the Court's First Order for the Production of Information, dated November 27, 1996 ("Paragraph 19").[1] This report provides the following information: (1) background information; (2) summary information regarding search efforts, costs, and results; and (3) detailed information regarding certain elements of Treasury's searches.

## Background Information

In 1999, Treasury set forth to fulfill its obligations to conduct comprehensive searches for documents responsive to Paragraph 19.[2] Treasury's efforts focused on determining anew: (1) which departmental offices and bureaus should be included in the search and production effort; (2) which categories of records would need to be searched; and (3) what procedures should be used in searching those records.[3]

Following its decision to answer these three questions anew, Treasury initially determined that three of its constituent parts might have records responsive to Paragraph 19. These three parts were certain Departmental Offices (Office of the General Counsel; Office of the Under Secretary for Domestic Finance and its constituent parts including the Office of the Fiscal Assistant Secretary; Office of the Assistant Secretary for Legislative Affairs; and Office of the Assistant Secretary for Public Affairs) (hereinafter referred to collectively as "DO"), the Financial Management Service ("FMS") and the Bureau of the Public Debt ("BPD"). Treasury also determined that other Treasury bureaus[4] were unlikely to have any responsive records. On October 28, 1999, Treasury briefed the Special Master and Plaintiffs' counsel and advised them of these determinations.[5]

Having made these determinations, Treasury, with the assistance of the Department of Justice ("DOJ") and Arthur Andersen LLP ("Arthur Andersen"), drafted and filed with the Court, the Special Master and Plaintiffs' counsel its *Revised Document Production*

---

[1] Should Treasury receive additional predicate information from the Department of the Interior regarding either (1) checks and check-related records or (2) Treasury securities, Treasury will promptly produce any responsive documents that it can identify using the predicate information.
[2] In late 1998, Treasury searched for and identified some checks and check-related records responsive to Paragraph 19. These documents were produced to the Plaintiffs in November 1998 and January 1999. However, in February 1999, the Court found that Treasury had failed to substantially comply with Paragraph 19.
[3] Treasury had previously attempted to address these questions and determine their answers. Following the Court's February 1999 ruling, Treasury assayed to address these questions and determine their answers anew.
[4] These bureaus include the Internal Revenue Service, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the United States Secret Service, the United States Customs Service, the Bureau of Alcohol, Tobacco and Firearms, the Financial Crimes Enforcement Network, the Federal Law Enforcement Training Center, the United States Mint, the Bureau of Engraving and Printing, the Community Development Financial Institutions Fund, and the Treasury Executive Office of Asset Forfeiture.
[5] Printouts of the two presentations that were used at this briefing are attached as Attachment F.

*Protocol* (the "*Revised Protocol*") and *Department of the Treasury Paragraph 19 Document Production Plan* (the "*Plan*"), both of which were dated November 24, 1999. These documents are attached hereto as Attachments A and B. (These documents were amended on June 21, 2000. The amending documents are attached hereto as Attachments C and D.) These documents, taken together, provided the blueprint for Treasury's search effort.

Both the *Revised Protocol* and *Plan* set forth Treasury's understanding that Paragraph 19 calls for the production of:

> Documents or records referring or relating to individual Indian money accounts ("IIM accounts") that, on their face, expressly:
> (1) Identify any of the five named plaintiffs or their 31 predecessors in interest by name (or by some variation of his or her name);
> (2) contain an IIM account number, *i.e.*, a number uniquely associated with one of the five named plaintiffs or their 31 predecessors in interest by name (or by some variation of his or her name), or
> (3) in the case of check-related records other than checks, contain other information (*i.e.*, check symbol and serial number, date, amount) that may enable linkage of the record to one of the five named plaintiffs or their 31 predecessors in interest.

*See Revised Protocol* at 1; *Plan* at 2. This interpretation of Paragraph 19 guided Treasury's search effort.

In addition, in the *Revised Protocol* and *Plan*, Treasury differentiated between documents responsive to Paragraph 19 and other documents such as documents that contain summary-level accounting information. Last year, pursuant to commitments made in the *Revised Protocol* and *Plan*, and in response to Plaintiffs' Sixth Formal Request for the Production of Documents, Treasury prepared, and provided to Plaintiffs, detailed information regarding records that contain summary-level accounting information with respect to the IIM trust, including descriptions of the records, the time periods for which the records are available, the locations of the records and exemplars of the records. *See* letter from Brian Ferrell to Dennis Gingold dated June 5, 2000 enclosing binders of exemplars; letter from Brian Ferrell to Dennis Gingold dated June 21, 2000 enclosing *Department of the Treasury Inventory of Summary-Level Accounting Records* dated June 21, 2000 and corresponding detail sheets.

Finally, during its fourteen-month search effort, Treasury revisited its determination to exclude the Office of the Comptroller of the Currency ("OCC") and, with the assistance of the OCC, Arthur Andersen and an OCC contractor searched certain historic OCC records. This is discussed in further detail below.

## Summary Information Regarding Efforts, Costs and Results

Treasury searched both (1) records that were (and are) within Treasury's (and its agents') custody or control and (2) records that, due to their historical value, had been

transferred to the permanent custody and control of the National Archives and Records Administration ("NARA").[6] Records falling within the first category are stored on-site (*i.e.*, at various Treasury facilities), at Federal Records Centers ("FRCs") and at Federal Reserve Banks, branches and their private storage facilities ("FRBs"). Records falling within the second category are stored in various National Archives facilities. Review of records in both categories required research at 37 facilities in 24 cities. (Figure 1.)

**Figure 1: Facilities at which Records were Reviewed**

| City | Facility(-ies) |
|---|---|
| Atlanta, GA | FRC |
| Ardmore, MD | FMS Warehouse |
| Austin, TX | FMS Regional Financial Center |
| Baltimore, MD | FRB |
| Birmingham, AL | FMS Facility |
| Boston, MA | FRC |
| Chicago, IL | FMS Regional Financial Center |
| | FRC |
| College Park, MD | National Archives II Facility |
| Dallas, TX | FRB |
| Denver, CO | FRB |
| El Paso, TX | FRB |
| Ft. Worth, TX | FRC |
| Houston, TX | FRB |
| Hyattsville, MD | FMS Hyattsville Facility |
| Kansas City, MO | NARA Archives Central Plains Facility |
| Kansas City | FMS Regional Financial Center |
| | FRCs (2 Facilities) |
| Lanham, MD | Indian Trust Accounting Division Facility |
| Los Angeles, CA | FRB |
| | FRC |
| New Orleans, LA | FRB |
| Parkersburg, WV[7] | BPD 3rd Street Facility |
| | BPD Park Center Facility |
| | BPD Warehouse |
| Philadelphia, PA | FMS Regional Financial Center |
| San Francisco, CA | FRB |
| | FRC |
| | FMS Regional Financial Center |

[6] Treasury notes that the records that it searched within the permanent custody and control of the National Archives and Records Administration are available for review by members of the public. Treasury searched these records despite F.R.Civ.P. 34 because of unique circumstances. By searching these records, Treasury does not waive its right to object to any other document request that would have it search for records not in its possession, custody, or control.

[7] In addition, thousands of reels of microfilm that are ordinarily stored at the National Underground Storage facility in Boyers, PA on behalf of BPD were shipped to Parkersburg to expedite review.

| | |
|---|---|
| St. Louis, MO | FRC |
| Suitland, MD | Washington National Records Center |
| Washington, DC | BPD Headquarters |
| | BPD C Street Facility |
| | FMS Headquarters |
| | National Archives I Facility |
| | Treasury Department main building |

In order to complete the searches as outlined in the Revised Protocol and Plan, it was necessary to consider over 6 billion records. As set forth in Figure 1 of the Arthur Andersen Paragraph 19 Document Production Procedures and Findings Report ("Arthur Andersen Report") filed contemporaneously with this report, the estimated volumes of records considered under the first four sections of the Plan are: (1) under section 001, Records Stored at the National Archives and Federal Records Centers, over 1 billion pages; (2) under section 002, Checks and Check-Related Records, over 3 billion records; (3) under section 003, Savings Bonds, over 4 billion records; and (4) under section 004, Marketable Securities, over 350 million records.

The total number of personnel who reviewed records, including general office file searches stands in excess of approximately 2,200 people (including general office file searches which involved over 2,000 Treasury employees). To conduct its searches, Treasury incurred three types of costs: (1) costs for external resources; (2) quantifiable costs for internal resources; and (3) unquantifiable costs for internal resources. (Figure 2.)

**Figure 2: Estimated Costs of Searches**

| Cost Category | Amount |
|---|---|
| External Resources | In excess of $2,900,000 |
| Internal Resources | In excess of $1,000,000[8] |
| Total | In excess of $3,900,000 |

First, Treasury spent in excess of $2.9 million for the services of external resources, including Arthur Andersen, Federal Reserve Bank staff, Office of the Comptroller of the Currency contractors, and imaging and indexing services provided by Aspen Systems Corporation. Second, Treasury estimates that it incurred internal costs in excess of $1,000,000 for personnel who designed and/or conducted searches, or otherwise contributed to Treasury's compliance with Paragraph 19. While it may be obvious, Treasury notes that all of the funds that were expended on its search effort had been allocated for other uses and had to be diverted from these other activities.

Finally, Treasury's search effort resulted in the production of 2,296 documents. As indicated in the following chart, this total includes 1,573 primary and attachment documents (see below) produced from the National Archives and Federal Records

[8] This figure is based on best estimates provided by individuals knowledgeable with the search process.

Centers, 714 checks and check-related records, 0 savings bonds records, 1 marketable securities record, and 8 general office file documents. (Figure 3.)

**Figure 3: Number of Documents Produced Pursuant to the Plan, by Section**

| Section of the Plan | | Documents Produced |
|---|---|---|
| 001. | Records Stored at the National Archives and Federal Records Centers | 1,573 |
| 002. | Checks and Check-Related Records | 714 |
| 003. | Savings Bonds | 0 |
| 004. | Marketable Securities | 1 |
| 005. | General Office Files | 8 |
| Total | | 2,296 |

## Detailed Information Regarding Certain Elements of Treasury's Searches

As detailed in the Plan, Treasury's searches were conducted pursuant to five sub-plans (*i.e.*, sections of the Plan). These sub-plans addressed the following categories of records: (1) Records Stored at the National Archives and FRCs; (2) Checks and Check-Related Records; (3) Savings Bonds; (4) Marketable Securities; and (5) General Office Files.

The Arthur Andersen Report details how the searches of these categories of records were carried out in accordance with the sub-plans. The Arthur Andersen report complements the Plan, *i.e.*, it provides detailed information regarding how the sub-plans were performed. In addition, certifications relating to the completion of the searches according to the sub-plans are also attached at Appendix 64 (Section 001), Appendix 65 (Section 002), Appendices 66 and 67 (Section 003), Appendix 69 (Section 004), and Appendix 73 (Section 005). What follows is a description of the efforts and results associated with the searches pursuant to each sub-plan.

<u>001. Records at the National Archives and FRCs</u>

The searches pursuant to this sub-plan involved the following Treasury organizations: DO, FMS, BPD and OCC. Records were reviewed at National Archives, the ITAD facility in Lanham, Maryland, NARA's Central Plains facility in Kansas City, Missouri, 10 FRCs (including two in Kansas City, Missouri) and 8 FRBs.[9] The Arthur Andersen Report describes the specific work processes and procedures that were used to search

[9] Initially, the agency records to be searched under this sub-plan were thought to be kept exclusively at Federal Records Centers. As the search progressed, it became apparent that some records were stored at FRBs. Treasury therefore expanded the scope of the search of agency records under this sub-plan to include records stored at FRBs.

the various groups of records under this sub-plan. Three aspects of the work deserve discussion.

First, the National Archives II facility in College Park, MD contained significant amounts of historical accounting records that were received from the Bureau of Indian Affairs and its predecessor(s) and audited by Treasury before Treasury's auditing functions were transferred to the General Accounting Office shortly after its creation in 1921. These historical records date from 1817 through 1921. In advance of any searching, Arthur Andersen painstakingly analyzed the records to determine which boxes could be excluded from further review and which boxes would ultimately need to be pulled and searched. FMS assembled two teams of 9 people each to search these records in accordance with a search plan developed by Arthur Andersen. After being trained regarding search protocols and procedures,[10] these teams worked full time at the College Park facility for four months in two-week shifts. During that time, with the assistance and oversight of Arthur Andersen, the FMS searchers reviewed 2,378 settled account packages in 2,626 boxes. Each settlement package consisted of numerous papers of varying shapes and sizes that had been folded and tied into a bundle. Many of the documents were brittle and therefore required careful handling. In addition, many of the documents were handwritten and at times barely legible. In fact, some documents in the packages (e.g., annuity payrolls) contained hundreds of Indian names that were handwritten in cursive style. Under these conditions, the review of settled account packages was difficult and extremely time-consuming. Forms completed by the searchers certifying that they searched the settled account packages can be found at Appendices 1, 2 & 31.

In the review of settled account packages, FMS searchers identified documents that contained a name or AKA of one of the five named plaintiffs or their 31 agreed predecessors or any individual whose name was similar in some way to a plaintiff or agreed predecessor. For each of the documents that were discovered, Arthur Andersen would, as part of its quality control review, review the settled account package in question to (1) confirm that the name identified was potentially responsive and (2) identify any documentation in the settled account package that served to explain or support the document identified by the FMS searcher. Arthur Andersen saw to it that the documents and all supporting documentation were copied (some of these materials, due to their fragility, required processing by NARA document preservationists). Then, Arthur Andersen forwarded the copies to Treasury attorneys for review, along with logs compiled by Arthur Andersen indicating basic information regarding each document and its supporting documentation (year, settlement package number, storage unit number, title, name(s) and/or AKA(s) identified, and total number of pages). These logs are attached as Attachment E. Treasury attorneys reviewed all of the documents and supporting documentation and determined which were either responsive to Paragraph 19 or could not be determined to be non-responsive. Thereafter, as required by imaging and indexing protocols, all of these documents were marked (as appropriate) either as primary documents or attachment documents, and subsequently imaged, indexed, and

[10] A printout of the presentation that was used for training purposes is attached as Attachment G.

reviewed before final production. In total, 1,573[11] primary documents and attachment documents were produced to Plaintiffs in 8 productions. (Figure 4.) A certification regarding Treasury's responsiveness review of the documents and supporting documentation, Treasury's preparation of documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached in Appendix 64.

**Figure 4: Primary and Attachment Documents Produced from Settled Account Packages, by Date**

| Date | Number of Documents Produced |
|---|---|
| June 9, 2000 | 136 |
| June 27, 2000 | 214 |
| August 8, 2000 | 311 |
| September 5, 2000 | 205 |
| September 22, 2000 | 372 |
| October 20, 2000 | 181 |
| November 20, 2000 | 47 |
| December 19, 2000 | 107 |
| Total | 1,573 |

In addition to providing these documents to Plaintiffs, as part of each production, Treasury offered to: (1) provide Plaintiffs with the aforementioned logs as well as exemplars of documents that contain names of the plaintiffs and agreed predecessors but are not responsive to Paragraph 19; and (2) assist Plaintiffs in locating such non-responsive documents at the National Archives.

A second aspect of Treasury's work at the National Archives and FRCs deserves discussion because the records in question – OCC records – were originally outside the scope of Treasury's planned search. Treasury initially determined that OCC was unlikely to have any responsive records, for the reason that bank regulators, OCC included, typically review banks' total assets and liabilities at a high level in order to assess their health rather than monitor individual deposits and account activity. In addition, Plaintiffs made no objection to Treasury's determination in this regard, which was stated during the aforementioned October 28, 1999 briefing. However, as a matter of diligence, Arthur Andersen reviewed all NARA Record Groups in the Treasury cluster, not just those Record Groups associated with Treasury bureaus that Treasury had determined were likely to have responsive records. During this review, Arthur Andersen discovered an entry that prompted a review of certain historic OCC records at

[11] It should be noted that counting the number of documents produced to the Plaintiffs is by nature inexact. Q Systems (the photocopy contractor at the National Archives), sometimes photocopied multiple documents, especially checks, onto one page in order to save time and paper. Therefore, one "document" produced by Treasury could contain images of 3 checks, each of which could be counted as one document. In addition, it should also be noted that any given document could contain any number of pages.

NARA's Central Plains facility in Kansas City, MO. That review, consisting of a review of some or all of the contents of 63 boxes, was conducted by Arthur Andersen. That review did not identify any responsive documents. Nonetheless, that review did suggest the possibility that two sets of records in the custody and control of NARA at its National Archives II facility in College Park might contain information relating to IIM accounts - those sets of records being Bank Examination Reports from 1865-1939 and Records of the Division of Insolvent National Banks from 1865-1950.

Treasury, in conjunction with Arthur Andersen, developed a listing of national banks that potentially could have held IIM funds. This list was developed from four sources: (1) national banks listed in Record Group 75 (Records of the Commissioner of Indian Affairs) and identified by Arthur Andersen as potentially relevant; (2) national banks listed in responsive documents identified by the FMS searchers in Record Group 217 (*i.e.*, the historical accounting records discussed above); (3) national banks listed in responsive documents identified by Arthur Andersen searchers (working on behalf of the Department of the Interior) in Record Group 411 (Records of the General Accounting Office) ("GAO"); and (4) the *Report of the Commissioner of Indian Affairs to the Secretary of the Interior*, for the fiscal year ended June 30, 1909. Working with a team of searchers hired by OCC, Arthur Andersen supervised a search that included a total of 1,498 boxes, specifically 260 boxes of records relating to insolvent banks and 1,238 boxes of records of bank examination reports. No responsive records were identified in these searches.

A third aspect also deserves discussion. BPD, with the assistance of Arthur Andersen, conducted a comprehensive review of records (primarily relating to marketable Treasury securities) at 46 FRCs and FRBs. In total, approximately 50,000 boxes were reviewed by BPD with the assistance of Arthur Andersen, most of which were reviewed using finding aids and other indices, but some of which (in excess of 3,000 boxes) required manual search. These approximately 3,000 boxes were located in 10 FRCs and 8 FRBs.[12] A team of BPD and FRB employees along with Arthur Andersen spent approximately 1,800 person-hours searching records. These searches did not identify any documents responsive to paragraph 19. Finally, on the subject of FRCs, it should be noted that Treasury, working jointly with Arthur Andersen, used finding aids and other indices to conduct a review of DO and FMS records maintained at FRCs. This review determined that no additional searches were required.

## 002. Checks and Check-Related Records

As detailed in the Plan and Protocol, to search for checks issued to IIM beneficiaries and records relating to those checks, Treasury requires predicate information (*i.e.*, check

[12] During Treasury's review of FRC records, it discovered that eleven boxes of records stored by the Federal Reserve Bank of Atlanta, New Orleans Branch at the Fort Worth FRC had been destroyed. Treasury reported the destruction to the Special Master and subsequently has provided additional information to him.

symbol, serial number, date and dollar amount[13]) from the Department of the Interior ("Interior"). During the past year, Treasury received eight tapes of predicate information from Interior and conducted searches of its checks and check-related records. To date, using the information contained on the eight tapes submitted by Interior, Treasury has located and produced to Plaintiffs 222 copies of checks, 222 corresponding items of information from the Check Payment and Reconciliation System ("CP&R"), 82 copies of information from CP&R for which corresponding checks could not be located, and 178 other assorted documents including check claim forms. The total number of documents identified and produced using these tapes of predicate information is 704. (Figure 5.) Certifications regarding Treasury's searches for checks and check-related records using the tapes of predicate information are attached in Appendix 65. A certification regarding Treasury's preparation of the identified documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached in Appendix 65.

**Figure 5: Checks and Check-Related Records Identified and Produced Using Tapes of Predicate Information, by Date**

| Date | Number of Documents Produced |
|---|---|
| December 20, 1999 | 304 |
| February 23, 2000 | 68 |
| May 2, 2000 | 17 |
| August 8, 2000 | 10 |
| September 5, 2000 | 200 |
| September 22, 2000 | 94 |
| October 20, 2000 | 11 |
| Total | 704[14] |

In the event that Interior submits additional tapes to Treasury, Treasury will search for checks and check-related records in the manner set forth in the Plan.

One additional aspect of this search deserves special comment. In the aftermath of the destruction of approximately 162 boxes in the basement of the FMS Hyattsville facility, Treasury undertook an extensive review of the remaining approximately 250 boxes in an attempt to determine their relevance, if any, to this case. This review consisted of three steps. First, during May 1999, the Richmond Federal Reserve Bank, as Treasury's Fiscal Agent, built a database from all of the transactions identified by payee name. The number and names of the payees were identified by a page-by-page search of the contents of the files, the ledgers, and the boxes of uncurrent checks. This information was then captured manually by a data entry process and then placed in the database, with the result being that the database consisted of approximately 273,000 payee names.

[13] Check symbol and serial number are necessary to conduct the actual search for any given check; date and dollar amount are not necessary for the search but they are used to confirm a match.
[14] Excludes 10 documents that were produced without the use of predicate information.

A search of this database was conducted on November 8, 1999, using the agreed upon names of the five named plaintiffs and the 31 agreed predecessors and the 60 AKAs known as of that date. This search identified two entries in the ledgers from the Hyattsville basement. Treasury does not believe that the ledger pages containing these entries are responsive because of the common nature of the names listed in the entries ("Mary Mack" and "Amy White"). Nonetheless, these two ledger pages were produced to Plaintiffs in December 1999. As new AKAs were identified, this database was searched again but no additional transactions were found. A certification regarding Treasury's search of the Hyattsville payee name database is attached in Appendix 65. A certification regarding Treasury's preparation of the identified documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached as Appendix 65.

Second, Treasury sought to determine whether duplicate documents existed of the approximately 162 boxes of material that had been destroyed. Because Treasury determined that the destroyed material included check cancellation requests made by Disbursing Officers that were sent to GAO, Treasury decided to search certain records stored in Record Group 411 (the GAO Record Group) at the National Archives, specifically audit reports of Indian accounts. FMS staff did a page-by-page search at the National Archives of approximately 600 settled Indian accounts for 3 Disbursing Officers whose files were contained in the Hyattsville basement records. Treasury did not locate any duplicate documents.

The third step involved the creation of a second searchable database of transactions that were identifiable only using predicate information (*i.e.*, check symbol, check serial number, date and dollar amount). Treasury, working with Arthur Andersen, compiled a list of Disbursing Officers who serviced the Indian tribes with which the five named plaintiffs and their agreed predecessors were affiliated, and used that list to identify transaction information (including check symbol and serial number) in the Hyattsville basement boxes. The check symbol and serial number for each transaction were then captured manually by a data entry process and then placed in the database by the Richmond FRB. Using the aforementioned eight tapes of predicate information, Treasury searched the new database, identified one probable responsive check transaction (in the amount of $16.50), and produced the documents associated with that transaction to the Plaintiffs in May 2000. A certification regarding Treasury's searches of the Hyattsville "numbers" database is attached at Appendix 65.

## 003. Savings Bonds

BPD searched primary savings bond records for responsive documents. As indicated in the Plan, initially, BPD looked for bonds issued in trust forms of registration that contained the names of offices or officials identified as relevant to Paragraph 19 searches. Any records meeting these criteria were then reviewed to determine whether they contained any names or AKAs of the five named plaintiffs or their agreed predecessors.

Subsequently, although not required by the Plan, BPD also searched for bonds issued in trust forms of registration that contained any names or AKAs of the five named plaintiffs or their agreed predecessors, regardless of whether or not these records contained the names of offices or officials identified as relevant to Paragraph 19 searches.

Savings bond records were reviewed in a variety of ways, which depended on the particular records being searched. See Section 003 of the Plan. These methods included the review of microfilm and electronic indexes. The various work papers used by BPD to document its searches of savings bond records are attached and briefly explained at Appendix 66. In addition, it should be noted that while Arthur Andersen was not directly involved with BPD's searches of its savings bond records, it did review BPD's search plan for these records, including the procedures that were to be used.

In total, BPD reviewed approximately 10,500 reels of microfilm. The review of microfilm and electronic indexes took over 1,550 person-hours to complete. No responsive documents were found. Certifications regarding Treasury's searches of savings bond records are attached at Appendix 67.

## 004. Marketable Securities

As indicated in the Plan, BPD extracted over 22 million records from its automated systems relating to registered marketable securities and searched them for records of securities issued in trust forms of registration and containing the names of offices or officials identified as relevant to Paragraph 19 searches. In addition, although not contained in the Plan, BPD also searched for bonds issued in trust forms of registration that contained any names or AKAs of the five named plaintiffs or their agreed predecessors, regardless of whether or not these records contained the names of offices or officials identified as relevant to Paragraph 19 searches. Arthur Andersen oversaw BPD's electronic extraction and search of registered marketable securities records from its securities systems. (The computer code of the extraction and search programs are attached at Appendix 68 .) BPD expended roughly 270 person-hours on the development, programming, testing and documentation of the extraction and search programs written to perform a search looking for the offices and officials and names of the five named plaintiffs, their agreed predecessors and AKAs.

BPD did not receive any predicate information (*i.e.*, CUSIP number or loan title, denomination and serial number) relating to bearer securities, and therefore was unable to conduct any systematic search of bearer security records. BPD also searched all case file folders that are maintained with respect to certain marketable securities transactions. Most of these files were searched electronically, but a subset required a manual search of 125 boxes, which required approximately 370 hours of employee time to complete.

BPD reviewed approximately 5,800 reels of microfilm containing marketable securities data. Approximately 1,500 of these reels required a more detailed review. BPD's search of these records identified one responsive document, which was produced to the

Plaintiffs in August 2000. This document indicated that a $50 Liberty Loan bond had been issued on behalf of Stella C. LaRose (an agreed predecessor of plantiff James LaRose) in 1918 and paid in 1920.

Certifications regarding Treasury's searches of marketable securities records are attached at Appendix 69. A certification regarding the responsiveness review of the one document identified, Treasury's preparation of this document for imaging and indexing, and Treasury's final pre-production review of the imaged and indexed document, is attached at Appendix 65.

005. General Office Files

All offices within DO, FMS and BPD that could possibly maintain responsive documents in their general office files (which do not include records covered by sections 002, 003 and 004 of the *Plan*) initially were instructed to retain records and thereafter undertook two office file searches; these searches involved over 2,000 Treasury employees. Certifications with respect to the document retention and searches are attached at Appendix 73. The first search effort was conducted in June and July of 1999. The second search effort was conducted in January, February and March 2000 and was narrower in scope because of exclusions that were made based on the results of the first search effort. Treasury cannot quantify the person-hours consumed by these search efforts but believes they were considerable. The searches of general office files identified only eight responsive documents, which were produced to the Plaintiffs in May 2000. Seven of these eight documents related to FMS's identification and production of checks and check-related records in late 1998 and early 1999 using predicate information provided by the Department of the Interior, *e.g.*, they listed the predicate information provided and the documents identified with that information.

BPD and FMS also conducted several searches of the dedicated e-mail mailboxes, which were set up respectively in June 1999 and July 1999 as repositories for e-mail related to this litigation. No responsive documents were identified. Certifications regarding FMS's and BPD's search of the dedicated e-mail mailboxes are attached at Appendix 73.

## Conclusion

Treasury's search for documents responsive to Paragraph 19 was time-consuming, thorough and costly. The searches were executed in the manner outlined in the Revised Protocol and Plan as amended on June 21, 2000, except where Treasury decided to do more than the Revised Protocol and Plan required. Treasury decided to do more than was required in order to ensure review of any category of records that could possibly contain responsive documents, even though those decisions had the effect of increasing the already high costs of Treasury's search effort.

# EXHIBIT 38:

# DECLARATION OF

# JASON R. BARON

# APRIL 15, 2008

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SEMINOLE NATION OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 09-CV-935-L<br>Judge George W. Miller |
| THE UNITED STATES | ) | |
| Defendant. | ) | |

DECLARATION OF JASON R. BARON

I, Jason R. Baron, pursuant to 28 U.S.C. § 1746, do hereby declare and state:

1. I serve as the Director of Litigation in the Office of General Counsel, National Archives and Records Administration ("NARA"), with my office located at Archives II in College Park, Maryland. I have been employed in this capacity since May 2000. Previously, between 1988 and 2000, I served as Trial Attorney and Senior Counsel in the Federal Programs Branch of the Civil Division of the Department of Justice. I am also a member of the Bar of the District of Columbia (D.C. Bar No. 366663).

2. I am generally familiar with the *Seminole Nation of Oklahoma* ("Seminole Nation") lawsuit. I am specifically aware of the Motion for Document Preservation Order, Confidentiality Agreement, Protective Order, and attached Exhibits A and B filed with this Court by the plaintiff on March 3, 2008. I am filing this Declaration based on my personal knowledge of NARA's holdings, as supplemented with information obtained from NARA archivists and staff.

3. Under the Federal Records Act ("FRA"), the Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) & 2110. The FRA provides the authority by which records of Federal agencies that have "sufficient historical or other value to warrant their continued preservation by the United States government" are transferred into the legal custody of NARA. 44 U.S.C. 2107. NARA's archival record holdings, by operation of statute, and in accordance with regulations promulgated thereunder, *see* 36 C.F.R. Part 1200 *et seq.*, represent records *being permanently retained by the United States government.* Accordingly, any and all archival records relevant to the proceedings in the *Seminole Nation* action are being so held on a permanent basis.

5. More specifically, based on the inventorying of NARA's Indian and tribal collections undertaken by NARA staff to date, I can report that a collection of open, publicly available records of the Seminole Nation may be found in (i) NARA's regional archives in NARA's Southwest Regional offices in Fort Worth, Texas; and (ii) that additional records exist in NARA's Washington, D.C. area archival holdings, both in our Main building on the Mall in Washington, D.C., as well as at Archives II situated in College Park, Maryland. See the Declarations of Steven D. Tilley and Gregory Pomicter, being filed contemporaneously. Numerous finding aids exist for these various collections, and NARA staff is available to provide reasonable assistance to researchers with respect to their use of these open and publicly available collections of permanent records wherever they may reside.

6. Beyond NARA's archival holdings, I am confident that NARA does not possess any operational or active records, either in textual (i.e., hard-copy) or electronic form, that would be considered relevant or material to the underlying proceedings in the *Seminole Nation* case. The only contact NARA archivists have with respect to archival records are requests they may receive from time to time for access to such records; they do not themselves generate records of any kind that would be relevant to the matters being litigated in this case, including involving a damage action for breaches of trust duties by the United States or its components or agencies.

7. Nevertheless, in response to ongoing tribal trust litigation cases, NARA issued a comprehensive nationwide Notice 2008-046, "Holds on NARA Operational Records Relevant To "Tribal Trust" Lawsuits," signed by NARA's Assistant Archivist for Information Services Martha Morphy, dated December 3, 2007 (see Tab A). The Notice was electronically disseminated to heads of offices and staff. NARA Notice 2008-046 was intended to alert staff to the existence of records retention orders entered in various tribal trust lawsuits. However, the NARA Notice went further with respect to observing preservation obligations, by placing all NARA staff on notice "of each person's duty to preserve relevant records and information across the board for *all* tribes currently pursuing tribal trust claims" (emphasis in original). Attached to the Notice was a list of all known tribal trust cases, *whether they currently have a retention order in place or not.* The *Seminole Nation* case appears on this list.

8. The Notice went on to state that NARA staff "must take reasonable steps to preserve every document, all data or tangible thing in its possession, custody or control" concerning five categories of information corresponding to the allegations of trust

mismanagement involved in the pending tribal trust lawsuits. The Notice specifically called for NARA staff to preserve both traditional paper documents that are relevant to the lawsuits, as well as electronic documents, including in the form of email, word processing, and voice mail, and provides specific instructions for the forwarding of electronic documents to central email and voice mail repositories for continuous preservation during the pendency of this and related lawsuits. The NARA Notice also specifically reminded employees that periodic reminders and update notices will be issued to fulfill NARA's obligations in compliance with existing court orders. Finally, the Notice stated that failure to comply with these orders may lead to the imposition of sanctions.

8. Additionally, undersigned counsel, working with NARA's records officer, has directed that NARA's technical staff responsible for the maintenance of our computer equipment and electronic communications systems act to preserve a set of disaster recovery backup tapes. These backup tapes contain electronic mail and other documents created or received by NARA staff nationwide that were residing on our electronic systems as of September 14, 2007. They are being held indefinitely pending further direction of NARA counsel and NARA's records officer.

10. With these compliance measures in place, NARA's Office of the General Counsel is continuing to monitor the efforts of various NARA components with respect to the preservation of tribal trust records, including those of the Seminole Nation. To this end, NARA's Records Officer is working in tandem with an attorney in my office who has been specifically assigned to monitor the central repositories of relevant e-mail and voice mail messages, to ensure that proper archiving of any such electronic records is taking

place. Both myself and the staff attorney assigned to monitor NARA's preservation actions have and will continue to participate in periodic meetings and nationwide conference calls initiated by NARA headquarters staff, to remind NARA staff in both regional and headquarters components of their continuing compliance obligations with respect to tribal trust lawsuits during their pendency. Additionally, as has previously been done during the course of my tenure, should any issues arise involving allegations of missing or damaged records relevant to this action, NARA's Office of the General Counsel will continue to take a leading role in working with any and all appropriate components of this agency, as well as with the Department of Justice and other affected federal agencies, in an effort to resolve outstanding issues.

11. NARA does also operate federal record centers ("FRC") around the country, including Indian and tribal records of the Department of Interior ("DOI") presently consolidated at our facility in Lenexa, Kansas. Records in the Lenexa FRC remain in the legal custody of DOI, and DOI as a party defendant in the litigation controls access to such records. However, all relevant DOI records have been under a "freeze" on disposition (equivalent to a legal preservation hold) since 2004, and there are no plans to lift the freeze with respect to records identified as tribal trust records.

12. As stated above, all appropriate components of NARA holding records in their legal custody related to the Seminole Nation have been alerted to the need to preserve these records. NARA will continue to take reasonable steps to monitor compliance with internal Notice 2008-46, including issuing periodic reminders of NARA's record retention obligations, until such time as the present litigation is resolved. I will also

ensure that NARA's Office of General Counsel will continue to monitor NARA's obligations in tribal trust cases, including *Seminole Nation*, into the foreseeable future.

13. Finally, NARA's Office of the General Counsel will immediately notify the Department of Justice should there be any violation of the Court's Orders by a NARA employee.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

JASON R. BARON

Executed on this 15th day of April 2008

# TAB A

# TO

# DECLARATION OF

# JASON R. BARON

2008-046

# NARA NOTICE

Date: December 3, 2007
To: Office Heads, Staff Directors, ISOO, NHPRC, OIG
Subject: Holds on NARA Operational Records Relevant to "Tribal Trust" Lawsuits

---

In accordance with Interim Guidance 825-1, this notice is to inform NARA staff of their obligations to preserve electronic data (including traditional documents as well as e-mail and voice mail messages) in connection wit trust" lawsuits in numerous forums throughout the United States. Please ensure that this notice is forwarded who may be affected.

In 2004 and again in 2005, we alerted staff to similar obligations to lawsuits with respect to two Indian tribes: Nation and Pueblo of Laguna. Recently, additional lawsuits involving other named tribes have been filed, req records retention orders calling for NARA staff to take similar preservation measures to retain all relevant doc follows up on prior notices given to appropriate officials and staff by the Office of General Counsel (NGC) in c particular lawsuits.

Because there are at present over 100 tribal trust lawsuits filed in various courts, we anticipate that there ma retention orders entered over the coming months and for the foreseeable future. In light of what can be reasc terms of NAR´s overall preservation obligations, we believe the most prudent course of action at this time is t notice, placing staff on notice of each person´s duty to preserve relevant records and information across the currently pursuing tribal trust claims. A list of all such known tribal trust cases is attached. We will also soon p link to this notice on NARA@Work with updates as needed.

To be covered by this hold notice, documents or electronic data must contain a reference to, or otherwise in s relevant to, the issues and/or allegations involved in one or more tribal trust lawsuits. "Tribal trust lawsuits" in of the following issues and/or allegations:

1. Alleged breaches by the United States or a governmental component thereof (including an agency) of the goverr responsibilities for Native American tribes or nations created by treaties, statutes and regulations;
2. Mismanagement of Native American trust assets, including funds and non-monetary assets;
3. Failure by the United States in its exercise of comprehensive supervision, control, and management over the Nat revenue-producing assets. This includes failure to enforce lease terms, including undercollection of amounts law
4. Failure by the United States to provide a comprehensive accounting of all categories of trust assets; and
5. Failure by the United States to implement effective agency control and audit procedures, to perform a reconciliati engage in regular reporting of transactions and account balances.

These Orders require that NARA staff must take reasonable steps to preserve every document, all data or ta

possession, custody or control, containing the above categories of information, or that may reasonably lead t information in the above categories of information. Therefore, effective the date of this notice, staff should fol instructions to comply with the hold order:

**Actions to Take**

*For documents created by NARA in paper format stored in office space*
Photocopy records and note the file number and series title from which they came. Accumulate such copies a monthly to NARA's Records Officer (NHR), indicating the name and mailcode of your unit.

*For documents created by NARA in paper format stored in a Federal Records Center*
Make note of the transfer number and box number(s) in which the relevant records are located and forward tl along with your unit's name and mailcode to NHR.

*For documents created by NARA in electronic format (word processing, email)*
Forward word processing documents or email messages as attachments to an email sent to tribal@nara.gov parent email the name and mailcode of your unit.

*For voicemail*
Forward voicemail messages to the special "Tribal Trust Litigation" voice mailbox, following these instruction:

1. Listen to the message.
2. Press "#" to respond.
3. Press "9" to forward.
4. Record a comment if you wish, and then press "*" and "#."
5. Enter the Tribal Trust Litigation telephone number (7-1000) and then press "#" four times.
6. Press "4" to save the message, then press "#."

The Justice Department specifically has asked that I remind all NARA staff that failure to comply with these o the imposition of sanctions. The obligation to preserve relevant documents to these cases will continue until t Periodic reminder and update notices will be issued to fulfill our obligations in compliance with existing court

Questions regarding this continuing obligation may be directed to Assistant General Counsel Jean Whyte, in General Counsel, who can be reached by telephone at 301-837-2926.

Regarding Department of the Interior (DoI) records in NARA's custody, contact:

- NW staff - Sharon Thibodeau at 301-837-3047.
- NR staff - Greg Pomicter at 301-837-2063 or David Weinberg at 301-837-3115.

Thank you for your compliance with these Court orders.

MARTHA MORPHY
Assistant Archivist for Information Services

Attachment A
Attachment B
Attachment C
Attachment D
Attachment E

---

**For questions on this notice contact:**

Richard Marcus, NHR
richard.marcus@nara.gov
Room 2350 AII
Phone: 301-837-1942
Fax: 301-837-0871

---

PDF files require the free Adobe Reader.
More information on Adobe Acrobat PDF files is available on our Accessibility page.

# TRIBAL TRUST ACCOUNTING AND TRUST MISMANAGEMENT CASES
## (April 10, 2008 version)

Alabama-Quassarte Tribal Town v. Kempthorne

Ak-Chin Indian Community v. United States

Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Kempthorne

[Eastern] Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States / [Northern] Arapahoe Indian Tribe of the Wind River Reservation, Wyoming v. United States

Blackfeet Tribe of the Blackfeet Indian Reservation v. United States

Cheyenne River Sioux Tribe v. United States

The Chickasaw Nation and The Choctaw Nation v. Department of the Interior

Chippewa Cree Tribe of the Rocky Boy's Reservation; Little Shell Tribe of Chippewa Indians; Turtle Mountain Band of Chippewa Indians; White Earth Band of Chippewa Indians v. United States **(Pembina Judgment Fund)**

Coeur d'Alene Tribe v. United States

Colorado River Indian Tribes v. United States

Confederated Tribes of the Colville Reservation v. Kempthorne

Confederated Tribes of the Goshute Reservation v. United States

Confederated Tribes of the Warm Springs Reservation of Oregon v. United States

Crow Creek Sioux Tribe v. United States

Delaware Tribe of Indians and the Delaware Trust Board v. United States

Eastern Shawnee Tribe of Oklahoma v. United States

Eastern Shoshone Tribe v. United States, Northern Arapaho Tribe v. United States

[Eastern] Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States / [Northern] Arapahoe Indian Tribe of the Wind River Reservation, Wyoming v. United States

Gila River Indian Community v. Kempthorne

Gros Ventre Tribe and Assiniboine Tribe v. United States

Haudenosaunee v. United States

*Haudenosaunee, Onondaga Nation v. Kempthorne*

Hoopa Valley Tribe v. United States

Hopi Tribe v. United States

Iowa Tribe of Kansas and Nebraska v. Kempthorne

Iowa Tribe of Kansas and Nebraska v. United States

Jicarilla Apache Nation v. United States

Kaw Nation of Oklahoma v. United States

Kaw Nation v. Kempthorne

Lower Brule Sioux Tribe v. United States

Makah Indian Tribe of the Makah Indian Reservation v. United States

Miami Tribe of Oklahoma v. Kempthorne

Miami Tribe of Oklahoma v. United States

Muscogee (Creek) Nation of Oklahoma v. United States

Navajo Nation v. United States

Nez Perce Tribe v. United States

Nez Perce Tribe, Mescalero Apache Tribe, Tule River Indian Tribe, Hualapai Tribe, Yakama Nation, Klamath Tribes, Yurok Tribes, Cheyenne-Arapaho Tribe, Pawnee Nation of Oklahoma, Sac and Fox Nation, and Santee Sioux Tribe of Nebraska v. Kempthorne

Northern Cheyenne Tribe of Indians v. Kempthorne

Northwestern Band of Shoshone Indians v. United States

Oglala Sioux Tribe v. Kempthorne

Oglala Sioux Tribe v. United States

Omaha Tribe of Nebraska v. United States

Osage Nation of Oklahoma v. United States

Otoe-Missouria Tribe of Indians of Oklahoma v. United States

Otoe-Missouria Tribe of Oklahoma v. Kempthorne

Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California, v. United States

Passamaquoddy Tribe v. United States

Passamaquoddy Tribe of Maine v. Kempthorne

Pawnee Nation of Oklahoma v. United States

Pechanga Band of Luiseno Mission Indians v. Kempthorne

Ponca Tribe of Indians of Oklahoma v. Kempthorne

Prairie Band of Potawatomi Indians v. United States

Pueblo of Laguna v. United States

Pueblo of Santa Ana v. United States

Quechan Tribe of the Fort Yuma Indian Reservation v. United States

Red Cliff Band of Lake Superior Chippewa Indians v. United States

Red Cliff Band of Lake Superior Indians v. Kempthorne

Rosebud Sioux Tribe v. Kempthorne

Rosebud Sioux Tribe v. United States

Round Valley Indian Tribes v. United States

Salt River Pima-Maricopa Indian Community v. Kempthorne

Salt River-Pima-Maricopa Tribes v. United States

San Manuel Band of Serrano Missions Indians v. United States

Seminole Nation of Oklahoma v. Kempthorne

Seminole Nation of Oklahoma v. United States

Shoshone-Bannock Tribes of the Fort Hall Reservation v. Kempthorne

Soboba Band of Luiseno Indians v. United States

Sokaogon Chippewa Community v. Kempthorne

Sokaogon Chippewa Community (aka Mole Lake Band of Lake Superior Chippewa Indians) v. United States

Standing Rock Sioux Tribe v. Kempthorne

Stillaguamish Tribe of Indians v. Kempthorne

Stillaguamish Tribe of Indians v. United States

Swinomish Indian Tribal Community v. United States

Te-Moak Tribe of Western Shoshone Indians v. Kempthorne

Three Affiliated Tribes of the Fort Berthold Reservation v. Kempthorne

Three Affiliated Tribes of the Fort Berthold Indian Reservation v. United States

Tohono O'Odham Nation v. Kempthorne

Tohono O'odham Nation v. United States

Tonkawa Tribe of Indians of Oklahoma v. United States

Tonkawa Tribe of Indians v. Kempthorne

United Keetoowah Band of Cherokee Indians in Oklahoma v. United States

United Keetoowah Band of Cherokee Indians in Oklahoma v. United States

Ute Indian Tribe of the Uintah and Ouray Reservation v. United States

Winnebago Tribe of Nebraska v. Kempthorne

Winnebago Tribe of Nebraska v. United States

Wyandot Nation of Kansas v. Kempthorne

Wyandot Nation of Kansas v. United States

Yankton Sioux Tribe v. Kempthorne

Yankton Sioux Tribe v. United States

Yomba Shoshone Tribe v. United States