# EXHIBIT 39:

# DECLARATION OF

# STEVEN D. TILLEY

# APRIL 15, 2008

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SEMINOLE NATION OF OKLAHOMA<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | ) | No. 06-CV-935-L<br>Judge George W. Miller |

DECLARATION OF STEVEN D. TILLEY

I, Steven D. Tilley, do hereby declare:

1. I hold the position of Director of the Textual Archives Services Division in the Access Programs unit of the Office of Records Services, Washington, DC, National Archives and Records Administration (NARA), located in College Park, Maryland. I have been the Director of the Textual Archives Services Division since August 2004. I am responsible for all reference, processing, and preservation work on the permanently valuable textual records in NARA's legal custody (*i.e.*, our archival paper holdings) in our headquarters facilities located in College Park and Washington, DC. Among my overall duties, I supervise a staff of approximately 180 archivists and other personnel. Prior to my present position, I served as the Chief of the Special Access and FOIA Staff in the Textual Archives Services Division from 1997 to 2004. From 1993 to 2004, I served as the Director of the President John F. Kennedy Assassination Records Collection.

2. I am generally familiar with *The Seminole Nation of Oklahoma v. U.S.* lawsuit, the Motion for Document Preservation Order ("Preservation Order"), Confidentiality

Agreement, Protective Order and attached Exhibits A and B (collectively referred to herein as "Motion") filed with this Court by the plaintiff on March 3, 2008. My staff and I have received the agency-wide Notice concerning tribal trust lawsuits, including the present case. I am submitting this declaration to provide the Court with additional information on the scope of NARA's holdings and to apprise the Court of the extraordinarily burdensome nature of plaintiff's demand for the transfer and/or copying and shipping of records to Oklahoma.

3. This declaration is based on my personal knowledge, as well as factual information gathered on my behalf by NARA staff.

*NARA's Role in the Management and Retention of U.S. Government Records*

4. The Archivist of the United States has the statutory responsibility to "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation" of governmental policies and transactions, as well as to ensure "proper records disposition." 44 U.S.C. § 2904. Working in cooperation with the Archivist, the head of each agency is, in turn, required to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." *Id.*, § 3102. Both the Archivist and agency heads have the responsibility "to promulgate standards, procedures and guidelines with respect to records management." *Id.*, § 2904(a). By statute, the Archivist "establish[es] standards for the selective retention of records of continuing value, and assist[s] Federal agencies in applying the standards to records in their custody." *Id.*, § 2905. The statutory scheme thus contemplates that all federal records will be appraised as either having temporary or continuing value, in accordance with records schedules approved by the Archivist. Pursuant to such record

schedules, records that are designated as permanent are subject to transfer into the legal and physical custody of the National Archives under the terms of those schedules.

*Records in NARA's Legal and/or Physical Custody – A General Overview*

5. The Archivist is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) & 2110. The Archivist's statutory and regulatory scheme includes a comprehensive framework for ensuring that there are specific environmental and security requirements for the storage of records in NARA's legal custody, including stringent environmental and security standards for the storage of permanent records in our agency's archival facilities. See NARA 1571 ("Archival Storage Standards") & NARA 1572 ("Security for NARA Holdings") (attached at Tabs A & B, respectively). Additionally, pursuant to 44 U.S.C. 2107 and 2904, "[t]he Archivist of the United States has authority over the placement of permanent records." 36 C.F.R. 1228.70. Accordingly, permanent records, once placed in an archival facility, are presumptively not subject to further transfer or loan except under very narrow and controlled circumstances. *Id.*

6. To house what at latest estimate is approximately 3.3 million cubic feet of archival holdings, 543,000 artifacts, and over 11.8 billion electronic logical data records, NARA currently maintains two national headquarters facilities in the Washington, DC area. NARA also is responsible for the preservation of hundreds of millions of presidential records contained within 11 presidential libraries throughout the country. A discussion of NARA's separate regional facilities holdings is contained in my colleague Gregory Pomicter's Declaration, filed contemporaneously herewith. In light of my

principal duties and responsibilities for the management of NARA's archival holdings in the Washington, DC area, I will provide a brief introduction to NARA's holdings, and then will generally limit my discussion to how plaintiff's proposed Motion would affect NARA operations in processing and working with respect to archival holdings in our headquarters buildings in Washington, DC and College Park.

*NARA's Storage of Records Relevant To This Litigation*

7. NARA's vast archival holdings are organized or classified in over 500 record group designations. In general, federal records are arranged by the name of the government agency with which they are associated (*e.g.,* the Defense Department (formerly War Department), the Treasury Department, the Government Accountability Office, the Department of Interior, etc.), and each agency has its own bureaucratic filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. Rather, the records of each agency are arranged and filed by the agency's own bookkeeping and filing system, in accordance with existing file plans and records series set out in each agency's records schedules. For example, Army records might be arranged by the name of a division, fort, or department, not what tribes Army staff might have had contact with. Consequently, NARA archivists are not generally able to search records of all government agencies under the search term "Seminole Nation" to locate all records relating to this tribe. Moreover, although, as described in more detail below, most records related to the Seminole Nation would be expected to be found within the Department of Interior's (DOI) record groups, NARA archivists are also aware of many record groups outside of DOI that also might conceivably contain Seminole Nation-related records.

8. The records of DOI collectively comprise sixteen record groups, including among others located in our headquarters archives, Record Group 75 (Records of the Bureau of Indian Affairs (BIA)), and Record Group 48 (Records of the Office of the Secretary of the Interior (OSI)). Many of these DOI Record Groups potentially hold extremely substantial quantities of archival records. For example, in our Main Archives facility in Washington DC, we estimate that there are at least 25,777 cubic feet of BIA records in Record Group 75, housed in 58,549 containers (which would stretch to over five miles of records). Based on NARA's estimate that each cubic foot of records contains, on average, between 2000 and 3000 pages, this record group alone approximately contains between 52 and 77 million pages. In turn, we estimate that we have 34,383 cubic feet (approximately between 69 and 103 million pages) just of "known" records relating to Native Americans in our archival holdings at the Archives II building in College Park. These holdings are drawn from approximately 73,978 cubic feet (approximately between 148 and 222 million pages) of records consisting of Record Group 48 (Records of the Office of the Secretary of the Interior); Record Group 57 (Records of the United States Geological Survey), Record Group 79 (Records of the U. S. Park Service); Record Group 217 (Records of the Office of the Accounting Officers of the Department of the Treasury); Record Group 381 (Records of the Office of Economic Opportunity); Record Group 411 (Records of the Government Accountability Office), and Record Group 513 (Records of the Indian Health Service), each of which may include information on the Seminole Nation tribe relevant to this lawsuit.

9. As a general matter, although NARA's collections of records in each record group more or less have existing documentation and finding aids associated with them,

which normally can be of use to researchers in locating records related to the Seminole Nation tribe, NARA neither has nor generates in the ordinary course of its operations document-level indexes of its collections sufficient to identify all records relevant to the present lawsuit. Moreover, neither NARA's holdings, nor our existing finding aids, can be said to be differentiated or segregated into what constitute "trust" and "non-trust" records pertaining to either Indian affairs generally or Seminole Nation-related records specifically. Accordingly, to make available to plaintiff in Oklahoma all inactive "Seminole Nation trust records," searches would have to be devised and conducted according to ad hoc and highly variable filing systems developed over the course of the past 100 or more years by all the pertinent government agencies involved. To the extent that the plaintiff's proposed Preservation Order can be read to obligate NARA archivists to first attempt to engage in isolating solely "trust" records relating to the Seminole Nation from the larger known or conceivable collections of records groups containing records relating to the Seminole Nation tribe, for the purpose of moving records to Oklahoma, such a reading of the plaintiff's proposed Order amounts to imposing an impossible burden on this Agency to perform given the magnitude of performing such a task. I would estimate that labor costs associated with transporting records from our Washington, D.C. area facilities alone would be $70,000 to $75,000. Transportation costs to move documents would be approximately $170,000.

10. Given what might be on the order of the thousands of hours involved, *see infra,* ¶ 15, requiring highly-trained NARA archivists to devote their time to a project of isolating Seminole Nation-related records and/or Seminole Nation-related trust records would, in my view, effectively mean shutting down the ability of the significant offices of

the National Archives of the United States in College Park and in Washington DC to perform the important mission of providing reference services to the public at large. Such reference services include providing guidance to individual citizens who personally visit NARA headquarters facilities, or who write in or call us, seeking guidance as to where to locate individual records in our vast collections. In FY 06, NARA headquarters staff handled 23,373 written reference requests and 57,642 oral reference requests for information about our holdings. In addition to handling reference requests, my staff also is actively engaged in processing a backlog of more than a million cubic feet of records awaiting being made available to the public; accessioning approximately 23,650 cubic feet of new records from fiscal year 2004 to fiscal year 2008; performing preservation work on existing archival record collections; and screening records for privacy-related information and to ensure that only unclassified records are opened.

11. No less impossible is the task of reliably segregating "all" records related to the Seminole Nation tribe for inspection by plaintiff in Oklahoma, even without regard to a concern for their "trust" or "nontrust" status. Just with respect to Bureau of Indian Affairs records in Record Group 75, there is a tremendous level of complexity to NARA's records holdings, coupled with highly varying degrees of documentation ranging from the helpful to the unhelpful with respect to isolating holdings related to the Seminole Nation tribe. BIA records are most often arranged by the federal agency that had responsibility with respect to particular tribes, rather than by the name of a specific tribe. The BIA has had responsibilities regarding Indian tribes from 1824 to the present, and was set up in an organizational system of "agencies" under an "agent" that oversaw different tribes or reservations and reported back to Washington to the Commissioner of

Indian Affairs. The records were filed in Washington under the name of the agency. In the case of the Seminole Nation, records from 1824-1880 relating to this tribe may be found under correspondence received by the Office of Indian Affairs. From 1880-1907, the records are found by reviewing five sets of Indexes and the Registers of Letters Received by the Office of Indian Affairs, under the appropriate subject categories such as the Seminoles and the Union Agency. For the third recordkeeping period beginning after 1907, the general correspondence BIA files, including the Union Agency, 1907-1914, Five Civilized Tribes, 1907-1939, Seminole, 1907-1939 and Muskogee Area Office, 1948-1975 may contain Seminole Nation records. When the Florida Territory was organized in 1822, a Florida Superintendency was established for Indian affairs under the direct supervision of the Secretary of War. In 1824, the Office of Indian Affairs was created. The Office of Indian Affairs appointed an agent to serve on the Seminole Reservation and a subagent for the Indians on the Apalachicola River. Many Seminoles emigrated to Indian Territory between 1830-1840, and they were eventually placed under the Union Agency that later became the Five Civilized Tribes.

12. In addition, any other potential records related to the Seminole Nation tribe within NARA's archival collections of BIA records are subsumed within a very large number of more generic categories of Indian records types. There would be thousands of boxes of letters to sort through, filed by a number retrievable by an existing register. In many instances, where particular original documents do not exist amongst NARA's holdings, synopses of letters are available on a separate Register of Letters, or in a series entitled Abstracts of Letters Sent. Other series of records within Record Group 75 that might contain records relating to the Seminole Nation tribe, if examined, would include

BIA correspondence files called General Services (1,666 boxes for the years 1909-1939, and 1,500 more for subsequent time periods), as well as records under the headings Surveys, Allotment Books, School Reports, Inspection Reports, Claims, Treaty Files, Land Reserves, Military Bounty Lands, Census Records, Annuity Payment Rolls, Enrollment Records, Personnel and Employment Records, Removal Records, Irrigation Division Records, Forestry Division Records, Education Division Records, records from the office files of several commissioners, records of the Health Division, Registers of Contracts, Land Management Standards and Surveys, Farming and Grazing Leases, Land Operations Branch Annual Reports, Administrative Office Files of the Branch of Welfare, Job Corps Records, Hearings on Indian Affairs, Economic Development of Tribal Resources, and a plethora of additional categories, all of which conceivably might contain Seminole Nation-related records.

13. As extensive as NARA's BIA archival holdings are, they represent only a fraction of the universe of record collections potentially containing records relating to the Seminole Nation tribe. As listed in more detail *supra,* ¶ 8, NARA's archival collections in College Park also include Record Groups 48, 57, 79, 217, 381, 411, and 513. Some of these record groups are known to contain substantial holdings of Indian records, and may well hold information about the Seminole Nation tribe; however, although some of these record collections have isolated references to the name Seminole Nation, the majority of the records are neither indexed nor searchable under the name Seminole Nation. For such collections, a labor-intensive research effort would need to be undertaken to review individual collections on a file-by-file basis, to determine if records related to the Seminole Nation existed. This would be the case given that existing finding aids are

structured to correspond to how the records were organized by the various agencies that originally generated or maintained the records, as explained above, and not necessarily by name of tribe. As stated above, *supra* ¶ 8, this substantial subset of "likely places" to find records related to the Seminole Nation tribe itself amounts to an estimated 34,383 cubic feet of records holdings.

14. For the foregoing reasons, the task of finding all or substantially all archival records in NARA headquarters collections actually relating to the Seminole Nation is simply not possible without a close review of millions of unindexed records. NARA does not have either the adequate staffing or resources that would be needed to attempt to engage in isolating or indexing these vast records collections, for the purpose of transfer of such records (or copies of records) to Oklahoma.

15. Based on my extensive experience in reviewing archival records, including on very large projects involving thousands of individual pages, I am generally familiar with how much time it would take a NARA archivist reasonably familiar with the relevant records collections to review archival holdings for the purpose of isolating Seminole Nation-related records. I would not wish to quantify the time it would take to review box and file contents at the file- or document level. As a matter of my past experience I can attest that the review process might involve many hours of labor. To review just the 25,777 cubic feet of records at our Main Archives facility involving BIA records would take many thousands of hours of labor by NARA's staff.[1] Pulling any substantial number of staff members away from all of the other functions that NARA archivists perform, solely for the purpose of isolating and copying Seminole Nation-

---

[1] Moreover, the hypothetical does not take into account the additional 34,383 cubic feet of non-BIA records in our College Park holdings likely to contain Seminole Nation-related records that I referenced above.

related records, would interfere with all of the other competing priority work performed on a daily basis by my NARA staff, including the referencing, processing, and screening functions I described at length, *supra,* at ¶ 10.

*NARA's Specific Objections To Plaintiff's Motion*

16. On NARA's behalf, I note the following specific objections to plaintiff's proposed Motion:

17. First, NARA's policy during the 70 years that our reading rooms have been open and available to the public has been to afford access to all to our permanent archival holdings. As such, Seminole Nation-related records that are contained in various of the above-referenced record groups are open and available for research and copying by plaintiff's counsel in this litigation, just as they are to all members of the public. NARA objects to any requirement that would require NARA staff to assume duties never before performed, including isolating "trust" records on behalf of a party litigant, and/or engaging in wholesale segregating out and copying of records collections solely for the convenience of one plaintiff party. As a matter of principle, this Court should not shift the burden to NARA staff to perform highly intensive research for the benefit of one party, given the fact that all other members of the public will suffer due to the diversion of staff resources that would ensue. To the extent that the Motion is being read to impose an additional burden on NARA staff to provide assistance to plaintiff beyond what might be reasonably provided to a member of the public asking for reference assistance, those proposals of plaintiff's Motion should not be granted and should otherwise be deemed inapplicable to NARA.

18. Second, for the reasons given above, any reading of the proposed Motion to require the imposition of an obligation on NARA staff to cull out and copy Seminole Nation-related records should not be imposed, as it would place crippling burdens on NARA and its staff and in fact should be regarded as simply impossible to comply with, given existing time and resources.

19. Third, NARA objects in the strongest terms to any proposal to move or transfer *original* copies of archival documents to Oklahoma. Any such contemplated move would risk wholesale disruption of existing archival collections that have been stably placed in NARA's national headquarters for many decades. A long laundry list of concerns going to the security, continued integrity, and preservation of our existing collections under appropriate environmental controls would arise if the Court were to order such a transfer. Simply put, NARA's archival custodial responsibilities make any proposal for shipment of records away from archival facilities untenable. It also would be fundamentally unfair to other researchers to be creating large holes in existing collections, solely for the convenience of one plaintiff party.

20. I can represent on behalf of NARA's headquarters staff, that NARA very much wishes to assist plaintiff in providing existing finding aids that deal primarily with records related to the Seminole Nation and other Indian tribes, so as to work with plaintiff and its representatives in an effort to find and review as many Seminole Nation-related trust records as possible. We have senior and knowledgeable archivists regarding the records of Indian country, and based on our institutional knowledge of our archival holdings (including using existing finding aids effectively), we stand willing to work with

plaintiff on a voluntary basis in assisting plaintiff's own efforts to find publicly available, pertinent material during the discovery phase of the present lawsuit.

21. In sum, plaintiff's proposed Motion would cripple NARA's ability to perform its important mission to U.S. citizens, by hugely diverting scarce staff resources for a collection, copying and transfer of records enterprise of vast dimension, but uncertain utility and result, in any reasonable time frame. Plaintiff's Motion would also impose unprecedented burdens on this Agency to the extent it requires the expenditure of resources towards the isolation or segregation of particular types of records otherwise fully open and available to the public, merely on behalf of a party seeking records in furtherance of litigation. On behalf of this agency, I urge the Court not to rule in favor of plaintiff's Motion given that the transfer of records, or any other requirement that would impose such severe burdens on NARA and its staff, would severely constrain NARA's ability to serve the public at large, including those who seek research assistance and access to NARA holdings.

I declare under penalty of perjury that the foregoing is true and correct.

Steven D. Tilley

STEVEN D. TILLEY

Executed on this 15th day of April 2008

# TAB A

# TO

# DECLARATION OF

# STEVEN D. TILLEY

# National Archives and Records Administration

**NARA 1571**
February 15, 2002

**SUBJECT:** Archival Storage Standards

**1571.1 What is the purpose of this directive?**
This directive establishes structural, environmental control, fire safety, preservation, and security standards for appropriate archival storage conditions in NARA archival facilities.

**1571.2 What is the authority for this directive?**
The authorities for this directive are

a. 44 U.S.C. 2109, which makes the Archivist of the United States responsible for the preservation of records or other documentary material transferred to the Archivist's legal custody. Appropriate storage conditions are an essential component of a strategy for preservation of archival records.

b. 44 U.S.C. 2112 and 2903, which make the Archivist responsible for custody, control and operation of certain buildings, land, and space.

c. 44 U.S.C. 2112(a)(2), which requires the Archivist to promulgate architectural and design standards for new and existing Presidential libraries.

**1571.3 Definitions**
For purposes of this directive, the following definitions apply

a. **Archival facility** means

(1) A NARA-owned or leased facility used to store archival records;

(2) A GSA-owned or leased facility used by NARA to store archival records; or

(3) A Presidential library acquired by agreement in accordance with 44 U.S.C. 2112(a)(1)(B)(i).

b. **Archival records** means

(1) Federal records, Presidential historical materials, Presidential records, and donated historical materials transferred to the legal custody of NARA; and

(2) Supreme Court records and the records of Congress that have been deposited in NARA's physical custody.

c. **Facility manager** means the program official who is responsible for facility management activities within that building.

d. **Records area** means a records storage area, a designated processing area, an exhibit area, or a preservation (conservation, duplication, microfilm, digital imaging) laboratory. The term covers areas where records may be kept for extended periods.

e. **Records storage area** means an area containing archival records that is enclosed by four firewalls, the floor, and the ceiling. The term includes general stack areas, vaults, and storage areas for exhibits and museum objects, but does not include reference space, staff offices, public spaces (e.g., restrooms and lobbies) or processing areas.

f. **Research room** means a room in which researchers may use original records and for which they must be issued a researcher identification card.

**1571.4 Responsibilities**

a. **Space and Security Management Division** (NAS)

(1) Conducts periodic building condition surveys as outlined in par. 1571.23 and assists the program offices in establishing and maintaining a system-wide facility improvement and renovation program;

(2) In coordination with other NARA offices, establishes architectural and design standards for all leased and NARA-owned facilities;

(3) Furnishes professional and technical advice on the design and construction of archival storage facilities; and

(4) Acts as project manager for archival facility design and construction projects.

b. **Preservation Programs** (NWT) conducts an integrated, scientific preservation program, including

(1) Developing and recommending long-range preservation plans and policy for archival records, coordinating with the Office of Presidential Libraries (NL) and the Office of Regional Records Services (NR), as necessary;

(2) Writing specifications for and providing quality assurance testing of those materials used to prolong the useful life of records (e.g., folders and boxes) and of materials that will be used in the proximity of records (e.g. paint, adhesives and finishes, carpeting, pesticides, and cleaning supplies);

(3) Monitoring environmental conditions of archival facilities;

(4) Administering integrated pest management programs;

(5) Providing technical advice and consultant services on specialized storage requirements to NL, NR, and the Office of Records Services – Washington, DC (NW);

(6) Furnishing professional and technical preservation assistance; and

(7) Reviewing the design and construction of archival storage facilities for records preservation issues.

c. **Presidential library directors** administer the day-to-day facilities management program of the library in coordination with the NL, and major renovation and restoration projects in coordination with NL and the Office of Administrative Services (NA).

d. **Regional administrators and facility directors** administer the day-to-day facility management programs of the regions in coordination with NR.

e. **Facilities and Materiel Management Services Division (NAF)** is responsible for the day-to-day facility management program of the National Archives Building and the National Archives at College Park (Archives II).

**1571.5 To what NARA archival facilities does this policy apply?**

a. This policy applies to all new NARA archival facilities occupied by NARA on or after October 1, 2001, except new space leased for archival programs on a short-term basis while a permanent archival facility is being built or renovated. Additional facility specifications that are not directly related to appropriate storage conditions for archival records may be included in supplements to this directive.

b. New space leased on a short-term basis must meet the facility standards for storage of permanent Federal records specified in 36 CFR Part 1228, Subpart K.

c. To the extent feasible and financially practicable, existing NARA archival facilities should conform to these standards when the facility is renovated or otherwise significantly modified. If the facility cannot be brought into conformance with every standard, NA and the affected program office determine what mitigating action will be taken to minimize threats to the holdings. For example, if piping within a storage area cannot be removed, a mitigating action, such as frequent inspections, may be identified. Mitigating actions must be coordinated with NWT and approved by the Archivist.

d. All NARA archival facilities must have an Integrated Pest Management program (see par. 1571.17) and must enforce the facility policies specified in par. 1571.24.

e. All NARA archival facilities must comply with pars. 1571.14 and 1571.15 when selecting and installing new furnishings and materials, including carpet, in the facility and par.

1571.12 when painting records storage areas.

**1571.6 What are the general structural standards for NARA archival facilities?**

a. The facility must be designed in accordance with regional building codes to provide protection from building collapse or failure of essential equipment from earthquake hazards, tornadoes, hurricanes, and other potential natural disasters.

b. The facility must be constructed with non-combustible materials and building elements, including roofs, walls, columns, and floors.

c. A floor load limit must be established for the records storage area by a licensed structural engineer. The limit must take into consideration the weight of the specific type(s) of archival records to be stored, height and type of the shelving or storage equipment, the width of the aisles, the configuration of the space, etc. The allowable load limit must be posted in a conspicuous place and must not be exceeded.

d. The architectural and engineering design team for the facility must include and work closely with a preservation specialist, who has experience in developing archival storage facilities and has been approved by NARA. The plans for the facility must be reviewed by NWT at each submission stage.

**1571.7 What standards must be followed to protect against water damage?**

a. **Location of facility.** The archival facility must be sited a minimum of five feet above and 100 feet from any 100 year flood plain area, or be protected by an appropriate flood wall that conforms to local or regional building codes.

b. **Roof.** The facility must ensure that the roof membrane does not permit water to penetrate the roof. Place nothing on the roof that may cause damage to the roof membrane, including equipment. Do not install skylights or sloped glazed windows in areas where records are regularly present. Avoid roof penetrations, including vents, over these areas. However, automatic roof vents, designed solely to vent in the case of a fire, with a temperature rating at least twice that of the sprinkler heads, may be used over records storage areas.

c. **Piping.**

(1) Do not run piping (except fire protection sprinkler piping and storm water roof drainage piping) through records storage areas.

(2) If drainage piping from roof drains must be run though records storage areas, the piping must be run to the nearest vertical riser and must include a continuous seamless gutter sized and installed beneath the lateral runs to prevent leakage into the storage area. Vertical pipe risers in records storage areas must be fully enclosed by shaft construction with appropriate maintenance access panels.

d. **Location of records within the facility.**

(1) Do not store records below grade. Cave/underground facilities may be exempted from the requirement to store records above ground if the facilities

(a) Meet the other standards in this directive;

(b) Demonstrate long-term low risk to records because of water, fire, or structural threats; and

(c) Are granted a waiver from a specific standard by the Archivist.

(2) Store records at least 3 inches from the floor surface.

(3) NWT and NAS must review plans to place records shelving equipment along an exterior wall in advance.

(4) No fountains, pools, or standing water are allowed over or adjacent to areas where records are stored, processed, used, or exhibited.

e. **Water detection system.** If special considerations indicate concerns with possible water damage in records storage areas, consult with NWT on the advisability of installing a water detection system.

**1571.8 What are the general heating, ventilation, and air conditioning (HVAC) requirements?**

a. Archives storage areas, processing areas, and preservation laboratories must be served from separate HVAC systems. All other areas of the building may share the same HVAC system. HVAC equipment must not be mounted on the roof of a new facility.

b. Air handling units serving records storage and processing areas must provide sufficient air exchanges to maintain requirements for temperature, relative humidity, and pollutant control. The number of air exchanges are determined by the planned size of the room, volume of records, volatile organic compounds coming off the records, occupancy, etc.

c. The records storage areas of the facility must be kept under positive air pressure especially in the areas adjacent to the loading dock. Loading docks must have an air supply and exhaust system that is separate from the remainder of the facility.

d. Areas where records are used, processed, stored, or exhibited must be isolated from sources of pollutants and particulates, such as the loading dock, machine rooms, or areas where woodworking or painting take place. Doors to the record areas must not open directly onto the loading dock, machine rooms, locations where woodworking or painting takes place, or other similar areas. The air intakes and returns must be designed such that lower quality air and environment cannot affect the records areas, and must have direct venting to the outdoors.

**1571.9 What are the temperature and humidity standards?**

a. Appendix A specifies the **maximum** acceptable temperatures in areas where records are stored, and the **maximum** acceptable temperature set point for areas where records are exhibited, processed, or used. Appendix A also specifies the acceptable range for relative humidity in areas where records are stored, processed, exhibited, or used. Use cooler temperature and drier relative humidity set points whenever possible, as these conditions extend the life and significantly enhance the preservation of the records. Coordinate the selection of temperature and relative humidity set points with NWT.

b. The standards specified in Appendix A must be maintained 24 hours per day, 365 days per year, unless otherwise stated. Once a set point is programmed, daily fluctuations must not exceed 5° F and/or 5 percent relative humidity. Relative humidity levels represented in a range indicate minimum and maximum set points. Seasonal movement between these set points must not exceed 5% per month while staying within the +/-5% daily band restriction.

c. Seasonal relative humidity drift in actual operation of the system to reconcile energy efficiency and external climate extremes in certain geographical locations and with certain building types may occur. The building should be designed to accommodate the environmental requirements in a highly energy efficient manner.

d. Temperature and relative humidity conditions in records areas must be continuously monitored and must be recorded at intervals that are frequent enough, and in a sufficient number of locations to demonstrate and confirm compliance with the standard. The facility manager must maintain the HVAC systems and integrated monitoring equipment according to manufacturer's specifications. The facility manager is responsible for monitoring the temperature and relative humidity conditions in the facility following NWT guidance and specifications, and ameliorating problems as they develop. Report ongoing problems to NWT and NAS.

**1571.10 What are the limits for air pollutants (particulate and gases)?**

Appendix B specifies the maximum allowed levels of particulates and gases in records storage areas, processing areas, exhibit areas, and research rooms. The facility manager is responsible for monitoring for pollutants in the facility at intervals frequent enough to demonstrate and confirm compliance with the standard, following NWT guidance and specifications. The facility manager is responsible for maintaining particulate and gas filtration systems according to manufacturer's specifications and ameliorating problems as they develop. Report ongoing problems to NWT and NAS.

**1571.11 What air handling and filtration systems are required?**

The following filtration systems are required in the air handling unit for the records storage and processing areas:

a. **Gas-phase filtration system.** The gas phase filtration system must control

effectively gas phase contaminants including, aromatic, aliphatic, oxygenated hydrocarbons, chlorinated hydrocarbons, and inorganic acid/basic compounds. The operation of the air purification system may be a combination of chemisorption, adsorption, and catalytic processes. The system must be designed to allow periodic monitoring of the filter performance by providing sampling ports or access to the filter ports.

b. **Particulate filtration system.** The particulate filtration system for archival records storage and processing areas must have a Minimum Efficiency Reporting Rating (MERV) of 14 or greater based on ASHRAE 52.2, "Methods of Testing General Ventilation Air Cleaning Devices for Removal Efficiency by Particle Size." To extend the service life of the system, it may be desirable to install preliminary filters with lower MERV ratings. A pressure drop measurement system or other equipment must be provided to determine when the filters need to be changed

c. **Humidification control system.** The air handling units must be designed for both humidification and dehumidification. Humidification must be achieved by a clean steam injection system (such as an electronic steam humidifier), an atomized air system using clean water, or equivalent system located down stream of the gas filtration system. The design of the system must ensure that the system does not generate or harbor microorganisms.

**1571.12 What finishes are permitted in records areas?**

a. Use a water-based latex paint for painting walls and ceilings. All concrete block walls in the storage area must be primed and painted to prevent dust.

b. Use a low volatile organic compound (VOC) acrylic membrane curing compound for the concrete floors of the records storage areas, after which apply a floor epoxy. Limit the VOC off-gassing of any epoxy and floor coatings in any area where records are processed, used, stored, or exhibited to less than 0.1 part per million by restricting the use of toluene and xylene in the floor coating mix.

c. Use a powder-coating system to paint all painted metal shelving surfaces (including map cases, museum cabinets, etc.) used within all records areas. The powder-coating polymer must be a polyester epoxy hybrid or best equivalent available that passes NWT-conducted or independent lab tests for hardness, coating stability, bending, coating adhesion, and coating durability. The paint must not exceed the off-gassing limits specified in Appendix B. Do not apply powder coating to the metal surfaces onsite in the storage area.

d. If ceiling pipe or exterior stack wall metal panels are to be painted, use an acrylic water reducible primer covered by two latex paint coats.

**1571.13 What finishing materials are prohibited in areas where records are used or stored?**

The following materials are not permitted in the areas where records are used, processed, exhibited and stored, including vaults, but may be used in other areas of the facility. For renovated facilities, this paragraph does not apply to previously installed or applied materials.

a. Cellulose nitrate lacquers and adhesives;

b. Polyurethane products, including paints, varnishes, and foams;

c. Acid-curing silicone sealants and adhesives;

d. Sulfur containing materials that could release $SO_2$;

e. Pressure sensitive adhesives that release VOCs;

f. Unstable chlorine polymers (PVCs);

g. Formaldehyde emitting compounds, such as might be found in particle boards;

h. Vinyls; and

i. Oil-based paints and varnishes.

**1571.14 What materials may be used in records storage areas and records areas, and how is their suitability determined?**

a. Finishing materials, such as paints, finishes, fabrics, carpeting, and floor and wall coverings, used in areas where records are processed, stored, or exhibited for any purpose, must be approved by NWT. NWT may need to test or direct the testing of materials to determine suitability and render approval. Sufficient time to undertake testing must be incorporated into planning and construction schedules.

b. Cleaning supplies used in areas where records are regularly present should be selected carefully to minimize potential damage to records. NWT will provide more specific guidance on how to select appropriate products, and types of products or specific products whose use is restricted or prohibited.

**1571.15 Are carpeting and wall coverings permitted?**
Carpeting, vinyl tiles, and wall coverings are not permitted in the records storage areas, but may be used in other parts of the archival facility. Carpeting, vinyl tiles and wall coverings that minimize off gassing of VOCs must be used in areas where records are regularly present.

**1571.16 What are the requirements for lighting?**

a. **Records storage areas.**

(1) Normal light levels must not exceed 500 Lux measured 36 inches above the floor level. Ultraviolet (UV) filtration on emergency lighting is required so that UV radiation below 400 nanometers in wavelength does not exceed 75$\mu$ W/lumen and 75 $\mu$W per square meter

of surface area.

(2) Where records are not protected by an enclosure:

(a) UV filtration as specified in subpar. a(1) is required on all lights.

(b) Lights in the storage areas that are not required for safety must be off when work is not taking place. Systems (e.g. motion detectors, timers, etc.) should be incorporated to ensure that light exposure to the holdings is minimized.

b. **Processing areas.** Lighting levels for normal office space may be used. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

c. **Exhibit areas.** Lighting must have the capability of full control for light levels 0-200 lux. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

d. **Research rooms.** Lighting levels for normal office space may be used. UV filtration is required so that UV radiation below 400 nanometers in wavelength does not exceed 75µ W/lumen and 75 µW per square meter of surface area.

**1571.17 What are the requirements for pest and vermin control?**
The archival facility must have an Integrated Pest Management (IPM) program as defined in the Food Protection Act of 1996 (Section 303, Public Law 104-170, 110 Stat. 1512). The facility manager is responsible for monitoring and amelioration of problems as they develop. Report problems to NWT.

**1571.18 What are the general fire-safety requirements for archival facilities?**

a. NARA archival facilities must comply with requirements and recommended practices specified in NFPA 232-2000, Standard for the Protection of Records unless a requirement in this directive is more stringent.

b. Do not install mechanical equipment containing motors rated in excess of 1 HP within records storage areas.

c. Do not install high-voltage electrical distribution equipment (i.e., 13.2kv or higher switchgear and transformers) within records storage areas.

d. Penetrations in the walls must not reduce the specified fire resistance ratings.

e. Provide a redundant source of primary electric service, such as a second primary service or an appropriately rated emergency generator to ensure continuous, dependable service to the fire alarm and fire protection systems. Manual switching between sources of service is

acceptable.

f. Do not store hazardous materials, including records on cellulose nitrate film, in records storage areas. Records on cellulose nitrate film may include still photographic negatives, still photographic transparencies, x-rays, motion picture film and microfilm. Nitrate motion picture film and nitrate sheet film may be stored in separate areas that meet the requirements of the appropriate NFPA standard, NFPA 40 (1997), Standard for the Storage and Handling of Cellulose Nitrate Motion Picture Film, or NFPA 42 (1997), Code for the Storage of Pyroxylin Plastic.

**1571.19 What are the smoke detection system requirements?**

a. The archival facility must have an approved, supervised automatic smoke detection system providing full-building coverage. Smoke detection systems must meet the requirements of NFPA 72, National Fire Alarm Code, and must be maintained in accordance with NFPA 72, Part H.

b. Locate smoke detection devices to provide a 99 percent reliability of detecting the origin of the fire in less than 5 minutes. Use photoelectric-type detectors in records storage areas.

**1571.20 What are the requirements for automatic sprinklers?**

a. All records storage and adjacent areas must be protected by a professionally designed automatic sprinkler system that is designed to limit the maximum anticipated loss from any single fire event to a maximum of 300 cubic feet of records destroyed. Sprinkler systems for records storage areas must be separately zoned from other building areas.

b. A wet sprinkler system, installed in accordance with NFPA 13, Standard for the Installation of Sprinkler Systems, must be used except as provided in subpar. c.

c. Clean agent systems that comply with NFPA 2001, Standard on Clean Agent Fire Extinguishing Systems, or pre-action sprinkler systems must be used in cold-storage rooms and other areas subject to temperatures below 40°F, and may be used in records storage vaults and museum storage areas. These systems also may be used in computer rooms and electrical and telephone closets.

**1571.21 What are the security requirements for archival facilities?**

a. The facility must comply, at a minimum, with the security specifications for a Level III facility as defined in the Department of Justice, U. S. Marshals Service report Vulnerability Assessment of Federal Facilities dated June 28, 1995. A copy of the specifications is provided in Appendix A to 36 CFR Part 1228. NAS designates facilities that require higher level security specifications.

b. The facility must have an anti-intrusion alarm system to protect against unauthorized entry.

c. The facility must enforce controls on access to records storage areas.

d. Special security measures may be required for records storage vaults to comply with information security requirements or to protect materials of high intrinsic or monetary value.

**1571.22 How should the building condition be monitored and maintained?**
The facility manager must ensure that

a. Schedules are developed for maintenance and calibration of control system devices for all major building systems in accordance with manufacturers' recommendations;

b. Scheduled maintenance is performed promptly; and

c. Schedules are reviewed and updated annually.

**1571.23 How often should building condition surveys be conducted?**
To ensure that archival facilities subject to this directive meet the standards, NAS should conduct (or contract for) building condition surveys according to the following schedule:

a. **New facilities.** Once before acceptance of a new archival facility, at two years, and again when 10 years old. After 10 years, follow the schedule for existing facilities. If any "punch-list" items are identified in the inspection before acceptance, NAS must monitor correction/completion of those items.

b. **Existing facilities.** Every 5 years. When an existing facility is renovated or significantly modified, the 5-year cycle begins again in the fiscal year following completion of the renovations or modifications. A pre-acceptance inspection is performed for building renovations. If any "punch-list" items are identified in the inspection before acceptance, NAS must monitor correction/completion of those items.

**1571.24 What other facility use policies contribute to appropriate archival storage conditions?**

a. Prohibit smoking, eating, and drinking in all areas in which records are stored, exhibited, or used.

b. In facilities that have records processing areas, prohibit processing records and photocopying in the records storage areas. To ensure that records are subjected to the best environmental conditions available, retain them in processing areas for as short a time as possible.

## Appendix A
## Temperature and Relative Humidity Standards for Archival Records

**Table 1. Records Storage Areas**

| Records medium | Dry Bulb Maximum Temperature | Relative Humidity Set Point |
|---|---|---|
| **Paper**<br>Textual records including files, cards, bound volumes, computer printout and other papers<br>Cartographic records including maps, charts, architectural drawings, posters | 65°F* | 35 - 45%* ± 5% |
| **Photographic media (black and white)**<br>Black and white non-acetate/non-nitrate motion and still picture negatives/ film, photographic paper prints, x-rays, and microforms | 65°F* | 35% ± 5% |
| **Photographic media (black and white)**<br>Black and white acetate motion and still picture negatives/film, x-rays, and microforms; diazo and vesicular microfilm (not including reference copies) | 35°F | 35% ± 5% |
| **Photographic media (color)**<br>Color still and motion picture negatives/ film, slides, and prints<br>Modern digitally produced prints (ink-jet, dye sublimation, electrophotographic, and thermal) | 35°F* | 35%± 5% |
| **Transition/barrier room** at "cold" storage stack | 50°F | 35%± 5% |
| **Magnetic/electronic media** including computer tapes and disks, video tapes, audio tapes, optical disks | 65°F* | 35%± 5% |
| **Other**<br>Artifacts and Presidential library gifts | 65°F | 35 - 45%± 5% |

**Note to Table 1**: Specific microclimates (cases, sealed frames, special housings) may be required for some materials on exhibit and in storage. Materials may include: parchment, photos, fragile bound volumes, metals, or textiles. Items loaned from other institutions may require tighter RH control as per loan agreements

*Cooler temperature set points and within the specified range drier relative humidity set points should be used for these media whenever possible in order to improve the preservation of the records. Magnetic/electronic media should not be stored at a temperature lower than 46°F.

# TAB B

# TO

# DECLARATION OF

# STEVEN D. TILLEY

# National Archives and Records Administration

**NARA 1572**
January 14, 2006

**SUBJECT:** Security for NARA Holdings

**TO:** Office Heads, Staff Directors, ISOO, NHPRC, OIG

**Purpose of this transmittal memo.** This transmits a directive that outlines the policy on security for NARA holdings, including those needing special protection, and procedures that staff must use to implement the policy.

**Why are we issuing this directive?** This directive informs staff, particularly in the Office of Records Services—Washington, DC (NW), the Office of Regional Records Services (NR), and the Office of Presidential Libraries (NL), of measures NARA must take to protect materials in the National Archives of the United States.

**Cancelled directives.** This directive cancels ARCHIVES 1400, CHGE 4, Chapter 8, Part 4.

ALLEN WEINSTEIN
Archivist of the United States

Attachment

# National Archives and Records Administration

**NARA 1572**
January 14, 2006

**SUBJECT:** Security for NARA Holdings

**1572.1 What is the purpose of this directive?**
This directive specifies NARA's policy on security for NARA holdings, especially archival materials needing special protection, and the procedures for implementing the policy.

**1572.2 What are the authorities for this directive?**
18 U.S.C. 2071, 44 U.S.C. 2107, 44 U.S.C. 2111, 44 U.S.C. 2111note, 44 U.S.C. 2112, 44 U.S.C. 2118, 44 U.S.C. 2202, 44 U.S.C. 2207, 44 U.S.C. 2905(a), and 44 U.S.C. 3106.

**1572.3 What NARA holdings are covered by this directive?**

a. This directive covers Federal records, Presidential and Vice Presidential records, Nixon Presidential historical materials, and donated historical materials, including artifacts, in the National Archives of the United States regardless of their location. This directive also covers records of the U.S. Senate, U.S. House of Representatives, Architect of the Capitol, and the U.S. Supreme Court that NARA maintains and preserves.

b. This directive does not apply to classified national security information. Other NARA policy directives and guidance apply to the access and handling of classified national security information, records of concern, or the handling of incumbent Presidential gifts. These include: Interim Guidance 202-1, NARA Information Security Program; Interim Guidance 1600-3, Access to Archival Materials in the Context of Concern about Terrorism; Interim Guidance 1600-5, Access to Materials Containing Classified Information in NARA Research Rooms by Non-Governmental Persons; Life Cycle Controls for Presidential Artifacts; and our regulations at 36 CFR part 1275.

**1572.4 Responsibilities**

a. All staff working with NARA holdings are responsible for properly securing them during storage and use.

(1) Staff must report the compromise of holdings storage areas or the discovery of theft, damaged, missing, or vandalized holdings to their immediate supervisor.

(2) The supervisor determines, generally within 24 hours, whether to further report compromise of storage space, theft, damage, or vandalism to the division and office level in the Washington, DC, area, or their equivalents in the regional archives and Presidential libraries. Before reporting further, supervisors must try to determine the following:

(a) Have the materials been misfiled when placing them back in the stack after use?

(b) Are the materials being used in a research room, awaiting reproduction in a copying area, on exhibition, undergoing conservation treatment, or in an office area to show to a special visitor or group?

(c) Could the materials have been placed in a parallel file by mistake?

(d) In the case of physical damage to materials, was vandalism involved? Or did an accident occur on the part of staff, researchers, or other users?

(3) Managers must report suspected theft or vandalism to the Office of Inspector General (OIG) as indicated in NARA 1202, Office of the Inspector General - Investigations.

b. The Office of Presidential Libraries (NL), Office of Regional Records Services (NR), and Office of Records Services--Washington, DC (NW):

(1) Develop and implement standard operating procedures for each records storage area where materials requiring special protection are kept.

(2) Nominate selected staff for background checks required to access vaults or other specially protected areas and train the staff in the handling and storage of materials under special protection.

(3) Ensure that research rooms are staffed with personnel who have been trained to enforce NARA's holdings use regulations in 36 CFR 1254, Using Archival Records and Donated Historical Materials.

(4) Notify on site security personnel and the Security Management Branch (NASS) security staff of the possible theft.

(5) Notify the OIG immediately of any reports relating to suspected theft or vandalism.

(6) Provide background information about the holdings to OIG or other investigatory body on request, in accordance with all governing statutory authorities.

(7) Take appropriate disciplinary action in the cases where staff have compromised or damaged holdings.

c. The Space and Security Management Division (NAS) manages physical security and background checks through the personnel security officer in the Security Management Branch (NASS).

d. In the Washington, DC, area:

(1) Access Programs (NWC) manages NW custodial control of textual stack areas, including stack space management, with the exception of those for the Center for Legislative Archives (NWL). NWL manages its own stack areas in The National Archives Building (Archives I). The Special Media Archives Services Division (NWCS) provides that function for the stack areas storing primarily special media archives. The Electronic and Special Media Records Services Division (NWME) oversees control of electronic media storage areas.

(2) The Nixon Presidential Materials Staff (NLNS) manages the custodial control of all Nixon Presidential Historical Materials including textual, audiovisual, and specially compartmented information facility (SCIF) areas in the National Archives at College Park (Archives II). The Presidential Materials Staff (NLMS) manages textual, audiovisual, electronic artifact, and SCIF areas in NLMS control in Archives I.

e. Presidential library and staff directors (NL) and regional archives directors (NR) oversee management of archival storage space at their facilities. For holdings that require special protection beyond the facility's capacity, the director consults with the office head and NAS for assistance.

f. NR and NW as appropriate also ensure that NARA's affiliated archives comply with this directive.

## PART 1. GENERAL HOLDINGS PROTECTION REQUIREMENTS

### 1572.5 What are the minimum requirements for securing holdings when they are not in use?

At a minimum, holdings not in use must be stored in stack or storage areas with accessibility limited to authorized personnel. Managers of custodial units maintain location registers that specify the storage location of holdings at an appropriate level of physical control.

### 1572.6 What are the minimum requirements for securing classified holdings when not in use?

The additional requirements for securing holdings that contain classified national security information are described in Interim Guidance 202-1, NARA Information Security Program.

### 1572.7 What are the minimum requirements for controlling holdings when they are removed from secure storage locations?

Whenever holdings are removed from secure storage locations for any reason, staff must document the removal by completing a Reference Service Slip (NA Form 14001), a Request for Military Records (NA Form 14027), a NARA out-card, or some other NARA-approved, appropriate record of the removal that identifies the removed holdings, the staff member responsible for the removal, the reason for the removal, and the date of the removal. Requirements for materials needing special protection are in Part 2 of this directive.

### 1572.8 What are the minimum requirements for securing holdings when they are in use by persons other than NARA staff?

a. Before using any original holdings, researchers must apply to conduct research as

indicated in Interim Guidance 1600-4, Research Application Procedures. Some exceptions may be made for non-NARA users who are accessing holdings for ongoing government business or the representatives of a former or incumbent President, but such researchers must fulfill other governing statutory or regulatory requirements.

b. A NARA staff member must be present to oversee any use of holdings by persons other than NARA staff. Staff must document use of holdings by persons other than NARA staff by completing those portions of the NA Form 14001, NA Form 14027, or some other NARA-approved, appropriate record of the removal with the name of the non-NARA user and the date and times of use. Managers are responsible for communicating to users all rules for safe handling of holdings.

c. Requirements applicable to the use of holdings that contain national security information are described in Interim Guidance 202-1.

d. If NARA research room staff see a researcher damaging holdings or suspect that a researcher is attempting to steal or has stolen holdings, notify any available security officers immediately and a supervisor and the OIG as soon as possible. Do not confront the suspect. The custodial unit must keep the OIG apprised of any records determined to be missing.

e. NARA's holdings protection requirements for other institutions that borrow NARA holdings are found in NARA 1701, Loans of Holdings in NARA's Physical and Legal Custody.

## PART 2. SPECIAL PROTECTION REQUIREMENTS

**1572.9 Is it ever necessary to take protective measures beyond the general holdings protection requirements?**
Managers of custodial units may determine that some holdings need special protection requiring extra measures of physical and intellectual control.

**1572.10 Who determines what non-classified holdings need special protection?**
Managers of custodial units are responsible for making the final determinations about which holdings in their custody require special protection based on the recommendations of knowledgable archivists on their staffs.

**1572.11 What are the characteristics of holdings needing special protection?**

a. To decide whether holdings would benefit from special protection, knowledgable archival staff generally consider whether the holdings are:

(1) Especially vulnerable to theft;

(2) In extremely fragile condition; or

(3) Likely targets of vandalism.

b. Some examples of holdings that have been determined to need special protection are: some museum items in Presidential libraries; and, the patent for the electric light bulb, George Washington's account book as Commander in Chief of the Continental Army, and the rough order log and night order book of the USS Missouri among the holdings of NW.

**1572.12 How do we store and handle holdings needing special protection?**

a. The methods of storing holdings needing special protection vary with the nature of the facility and the clearance levels of the staff. The methods include the use of separate stacks or vaults.

b. Custodial offices report their storage methods and exact containers locations to NAS to compile and maintain a central list of all specially protected storage areas and containers.

c. When feasible, substitute copies of specially protected materials for original holdings for research and exhibit purposes. When this is being done, replace:

(1) Original textual materials on the shelf with a copy of the document. Copy or describe the material(s) with its unique control number if one has been assigned on archival bond paper with an annotation to the location of the original. The archival copy becomes a permanent part of the file to reduce the handling of the original and serves as a cross-reference to the location of the original item.

(2) Artifacts on the shelf with a description of the artifact.

(3) Nontextual materials with a reference copy when possible.

d. Create and maintain an item list of documents and artifacts needing special protection and keep the list in a locked security container. Keep a duplicate copy of the list under lock elsewhere in the responsible unit. Electronic copies of such lists maintained on a shared network drive must be password-protected and accessible only to staff responsible for specially protected holdings areas. If an entire series or collection needs special protection, managers of custodial units may substitute a container or folder list in place of an item list.

e. Limit access to areas containing materials requiring special protection to authorized individuals.

**1572.13 What physical controls are imposed on specially protected materials areas?**

a. Physical controls may vary depending on the building where the holdings are located. Facilities without electronic key systems must use combination locks or other secure methods of barring access to unauthorized staff and visitors. Direct questions about appropriate mechanisms and requirements to NASS.

b. Each specially protected stack, vault, or safe is equipped, at a minimum, with a three-position combination lock. Units that now use stacks or safes with keys for holdings needing special protection will plan to upgrade to stacks or safes with combination locks.

c. To change the combination, the responsible manager designates a staff member with access to the area to notify NASS and request any necessary assistance in making the change. Combinations are changed for the following reasons:

(1) First use of a newly procured combination lock;

(2) A combination lock is taken out of service;

(3) A staff member who knows the combination leaves the unit or no longer needs to know the combination; or

(4) The security of the combination appears to have been compromised.

d. The person changing the combination for a vault in Archives I or Archives II enters the combination on a Standard Form (SF) 700, Security Container Information, and forwards two copies in a sealed envelope to NAS located in Archives I and Archives II. Each copy of the SF 700 must be marked "Unclassified - specially protected material." The person also informs their supervisor and the other designated staff members with access to the area of the new combination. When the combination is changed, the manager responsible for the area documents the date of change and the reason(s) for the change in a memo sent to NAS with a copy to the office head. At locations out of the Washington, DC, area, place the SF 700 in a sealed envelope in a container with a combination lock.

e. NASS conducts inspections of secure areas as part of the cycle of security and workplace inspections.

**1572.14 How does NW conduct systematic inspections?**

a. Responsible managers inspect materials in their designated specially protected areas (see par. 1572.11) at least once a year between October 1 and April 30. (More frequent inspections are encouraged.)

b. Separate teams inspect each specially protected stack, vault, and safe. The teams consist of at least two persons and must include at least one representative of the unit responsible for the stack or safe and, if possible, a disinterested staff member who does not work directly for the individual responsible for the area being inspected. The team members work together (never alone) and do not need to know the combination for entry into the stack or safe. The appropriate NW program director appoints team members in the Washington, DC, area.

c. The inspection teams prepare written reports and submit them to the office head by May 30 with an information copy for the manager responsible for the stack or safe.

d. At least 25 percent of artifacts and unique record items that are not parts of larger series are inspected on a rotating basis.

e. In NW, for entire series under special protection, the inspectors must inspect five percent of the documents, randomly selected, in each series. The documents are compared to microfilm or published copies, special lists, indexes, or other forms of control used for the series. The responsible manager prepares a list of the items inspected and retains the list under lock for 15 years.

f. The inspectors verify that a document or artifact is located in the specially protected stack, vault, or safe, and note its physical condition. The inspectors must notify the manager of any changes in condition compared to previous inspection reports.

**1572.15 How does NR conduct systematic inspections?**

a. Responsible managers inspect materials in their designated specially protected areas (see par. 1572.11) at least once a year between October 1 and April 30. (More frequent inspections are encouraged.) Regional archives directors may defer inspections with advance approval from the office head.

b. Teams inspect each specially protected stack, vault, and safe. The teams consist of at least two persons whenever possible as a best practice. The team members do not need to know the combination for entry into the stack or safe. Regional archives directors appoint team members in NR.

c. The inspection teams prepare written reports and submit them to the office head by May 30 with an information copy for the manager responsible for the stack or safe.

d. At least 25 percent of artifacts and unique record items that are not parts of larger series are inspected on a rotating basis.

e. The inspectors verify that a document or artifact is located in the specially protected stack, vault, or safe, and note its physical condition. The inspectors must notify the manager of any changes in condition compared to previous inspection reports.

**1572.16 How do the Presidential libraries conduct inspections?**
Presidential libraries contain an extremely high volume of materials having direct association with a former president. The materials have a limited exposure to researchers and staff compared to Washington, DC, area holdings. Inspections in the libraries are conducted for the museum components. The library directors appoint the inspection teams. Each team will consist of at least two people.

a. During the first quarter of each fiscal year, the museum staff inventories museum items vulnerable to theft. Items to inventory include small, valuable objects such as jewelry, firearms, art objects, coins, and currency. The dated inventory briefly describes each object and its location. At least one staff member other than the person preparing the inventory verifies the inventory's content by checking the objects against the inventory. Library directors include a report of this inventory in the quarterly narrative report to NL for the first quarter. Between annual inventories, the staff maintains a record of changes in location of inventoried items and the location of new additions to museum holdings subject to the inventory.

b. Annually each library conducts a physical inventory of museum items that are not subject to the valuable object inventory. The number of items to be included in the inventory is 5 percent of the museum holdings or 1000 items, whichever is less. A 5 percent sample will be selected for inventory by selecting every 20th item in the accession records of the museum. The starting point for selecting items for each year's inventory will be changed every year so that the entire collection will be inventoried over 20 years. Alternately, the inventory may consist of 1,000 items from one, or more, categories of the collection. Museums may use the inventory to identify items requiring preservation action and for identifying items for disposal. The results of the inventory must be reported in the narrative report of library activities for the quarter in which the inventory is conducted.

**1572.17 How does NARA control access to specially protected materials areas?**
Managers make every effort to reduce the need for access to holdings under special protection. Permit access only when the original material must be consulted or when the responsible manager authorizes a tour of the special area. Do not use the stack, vault, or safe for the storage of equipment, supplies, surplus publications, or other similar items that many staff may need to obtain. Facility staff and contractors must schedule any necessary access with the responsible manager and must be accompanied at all times by a staff member designated to have access to the specially protected area.

**1572.18 How is staff access to specially protected holdings areas controlled?**

a. Office heads, regional facility directors, and library directors upon the recommendation of responsible managers, designate staff members to receive the combination or key to the stack, vault, or safe containing holdings under special protection. The names of these persons and the specific areas (vault or safe location) to which they have access are forwarded to NASS.

b. Only staff and managers designated to have access to stacks, vaults, or safes containing holdings under special protection are authorized to have access to these areas or containers. Other staff members or persons allowed into the specially protected areas must be accompanied at all times by a staff member authorized to have access to the area. In the regional archives, staff not designated to have access to a secure vault or safe containing specially protected materials in an otherwise accessible stack area may have access to that stack.

c. Taking the materials outside of the area for any reason requires documentation by using NA Form 14001, or other appropriate NARA-approved form as stated in pars. 1572.7 and 1572.8.

**1572.19 How do we monitor use of a specially protected holdings area?**

a. Staff entering the secure area sign in and out on NA Form 14094, Specially Protected Area Traffic Sheet, or SF 701, Activity Security Checklist or other NARA-approved form.

b. The responsible manager retains under lock each completed NA Form 14094 or SF 701. Disposition of the forms is specified in the NARA records schedule (FILES 203), item 1442-3.

c. Some Presidential libraries control access by requiring employees to charge out the key to the special holdings area. A log of the key charge outs is maintained by the library.

**1572.20 May holdings needing special protection be taken to a research room or staff office?**

a. Whenever feasible, it is NARA policy to furnish copies in place of originals when holdings needing special protection are requested for research. LICON chiefs or other designated staff are expected to review requests made by researchers to examine original holdings needing special protection in place of copies and determine whether or not compliance is consistent with holdings protection guidance.

b. Managers may make exceptions under special circumstances on a case-by-case basis and may delegate this to the supervisor of the unit having custody of the holdings. Rare instances when access may be allowed require that a staff member with access to items needing special protection be present at all times while a researcher briefly consults such items. Consultation must be as brief as possible to limit the item's exposure to light and physical handling and limit opportunities for theft or vandalism. If managers have any question about an item's stability, consult the Document Conservation Laboratory (NWTD) or NWTS for NW holdings, NWT-L for Presidential library holdings, or NWT-R for Regional Records Services holdings before providing holdings needing special protection to a researcher.

c. Designated staff, at the discretion of the manager, may show items needing special protection to groups or visitors as part of educational or other outreach programs. Such exposure must be limited. Examples of groups and visitors that may fall into this category are participants in the Modern Archives Institute, records personnel from other agencies, and archivists or curators from other institutions and countries.

**1572.21 How are records created by this directive maintained under the NARA records schedule?**

Use the following file numbers for the functions and records described in this directive:

a. File no. 1442-2, "Records Storage and Security Files: Documents created in controlling the physical location of accessioned records and donated materials...," for:

(1) Storing and controlling removal of holdings requiring special protection. Records may include:

(a) Location registers and lists specifying storage locations of holdings (pars. 1572.5 and 1572.7, subpar. 1572.12c);

(b) Master list of all designated specially protected materials areas, maintained by NASS (subpar. 1572.12b); and

(c) Reference service slips, requests for military records, and other records documenting removal of holdings from secure storage locations for any reason (paragraph 1572.8 and subpar. 1572.18c).

(2) Changing combinations for specially protected stacks, vaults, and safes. Records may include Security Container Information forms and accompanying memoranda sent to NAS (subpar. 1572.13d); and

(3) Inspecting specially protected materials areas. Records may include:

(a) Inspection reports and lists of inspected documents prepared by inspection teams in NR and NW (subpars. 1572.14c, 1572.14e, and 1572.15);

(b) Annual inventories and related location registers of valuable objects and other museum items in the collections of Presidential libraries and Presidential Materials Projects (par. 1572.16); and

(c) Sample inventories (prepared concurrently with annual inventories) of at least 100 museum items not stored in sealed containers in Presidential libraries and Presidential Materials Projects (subpar. 1572.16b).

b. File no. 1442-3, "Records Storage and Security Files: Specially Protected Area Security Files," – for controlling and monitoring access to specially protected materials areas. Records may include:

(1) Lists of designated persons who have access to specially protected areas, maintained by managers of these areas and NASS (subpar. 1572.18a);

(2) Sign-in/sign-out forms for specially protected areas, maintained by managers of these areas (par. 1572.19); and

(3) Incident reports when security of a protected area has been compromised (subpar. 1572.20b).

c. File no. 312, "Personnel Security Clearance Files" (includes instruction for supervisors to use file no. 303-1) – for conducting background checks for staff members required to have access to specially protected materials areas (subpars. 1572.4b(1) and 1572.4c).

d. File no. 1420, "Research Room Reference Service Files" – for documenting removal of holdings for reference use by researchers and other non-NARA staff. Includes reference service slips ("pull slips") and related records (subpar. 1572.9b).

e. File no. 113-3, "Offices' Performance Reports: Feeder reports, which may be prepared quarterly, for office heads by heads of field units…," – for reporting results of museum inventories in Presidential libraries and Presidential Materials Projects. Includes the quarterly narrative reports prepared by libraries/projects and maintained by NL and the libraries/projects (subpars. 1572.16a and 1572.16b).

f. Records documenting thefts, vandalism, or other compromises of items stored in specially protected materials areas (subpars. 1572.4b(3) and 1572.20c), are unscheduled and must **not** be destroyed until the Archivist approves dispositions on an SF 115, Request for Records Disposition Authority. Organizations involved in these incidents (i.e., managers of specially protected areas, OIG, NAS, NGC), maintain the records in secure files until the Records Officer provides notification of the approved disposition(s).

# EXHIBIT 40:

# DECLARATION OF

# GREGORY POMICTER

# APRIL 10, 2008

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SEMINOLE NATION OF OKLAHOMA<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-CV-935-L<br>Judge George W. Miller |

DECLARATION OF GREGORY POMICTER

I, Gregory Pomicter, do hereby declare:

1. I hold the position of Assistant for Operations in the Office of Regional Records Services, National Archives and Records Administration (NARA), located in College Park, Maryland. I have been the Assistant for Operations for the past nine years. I am responsible for regional archival, records management, and administrative functions of the Office of Regional Records Services. Among my overall duties, from time to time I am called upon to act as Acting Assistant Archivist for Regional Records, at which time I supervise a staff of 25. Prior to my present position, I served as Deputy Assistant Archivist for Federal Records Centers, from 1989 to 1997. From 1997 to 1999, my work focused more on Federal Records Center operations even though my title remained the same. Since that time, my responsibilities have been broadened to include archival operations in the Office of Regional Records Services.

2. I am generally familiar with the *Seminole Nation of Oklahoma v. U.S.* lawsuit, the Motion for Document Preservation Order, Confidentiality Agreement, Protective Order and attached Exhibits A and B (collectively referred to herein as "Motion") filed with this Court by the plaintiff on March 3, 2008. I have received the agency-wide

Notice pertaining to tribal trust lawsuits, including Seminole Nation, and it has been distributed to my staff. I am submitting this declaration to provide the Court with additional information on the scope of NARA's regional holdings and to apprise the Court of the burdens imposed by plaintiff's demand for the transfer and/or copying and shipping of NARA archival records in one or more regional offices to Oklahoma.

3. This declaration is based on my personal knowledge as well as factual information gathered on my behalf by NARA staff.

*NARA's Regional Records System – General Overview*

4. The Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) and 2110. NARA currently maintains 21 regional facilities throughout the United States, in 13 states. These consist of two types of facilities: regional archives and federal records centers. Regional archives house permanently valuable records that have been transferred into NARA's legal custody, and federal records centers store temporary and permanent records that are legally owned and accessed by federal agencies. Federal agencies often possess indexes to the records to facilitate their use of the files, and until the records are transferred into NARA's legal custody the nature (*i.e.,* detail, scope, format) of the indexes may not be known to NARA.

5. Given the enormous volume of federal records that exist, agencies may also choose to physically store portions of their non-active or semi-active records in a NARA facility known as a "federal record center" ("FRC"). 44 U.S.C. § 3103 and 36 C.F.R. Parts 1253-54. Each records center facility provides reference and other services to the

federal agency that owns the records, and, upon authorization by the owning agency, to the public. NARA has physical custody of such records; however, the legal custody of the records remains with the agency that transfers the records to the NARA records center facility. In the normal course of business, such records may be disposed of or transferred to the legal custody of NARA (*i.e.,* accessioned), subject to NARA and agency approval, after all legal retention requirements have been met. (In the case of DOI records in NARA federal record centers, one or more administrative "freezes" are in effect preventing the destruction of any DOI records across all sixteen existing record groups.) *See also infra,* ¶16. As provided for in NARA regulations, agency record schedules normally set out a future date (*e.g.*, "after 30 years"), for the eventual transfer of legal custody to NARA of an agency's records in an FRC which have been appraised as "permanent" and therefore will be retained forever. Usually, at the time of transfer of legal custody, such permanent records are moved from FRCs to either a NARA regional or headquarters archival facility. Unless and until legal custody has been transferred to NARA, provision for access to records in FRCs is controlled by and is the responsibility of the agency that transferred the records. 36 C.F.R. 1254.8. In the normal course, once NARA has obtained legal custody of records designated as permanent, such records are open and available to the public at a NARA archival facility after processing (subject only to any restrictions imposed by the transferring agency).

6. In light of my principal duties and responsibilities for assisting in overseeing NARA's regional records programs, I will limit my discussion here to how plaintiff's proffered Preservation Order set forth in its Motion would affect NARA's regional archives in processing and working with archival holdings throughout the United States.

I support the statements made in the Declaration of Steven Tilley ("Tilley Declaration") being filed contemporaneously herewith, and will incorporate Mr. Tilley's remarks into this Declaration.

*NARA's Storage of Regional Records Relevant To This Litigation*

7. NARA's vast archival holdings include records in our Regional Archives situated throughout the United States. Just as in the case of headquarters archival records, federal records in the regional archives are arranged by the name of the government agency with which they are associated (*e.g.,* the Defense Department (formerly the War Department), the Treasury Department, the Government Accountability Office, the Department of Interior, etc.), and each of these agencies has its own bureaucratic filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. In consequence, with limited exceptions described below, NARA regional archivists would not generally be able to search records of all government agencies under the search term "Seminole Nation," to locate all records relating to this tribe. Moreover, as described in more detail below, most records related to the Seminole Nation tribe would be expected to be found within the Department of Interior's (DOI) record groups, NARA's regional archivists are also aware of many record groups outside of DOI that also might conceivably contain Seminole Nation-related records.

8. The records of the Department of the Interior (DOI) collectively comprise sixteen record groups, including among others located in our regional archives, Record Group 75 (records of the Bureau of Indian Affairs (BIA)), Record Group 48 (Records of the Office of the Secretary of the Interior (OST)), and Record Group 473 (Records of the

Mineral Management Service). Many of these NARA Record Groups potentially hold extremely substantial quantities of archival records. For example, we estimate that there are at least 43,345 cubic feet just of Record Group 75 BIA records known and cumulatively contained in NARA's regional archives which are dispersed across the country, in 13 cities. As each location cares for the original records pertaining to its respective region, except for any records that may have been microfilmed, no region has a NARA-generated copy of the entire collection of records that may relate to the Seminole Nation tribe.

9. As a general matter, although NARA's collections of records in each record group more or less have existing documentation and finding aids associated with them, which normally can be of use to researchers in locating records related to the Seminole Nation tribe, NARA's regional offices neither have nor generate in the ordinary course of business document-level indexes of their collections sufficient to identify all records relevant to the present lawsuit. Moreover, neither NARA's regional holdings, nor our existing regional finding aids, can be said to be differentiated or segregated into what constitute "trust" and "non-trust" records pertaining to either Indian affairs generally or Seminole Nation-related records specifically. Accordingly, to make available to plaintiff all inactive "Seminole Nation Trust records," searches would have to be devised and conducted at each of our regional archives according to ad hoc and highly variable filing systems developed over the course of the past 100 or more years by all the pertinent government agencies involved. To the extent that the Motion contemplates that NARA archivists would attempt to engage in isolating "trust" records relating to the Seminole Nation from the larger known or conceivable collections of records groups containing

records relating to the Seminole Nation tribe, the Motion amounts to imposing an impossible burden on this Agency's regional staff to perform.

10. Given what might be on the order of many thousands of hours involved, *see* Tilley Declaration, requiring highly-trained NARA regional staff to devote their time to a project of segregating Seminole Nation-related and/or Seminole Nation-related trust records would, in my view, effectively mean shutting down our regional archives' ability to perform the important mission of providing reference services to the public at large. Such reference services include providing guidance to individual citizens who personally visit NARA's various regional facilities, or who write, e-mail, fax, or call us, seeking guidance as to where to locate records in our vast collections. In FY 06, NARA regional staff handled 31,791 written reference requests. Also, staff of our National Personnel Records Center, which includes a regional archives, researched and responded to over one million written requests for information in personnel files (civilian and military). Most of these records are not archived; however, a significant volume of these records soon must be archived and processed for public use. In addition to handling the above forms of reference requests, NARA's regional staff also are actively engaged in processing and accessioning records, performing preservation work on existing archival record collections, screening records for privacy-related information and to ensure that only unclassified records are opened, and developing and delivering educational outreach programs supporting the needs of local educators and students. Each regional archives performs all archival functions with less than a dozen staff members and managers, only a few of which are trained archivists.

11. No less impossible is the task of reliably segregating "all" records related to the Seminole Nation tribe for inspection by plaintiff, even without regard to a concern for their "trust" or "nontrust" status. Records pertaining to the Seminole Nation tribe -- but not indexed at the document level -- are known to exist within the holdings of the National Archives in NARA's Southwest Regional offices in Ft Worth, Texas, under the general headings of "Records of The Five Civilized Tribes Agency and The Muskogee Area Office," "Records of the Bureau of Indian Affairs (Record Group 75) on deposit at The Oklahoma Historical Society," and "Records of the Osage Agency." Potentially, additional Seminole Nation-related records within NARA's archival collections of BIA records are subsumed within a very large number of more generic categories, or series, including such categories as Central Classified Files, Correspondence, Office Files, School Records, Subject Files, Administrative Files, Decimal Files, Employment Assistance Case Files, Employment Assistance Data Cards, and Area Relocation Specialist Records. Adding to the complexity of use issues, the employment assistance and area relocations series named above must be handled carefully respecting privacy issues.

12. As extensive as NARA's BIA archival holdings are, they represent only a fraction of the universe of record collections potentially containing Seminole Nation-related records. As alluded to above, NARA's regional archival collections also include Record Group 48, Records of the Office of the Secretary of the Interior (596 cubic feet), Record Group 57, Records of the U.S. Geological Survey (1100 cubic feet), Record Group 79, Records of the U.S. Park Service, 1916-2005 (5919 cubic feet), Record Group 381, Records of the Office of Economic Opportunity (191 cubic feet); Record Group 115,

Bureau of Reclamation (11,003 cubic feet), Record Group 435, Records of the Indian Arts and Crafts Board (26 cubic feet), Record Group 95, Forest Service (6684 cubic feet), and Record Group 411, Records of the Government Accountability Office (124 cubic feet). Some of the record groups are known to have substantial holdings of Indian records, and may conceivably hold information about the Seminole Nation tribe; however, the vast majority of the records are neither indexed nor searchable under the name "Seminole," or "Seminole Nation." For such collections, a labor-intensive research effort would need to be undertaken to review individual collections on a file-by-file basis, to determine if records related to the Seminole Nation tribe existed.

13. For the foregoing reasons, the task of finding all or substantially all archival records in NARA regional collections actually relating to the Seminole Nation is simply not possible without a close review of what adds up to literally millions of unindexed records. NARA does not have either adequate staffing or resources to attempt to engage in isolating or indexing these vast records collections.

*NARA's Federal Records Centers*

14. NARA's Records Center holdings include records stored in the Federal Records Centers situated throughout the United States. Agency records transferred to a NARA records center remain in the legal custody of the agency that originally generated or maintained the particular records at issue. NARA acts as the agency's agent in maintaining those records. NARA is unable to disclose such records except to the agency that maintains the record.

15. As is the case with the archival records, the records of the Department of the Interior (DOI) can be found in sixteen record groups, including Record Group 75, records

of the Bureau of Indian Affairs (BIA), Record Group 48, Records of the Office of the Secretary of the Interior (OST), and Record Group 473, Records of the Mineral Management Service. NARA's Federal Records Center in Lenexa, Kansas houses the majority of the Record Group 75 holdings. Of the 160,000 cubic feet of Record Group 75 records stored in Lenexa, most have some form of indexes. These indexes may be helpful in identifying records pertaining to either Indian affairs or Seminole Nation-related records, but cannot be used exclusively to locate all records relating to this tribe. The remaining DOI records stored at the regional records centers are not indexed. The task of finding all or substantially all record center holdings in NARA regional records centers relating to the Seminole Nation is simply not possible without a close review of the unindexed records. The Department of the Interior (DOI) would need to provide staff and resources to attempt to engage in isolating or indexing these vast records collections to meet the requirements of the order.

16. Since 2002, at the request of other parties NARA has placed and continues to administer an administrative freeze on the disposition (*i.e.*, destruction) of all DOI records in NARA federal records centers as the result of litigation in *Cobell v. Kempthorne*, 96CV01285 (D.D.C.). Other freezes on disposition of all or some DOI records are in effect apart from the *Cobell* case.

*NARA's Specific Objections To Plaintiff's Motion*

17. On NARA's behalf, I wish to lodge the following objections to plaintiff's Motion:

18. First, NARA's founding and continuing public access policy, since the Agency's inception in 1934, has been that our public reading rooms afford access to all of

our permanent archival holdings. As such, Seminole Nation-related records that are contained in various of the above-referenced record groups generally are open and available for research and copying by plaintiff's counsel in this litigation, just as they are to all members of the public. As both a general matter and especially under these circumstances, NARA objects to any requirement set out in Court order that would require NARA regional staff to assume duties never before performed, including isolating "trust" records on behalf of a private party, and/or engaging in wholesale segregating out and copying of records collections available to the public solely for the convenience of their being delivered to a plaintiff party. Moreover, as a matter of principle, this Court should not shift the burden to NARA's regional staff to perform highly intensive research for the benefit of one party, given the fact that all other members of the public will suffer due to the diversion of staff resources that will ensue.

19. Second, for the reasons given above, the Motion's imposition of an obligation on NARA staff to cull out and copy Seminole Nation-related records should not be granted, as it would place crippling burdens on NARA and its staff and in fact should be regarded as simply impossible to comply with, given existing time and resources.

20. Third, NARA objects in the strongest terms to any requirement to move or transfer *original* copies of archival documents to Oklahoma. Any such contemplated move would risk wholesale disruption of one or more existing regional archival collections that have been stably placed in NARA's regional offices for many decades. A long laundry list of concerns going to the security, continued integrity, and preservation of our existing collections under appropriate environmental controls would arise if the Court were to order such a transfer. Simply put, NARA's archival custodial

responsibilities make any proposal for shipment of records away from archival facilities untenable. It also would be fundamentally unfair to other researchers to be creating large holes in existing collections, solely for the convenience of one plaintiff party.

21. In lieu of plaintiff's Motion, I can represent on behalf of NARA's regional staff, that NARA very much wishes to assist plaintiff in providing existing finding aids that deal primarily with records related to the Seminole Nation and other Indian tribes, so as to work with plaintiff and its representatives in an effort to find and review as many Seminole Nation-related trust records as possible. There are many senior and knowledgeable archivists regarding the records of Indian country, and we stand willing to work with plaintiff on a voluntary basis in assisting in the collection of pertinent material during the discovery phase of the present lawsuit.

22. In sum, plaintiff's Motion would cripple NARA's ability to perform its important mission to U.S. citizens, by hugely diverting scarce staff resources for a collection, copying and transfer of records enterprise of vast dimension, but uncertain utility and result, in any reasonable time frame. The Motion imposes unprecedented burdens on this Agency to the extent it requires the expenditure of resources towards the isolation or segregation of particular types of records otherwise fully open and available to the public, merely on behalf of a party seeking records in furtherance of litigation. On behalf of this agency, I urge the Court not to rule in favor of plaintiff's Motion given that the transfer of records, or any other requirement that would impose such severe burdens on NARA and its regional staff, would severely constrain NARA's ability to serve the public at large, including those who seek research assistance and access to NARA holdings

I declare under penalty of perjury that the foregoing is true and correct.

Gregory Pomicter

GREGORY POMICTER

Executed on this 10 day of April, 2008

# EXHIBIT 41:

# DECLARATION OF

# BEN J. HARRISON

# APRIL 17, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 06-935 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |

**DECLARATION OF BEN J. HARRISON**

I, Ben J. Harrison, pursuant to 28 U.S.C. § 1746, state:

1. I have held the position of Deputy Regional Counsel for Region 6 of the U.S. Environmental Protection Agency since March 2007. Previously, from October 2006 to March 2007, I served as acting Deputy Regional Counsel. In these positions, I have been and am responsible for, among other things, supervising all legal work in our office related to Indian tribal issues.

2. From April 1990 to October 2006, I served as a staff attorney in the Office of Regional Counsel in Region 6. From approximately January 1995 to October 2006, my responsibilities included legal work related to Indian tribal issues.

3. I am a member of the Bar of the State of Arkansas (Bar No. 90076).

4. I am generally familiar with the Seminole Nation lawsuit. I am also aware of the necessity for the preservation of documents, data, and tangible things that are relevant or may reasonably lead to the discovery of information relevant to the subject matter involved in the pending lawsuit. I am filing this Declaration based on my personal knowledge of EPA's holdings, as supplemented with information obtained from EPA managers and staff.

5. EPA Region 6 staff are routinely provided information regarding record retention requirements. Between December 5, 2007 and February 15, 2008, 11 advisories providing guidance were sent to all Region 6 management and staff. These include instruction of definition of "record," emails as records, electronic information from personal digital assistants (PDA's) and Blackberries as records, record retention training, and protecting records from unauthorized removal. This routine instruction shows EPA Region 6's commitment to record retention and that any document preservation order is unnecessary.

6. On April 2, 2008, I distributed email messages to all EPA Region 6 senior managers and Office of Regional Council managers with instructions for further distribution to staff. The memorandum is intended to alert staff and managers to the existence of litigation

involving the Seminole Nation of Oklahoma, as well as other Tribes in the State of Oklahoma, the need to retain documents and instructions to apprise me should they or their staff become aware of the destruction of any potentially relevant materials.

7. On April 14, 2008, I again mentioned the necessity of retention of all materials related to Seminole Nation of Oklahoma to all Region 6 senior managers. I also reminded them that any destruction of such materials needed to be reported to me. No destruction has been reported as of the date of signing this declaration.

8. At this time, EPA Region 6 would face some difficulty in complying with Plaintiff's proposed document preservation order. The Region's materials related to the Seminole Nation of Oklahoma are not centralized. To locate, review for relevance, copy and ship such materials to a location in Oklahoma could prove unduly burdensome and significantly disrupt the Region's work.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

[signature]
Ben J. Harrison

April 17, 2008
Date

# EXHIBIT 42:

# DEFENDANT'S PROPOSED DOCUMENT PRESERVATION ORDER

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 07-02L
Filed: April ____, 2008

| | |
|---|---|
| SEMINOLE NATION OF OKLAHOMA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**[PROPOSED]ORDER**

This Court has determined that there is a need for an order regarding the retention or preservation of certain "documents, data, and tangible things" in this case.

Upon consideration of the parties' proposals as to form and content of the retention or preservation order, as well as Defendant's objections regarding the need for such an order, the Court hereby issues the following Order, pursuant to Rule 26(c) of the Rules of the Court of Federal Claims (RCFC), as well as the Court's inherent power to regulate its proceedings and maintain the integrity of its functions:

1. Obligation to Preserve Certain Documents, Data, and Tangible Things

During the pendency of this litigation (including informal settlement discussions, ADR, and/or any appeals herein), the parties, as well as their agencies, their employees, and their agents, shall take reasonable steps to preserve those documents, data, or tangible things that are in their possession, custody, or control, and that contain information that is relevant to, or may reasonably lead to the discovery of information that is relevant to, the subject matter of the pending litigation (including claims and defenses), as that subject matter is set forth in the Complaint and any amendments thereof and the Answer to such complaint and any amendments thereof. This Order does not impose an obligation on the parties to retain duplicate copies of the documents, data, or tangible things that are subject to the Order.

2. Definitions

For purposes of this Order, the following terms are to defined as follows:

(a) "Documents, data, and tangible things" shall be interpreted to consist of

writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic mail (e-mail) or other electronic messages; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media, such as tapes, disks, and cards; printouts; document image files; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic or digital recordings, or transcripts thereof; and drafts. The term also shall include information that serves to identify, locate, or link documents, data, and tangible things, such as file inventories and indices.

(b) "Preserve" shall be interpreted to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this case. "Preserve" includes the parties taking reasonable steps to prevent the partial or full destruction, alteration, deletion, shredding, incineration, wiping, theft, or mutation of documents, data, and tangible things, and any negligent or intentional handling that would make material incomplete or inaccessible. The term also includes the parties taking reasonable steps to prevent the relocation of documents, data, and tangible things, if such relocation would result in the documents, data, or tangible things no longer being in the possession, custody, or control of the party from whom the documents, data, and tangible things are relocated.

3. Mechanism for Ensuring Compliance With This Order

The parties shall each establish a mechanism for ensuring on-going compliance with this Order, such as periodic reminders of record retention obligations to be sent to appropriate document entities by a date to be determined by the Court and then every six months thereafter for the pendency of this case. The parties shall file a report setting forth their compliance mechanism, within 60 days of the date of this Order. Counsel shall notify the Court and opposing counsel, as soon as is reasonably possible , if, at any time, they become aware of a violation of Paragraph 1 of this Order (*i.e.*, the destruction or loss of certain documents, data, and/or tangible things).

4. Dispute Resolution

If a party desires clarification of any issue(s) related to the parties' obligations pursuant to, or compliance with, this Order, or believes that the opposing party has violated any term of this Order, the party shall notify the opposing party in writing and state the issue(s) requiring clarification or the grounds upon which the party has formed such belief. As soon as practicable after receiving such written notification, the parties shall meet and confer in an attempt to clarify the issue(s) in a mutually agreeable manner or resolve the dispute. If the parties cannot clarify the issue(s) in a mutually agreeable manner or do not resolve the dispute, within a period of 20 days either party may file a motion with the Court seeking a ruling regarding the parties' obligations under, and compliance with, this Order.

5. Further Instructions, Clarification, or Modification of This Order

Each party may apply to the Court, at any time, for further instructions, clarification, or modification of this Order, regarding, inter alia, their obligations to preserve specific categories of documents, data, and tangible things covered by the Order. The parties are encouraged to confer among themselves and to make a joint proposal or submission to the Court, wherever appropriate or possible.

**IT IS SO ORDERED.**

Date: ____________ ____________________

# EXHIBIT 43:

# Defendant's Proposed

# Confidentiality Agreement

# and

# Protective Order

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-cv-00935L |
| | ) | Judge George W. Miller |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PARTIES' JOINT STIPULATION, [PROPOSED] ORDER, AND EXHIBIT 1 REGARDING CONFIDENTIALITY OF CERTAIN DOCUMENTS, DATA, AND OTHER MATERIALS TO BE PROVIDED BY DEFENDANT TO PLAINTIFF**

WHEREAS Plaintiff Seminole Tribe of Oklahoma ("Plaintiff") has filed this case seeking declaratory and injunctive relief against Defendant related to the trust accounting and trust management responsibilities allegedly owed by Defendant to Plaintiff;

WHEREAS Defendant may provide Plaintiff's attorney(s) of record, as well as Plaintiff's officers, employees, representatives, or consultants, or experts ("Plaintiff's Designees"), with access to certain documents, data, or other materials within the possession, custody, or control of Defendant, principally, the United States Department of the Interior ("Interior") and of the Treasury ("Treasury"), and of the United States Department of Justice ("DOJ");

WHEREAS such documents, data, and/or other materials may contain information regarding Plaintiff or the funds, lands, or resources that have been managed or might have been managed by Defendant for or on behalf of Plaintiff;

WHEREAS such documents, data or other materials may contain information relating to Tribes and/or individuals not parties to this litigation; and

WHEREAS such documents, data, or other materials may contain information that Defendant

assert and designate as protected from disclosure: (1) pursuant to certain federal statutes, including but not limited to the Privacy Act, 5 U.S.C. § 552a, including information related to Individual Indian Money ("IIM") accounts ; Indian Minerals Development Act (IMDA), 25 U.S.C. § 2103(c); Trade Secrets Act, 18 U.S.C. § 1905; Archeological Resources Protection Act, 16 U.S.C. § 470hh(a); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201; National Historic Preservation Act, 16 U.S.C. § 470w-3; and the Mineral Leasing Act, 30 U.S.C. § 181 et seq.; (2) because it is confidential commercial and/or proprietary information under federal law; or (3) because it relates to Tribes and/or individuals not parties to this litigation;

THE PARTIES HEREBY STIPULATE AND AGREE TO THE FOLLOWING:

1. Documents, data, or other materials, as well as copies or images of such documents, data, or other materials, that are designated as protected from disclosure under the categories set out above shall be deemed "Confidential Materials" for purposes of this Joint Stipulation and the associated Order.

2. This Joint Stipulation and the associated Order shall govern the provision of Confidential Materials by Defendant to Plaintiff for all purposes related to this case, including but not limited to litigation, ADR, or other formal dispute resolution process, and informal settlement discussions.

3. Plaintiff shall not use the Confidential Materials, or their contents, for any purpose, other than this litigation. Any information designated as Confidential Materials shall be kept strictly confidential by Plaintiff's attorney(s) and Plaintiff's designee(s), and such information shall not be disclosed, made public, or made available to anyone, except as specifically provided in this Joint Stipulation and the associated Order or in any further Order that this Court may enter.

4. Any documents, data, or other materials made available by Defendant to Plaintiff's attorney(s) or Plaintiff's designee(s) for inspection in this case shall be deemed confidential for purposes of the inspection. Any images or copies of Confidential Materials that are provided to Plaintiff shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE." Plaintiff and Defendant may agree to forego Defendant's review to determine the confidentiality of certain documents, data, or other materials to be provided to Plaintiff, in which case Defendant shall include on those documents, data, and other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, or other materials to Plaintiff. All documents, data, or other materials so endorsed shall be deemed Confidential Materials and be protected as such under this Joint Stipulation and the associated Order. If Plaintiff intends to file documents, data, or other materials that have been endorsed as Confidential Materials with the Court as evidence or for any other purpose, Plaintiff shall follow the procedures set forth in this Joint Stipulation and the associated Order.

5. Plaintiff may request that Defendant review certain endorsed documents, data, or other materials to determine if they contain confidential information; redact any confidential information; and produce a redacted version of the documents, data, or other materials for filing with the Court without the Confidential Materials endorsement. After the documents, data, or other materials have been redacted or otherwise determined not to contain Confidential Materials, the documents, data, or other materials shall no longer be considered confidential and subject to this Joint Stipulation and the associated Order.

6. Documents, data, or other materials relating exclusively to individuals, other Tribes or entities, or to funds, lands, and resources to which Plaintiff does not claim a legal interest, shall

not be produced to Plaintiff, unless Plaintiff and Defendant agree that such production would be appropriate and necessary for the purposes of this case. In the event that the parties agree that such documents, data, or other materials should be produced to Plaintiff, Defendant shall include on the documents, data, or other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, or other materials to Plaintiff.

7. Plaintiff and Defendant shall share equally the costs of copying or imaging the documents, data, or other materials to be produced to Plaintiff. Copying or imaging charges shall be billed at reasonable rates calculated to cover only the actual costs of copying or imaging, commensurate with the size and difficulty of copying or imaging the requested documents, data, or other materials.

8. Any notes, dictation tapes, or media containing electronically stored information that are made as part of a review of the Confidential Materials and that contain information regarding the Confidential Materials shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE" and shall be subject to the same provisions as copies or images of the Confidential Materials.

9. Confidential Materials may be disclosed without further Court approval only to the following: (1) the Court or any settlement judge or mediator appointed or selected to work with the parties in this case; (2) the attorney of record in this case , as well as the attorneys, paralegals, and support staff in his/her offices who are working on the case for Plaintiff; and (3) Plaintiff's designees in this case.

10. Plaintiff's attorney of record in this case ; the attorney(s), paralegal(s), and support staff in the office(s) of Plaintiff's attorneys of record; and Plaintiff's designees may have access to

the Confidential Materials, provided, however, that, before receiving access to the Confidential Materials, each person shall execute an "Affidavit of Confidentiality," in the form attached hereto as Exhibit 1, and provide that executed form to Plaintiff's attorney of record. Office support or administrative staffers who simply handle or file the Confidential Materials but do not review their contents do not need to execute an Affidavit of Confidentiality. The executed Affidavits of Confidentiality shall be maintained by Plaintiff's attorney of record.

11. Any party filing Confidential Materials with the Court shall request that the Clerk of Court file such materials under seal. No party shall file with the Court any motion, application, memorandum or brief, or any other pleading or document that quotes or paraphrases Confidential Materials or that contains information obtained solely from Confidential Materials, unless the confidential portion of any such motion, application, memorandum or brief, pleading, or other document has been filed under seal with the Clerk of the Court. All filings under seal shall be made in accordance with the rules of this Court, as well as any other applicable rules, policies, procedures, and orders.

12. Plaintiff's attorney of record herein, as well as the attorneys working with Plaintiff's attorney of record, and any other person under Plaintiff's attorney's control who possesses Confidential Materials, shall employ reasonable measures, consistent with this Joint Stipulation and the associated Order, to control duplication of, access to, and distribution of the Confidential Materials.

13. All Confidential Materials shall be returned to counsel for Defendant or be destroyed, immediately upon the termination of this litigation, including the resolution of any appeals or the termination of any related administrative proceedings, if any, before the Interior Department,

whichever occurs later. At that time, all individuals who have executed an Affidavit of Confidentiality pursuant to Paragraph 10 of this Joint Stipulation and the associated Order and who still have access to such Confidential Materials shall certify in writing that all such Confidential Materials have been returned or destroyed. Plaintiff's attorney of record shall maintain these certifications and shall provide a copy thereof to Defendant's counsel upon receiving the certifications.

14. If Plaintiff disputes Defendant's assertion and designation that a document, data, or information is/are subject to confidentiality protection under federal law or regulations, Plaintiff shall notify Defendant in writing and state therein the grounds for disputing Defendant's assertion and designation of confidentiality. Within 30 days of Defendant's receipt of such written notification (or a longer period of time, if the parties so agree), the parties herein shall discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 30 days or an extension thereof, Plaintiff may file a motion to seek a ruling from the Court regarding Defendant's assertion and designation regarding confidentiality.

15. Until further order of this Court, this Joint Stipulation and the associated Order shall remain in full force and effect after the dismissal of the case and regardless of whether the parties reach settlement.

Respectfully submitted this ______ day of April, 2008,

RONALD J. TENPAS
Assistant Attorney General

| | |
|---|---|
| ____________________________ | ____________________________ |
| KENNIS M. BELLMARD, OBA #13965<br>DAVID POMEROY, OBA #7209 | TERRY M. PETRIE<br>United States Department of Justice |

MICHAEL D. MCMAHAN, OBA #17317
SANDRA B. HARRISON, OBA #18647
JENNIFER HENSHAW MCBEE, OBA #19170
JACQUELYN V. DUFFY, OBA #21630
Andrews Davis, P.C.
100 North Broadway Avenue, Suite 3300
Oklahoma City, OK 73102
Telephone: (405) 272-9241
Facsimile: (405) 235-8786
Email: dpomeroy@andrewsdavis.com
Email: mdmcmahan@andrewsdavis.com
Email: sbharrison@andrewsdavis.com
Email: jhmcbee@andrewsdavis.com

Attorneys for Plaintiff

Environment and Natural Resources Division
Natural Resources Section
1961 Stout Street, 8th Floor
Denver, Colorado 80294
Tel: (303) 844-1369
Fax: (202) 353-2021
Email: Terry.Petrie@usdoj.gov

OF COUNSEL:

ANTHONY P. HOANG
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0241
Fax: (202) 353-2021
Email: Anthony.Hoang@usdoj.gov

SHANI WALKER
Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

TERESA E. DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20227

Attorneys for Defendant

# EXHIBIT 1 TO PARTIES' JOINT STIPULATION REGARDING CONFIDENTIALITY OF CERTAIN DOCUMENTS, DATA, AND OTHER MATERIALS TO BE PROVIDED BY DEFENDANT TO PLAINTIFF, AND [PROPOSED] ORDER

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-cv-00935L |
| | ) | Judge George W. Miller |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

**AFFIDAVIT OF CONFIDENTIALITY**

STATE OF ____________________________,

1. My name is ______________________. My home or office address is ___________________________. I am serving as (counsel) (an expert) (a paralegal or legal assistant) on behalf of ______________________ in the above-captioned case.

2. I certify that I have read and understood the entire Joint Stipulation of Confidentiality and the associated Order, both of which are attached hereto and incorporated herewith as Exhibit A. I agree to undertake and abide fully and completely by the terms of the Joint Stipulation of Confidentiality and the associated Order.

3. In particular, and without limitation of the foregoing, I recognize that the Confidential Materials to which I have access as part of my work on this case may contain privileged proprietary information; I shall keep confidential the information contained in the Confidential Materials; I shall not disclose to, reveal to, or discuss with any person, in any way, any Confidential Materials, or the facts and information contained therein, other than as authorized by the attached Joint Stipulation of Confidentiality and the associated Order; and I shall not use the Confidential Materials, or the

facts and information contained therein, for any purpose, except as authorized by the Joint Stipulation of Confidentiality and the associated Order.

4. I agree that, upon (a) the termination of the above-captioned case, or (b) the conclusion of my involvement with the above-captioned case, whichever occurs first, I shall execute an affidavit certifying that I have returned or destroyed all such Confidential Materials, as set forth in the attached Joint Stipulation of Confidentiality and the associated Order.

5. I understand that, if I disclose or reveal any Confidential Materials, or the facts and information contained therein, in violation of the attached Joint Stipulation of Confidentiality and the associated Order, I may be subject to all applicable sanctions, including the penalties imposed by the Court for contempt.

____________________________________
(NAME OF AFFIANT)

SWORN TO AND SUBSCRIBED BEFORE ME,

THIS _____ DAY OF _________________ 2008,

_______________________
NOTARY PUBLIC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEMINOLE NATION OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-cv-00935L<br>Judge George W. Miller |

**[PROPOSED] ORDER REGARDING CONFIDENTIALITY OF CERTAIN DOCUMENTS, DATA, AND OTHER MATERIALS TO BE PROVIDED BY DEFENDANT TO PLAINTIFF, AND EXHIBIT 1 HERETO**

This matter is before the Court on the parties' joint stipulation regarding confidentiality of certain documents, data, and other materials to be provided by Defendant to Plaintiff in this case. Upon consideration of the joint stipulation and for good cause shown, it is hereby ORDERED that

1. The parties' joint stipulation should be and hereby is approved and entered as an Order of this Court.

2. Documents, data, or other materials, as well as copies or images of such documents, data, or other materials, that are designated as protected from disclosure under the categories set out above shall be deemed "Confidential Materials" for purposes of this Order and the associated Joint Stipulation.

3. This Order and the associated Joint Stipulation shall govern the provision of Confidential Materials by Defendant to Plaintiff for all purposes related to this case, including but not limited to litigation, ADR, or other formal dispute resolution process, and informal settlement discussions.

4. Plaintiff shall not use the Confidential Materials, or their contents, for any purpose,

other than this litigation. Any information designated as Confidential Materials shall be kept strictly confidential by Plaintiff's attorney(s) and Plaintiff's designee(s), and such information shall not be disclosed, made public, or made available to anyone, except as specifically provided in this Order and the associated Joint Stipulation or in any further Order that this Court may enter.

5. Any documents, data, or other materials made available by Defendant to Plaintiff's attorney(s) or Plaintiff's designee(s) for inspection in this case shall be deemed confidential for purposes of the inspection. Any images or copies of Confidential Materials that are provided to Plaintiff shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE." Plaintiff and Defendant may agree to forego Defendant's review to determine the confidentiality of certain documents, data, or other materials to be provided to Plaintiff, in which case Defendant shall include on those documents, data, and other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, or other materials to Plaintiff. All documents, data, or other materials so endorsed shall be deemed Confidential Materials and be protected as such under this Order and the associated Joint Stipulation. If Plaintiff intends to file documents, data, or other materials that have been endorsed as Confidential Materials with the Court as evidence or for any other purpose, Plaintiff shall follow the procedures set forth in this Order and the associated Joint Stipulation.

6. Plaintiff may request that Defendant review certain endorsed documents, data, or other materials to determine if they contain confidential information; redact any confidential information; and produce a redacted version of the documents, data, or other materials for filing with the Court without the Confidential Materials endorsement. After the documents, data, or other materials have been redacted or otherwise determined not to contain Confidential Materials, the

documents, data, or other materials shall no longer be considered confidential and subject to this Order and the associated Joint Stipulation.

7. Documents, data, or other materials relating exclusively to individuals, other Tribes or entities, or to funds, lands, and resources to which Plaintiff does not claim a legal interest, shall not be produced to Plaintiff, unless Plaintiff and Defendant agree that such production would be appropriate and necessary for the purposes of this case. In the event that the parties agree that such documents, data, or other materials should be produced to Plaintiff, Defendant shall include on the documents, data, or other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, or other materials to Plaintiff.

8. Plaintiff and Defendant shall share equally the costs of copying or imaging the documents, data, or other materials to be produced to Plaintiff. Copying or imaging charges shall be billed at reasonable rates calculated to cover only the actual costs of copying or imaging, commensurate with the size and difficulty of copying or imaging the requested documents, data, or other materials.

9. Any notes, dictation tapes, or media containing electronically stored information that are made as part of a review of the Confidential Materials and that contain information regarding the Confidential Materials shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE" and shall be subject to the same provisions as copies or images of the Confidential Materials.

10. Confidential Materials may be disclosed without further Court approval only to the following: (1) the Court or any settlement judge or mediator appointed or selected to work with the parties in this case; (2) the attorney of record in this case , as well as the attorneys, paralegals, and

support staff in his/her offices who are working on the case for Plaintiff; and (3) Plaintiff's designees in this case.

11. Plaintiff's attorney of record in this case ; the attorney(s), paralegal(s), and support staff in the office(s) of Plaintiff's attorneys of record; and Plaintiff's designees may have access to the Confidential Materials, provided, however, that, before receiving access to the Confidential Materials, each person shall execute an "Affidavit of Confidentiality," in the form attached hereto as Exhibit 1, and provide that executed form to Plaintiff's attorney of record. Office support or administrative staffers who simply handle or file the Confidential Materials but do not review their contents do not need to execute an Affidavit of Confidentiality. The executed Affidavits of Confidentiality shall be maintained by Plaintiff's attorney of record.

12. Any party filing Confidential Materials with the Court shall request that the Clerk of Court file such materials under seal. No party shall file with the Court any motion, application, memorandum or brief, or any other pleading or document that quotes or paraphrases Confidential Materials or that contains information obtained solely from Confidential Materials, unless the confidential portion of any such motion, application, memorandum or brief, pleading, or other document has been filed under seal with the Clerk of the Court. All filings under seal shall be made in accordance with the rules of this Court, as well as any other applicable rules, policies, procedures, and orders.

13. Plaintiff's attorney of record herein, as well as the attorneys working with Plaintiff's attorney of record, and any other person under Plaintiff's attorney's control who possesses Confidential Materials, shall employ reasonable measures, consistent with this Order and the associated Joint Stipulation, to control duplication of, access to, and distribution of the Confidential

Materials.

14. All Confidential Materials shall be returned to counsel for Defendant or be destroyed, immediately upon the termination of this litigation, including the resolution of any appeals or the termination of any related administrative proceedings, if any, before the Interior Department, whichever occurs later. At that time, all individuals who have executed an Affidavit of Confidentiality pursuant to Paragraph 11 of this Order and the associated Joint Stipulation and who still have access to such Confidential Materials shall certify in writing that all such Confidential Materials have been returned or destroyed. Plaintiff's attorney of record shall maintain these certifications and shall provide a copy thereof to Defendant's counsel upon receiving the certifications.

15. If Plaintiff disputes Defendant's assertion and designation that a document, data, or information is/are subject to confidentiality protection under federal law or regulations, Plaintiff shall notify Defendant in writing and state therein the grounds for disputing Defendant's assertion and designation of confidentiality. Within 30 days of Defendant's receipt of such written notification (or a longer period of time, if the parties so agree), the parties herein shall discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 30 days or an extension thereof, Plaintiff may file a motion to seek a ruling from the Court regarding Defendant's assertion and designation regarding confidentiality.

16. Until further order of this Court, this Order and the associated Joint Stipulation shall remain in full force and effect after the dismissal of the case and regardless of whether the parties reach settlement.

SO ORDERED.

Date: ______________________________

______________________________
HON. GEORGE W. MILLER
Judge, United States Court of Federal Claims

# EXHIBIT 1 TO [PROPOSED] ORDER REGARDING CONFIDENTIALITY OF CERTAIN DOCUMENTS, DATA, AND OTHER MATERIALS TO BE PROVIDED BY DEFENDANT TO PLAINTIFF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SEMINOLE NATION OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 06-cv-00935L<br>Judge George W. Miller |

**AFFIDAVIT OF CONFIDENTIALITY**

STATE OF ______________________________,

1. My name is ______________________. My home or office address is __________________________. I am serving as (counsel) (an expert) (a paralegal or legal assistant) on behalf of ______________________ in the above-captioned case.

2. I certify that I have read and understood the entire Order Regarding Confidentiality of Certain Documents and Data To Be Produced by Defendant to Plaintiff ("Order") and the associated Joint Stipulation, both of which are attached hereto and incorporated herewith as Exhibit A. I agree to undertake and abide fully and completely by the terms of the Order and the associated Joint Stipulation of Confidentiality.

3. In particular, and without limitation of the foregoing, I recognize that the Confidential Materials to which I have access as part of my work on this case may contain privileged proprietary information; I shall keep confidential the information contained in the Confidential Materials; I shall not disclose to, reveal to, or discuss with any person, in any way, any Confidential Materials, or the facts and information contained therein, other than as authorized by the attached Order and the

associated Joint Stipulation of Confidentiality; and I shall not use the Confidential Materials, or the facts and information contained therein, for any purpose, except as authorized by the Order and the associated Joint Stipulation of Confidentiality.

4. I agree that, upon (a) the termination of the above-captioned case, or (b) the conclusion of my involvement with the above-captioned case, whichever occurs first, I shall execute an affidavit certifying that I have returned or destroyed all such Confidential Materials, as set forth in the attached Order and the associated Joint Stipulation of Confidentiality.

5. I understand that, if I disclose or reveal any Confidential Materials, or the facts and information contained therein, in violation of the attached Order and the associated Joint Stipulation of Confidentiality, I may be subject to all applicable sanctions, including the penalties imposed by the Court for contempt.

______________________________
(NAME OF AFFIANT)

SWORN TO AND SUBSCRIBED BEFORE ME,

THIS _____ DAY OF ________________ 2008,

________________________
NOTARY PUBLIC